IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


TIMOTHY S. THERRIEN,           )
an individual,                 )
                               )
            Plaintiff,         )
                               )
-vs-                           ) No. 06-CV-217-JHP
                               )
TARGET CORPORATION,            )
a Minnesota corporation,       )        **VOLUME II**
                               )
            Defendant.         )


TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**BEFORE THE HONORABLE JAMES H. PAYNE**
**UNITED STATES DISTRICT JUDGE**

MAY 19, 2008




A P P E A R A N C E S


    **Paul DeMuro and Dustin J. Vanderhoof,** attorneys
at law, Frederic Dorwart Lawyers, 124 East Fourth
Street, Tulsa, Oklahoma, 74103, attorneys on behalf of
the Plaintiff;

    **Phil R. Richards and Jason L. Glass,** attorneys at
law, Richards & Connor, 525 South Main Street, 12th
Floor, Tulsa, Oklahoma, 74103, attorneys on behalf of
the Defendant.



*REPORTED BY:*        ***BRIAN P. NEIL, CSR-RPR, RMR, CRR***
                      *United States Court Reporter*


**United States District Court**

1                          I N D E X

2                                                        Page

3
Opening statement by Mr. DeMuro                          46
4   Opening statement by Mr. Richards                        64

5   _____

6
*WITNESSES ON BEHALF OF THE PLAINTIFF*
7

8   **TIMOTHY THERRIEN**

9   Direct Examination by Mr. DeMuro                         75
    Cross-Examination by Mr. Richards                       128
10

11  **JESSICA THERRIEN**

12  Direct Examination by Mr. DeMuro                        156
    Cross-Examination by Mr. Richards                       168
13

14

15

16

17

18

19

20

21

22

23

24

25

1              Monday, May 19, 2008

2                   * * * * *

3              THE COURT:  I understand that you've

4    invoked the rule.  Is that --

5              MR. DEMURO:  Yes, sir.

6              THE COURT:  Okay.

7              MR. RICHARDS:  Yes, Your Honor.

8              THE COURT:  Any expert exceptions to the

9    rule either one of you anticipate asking for?

10             MR. RICHARDS:  I would.

11             MR. DEMURO:  I don't have any objection

12   to his exception.

13             THE COURT:  Have you told each other who

14   your experts are so you know?

15             MR. DEMURO:  Yeah, I know who he is.

16   Thank you, Your Honor.

17             THE COURT:  Okay.  I'll announce the

18   rule has been invoked and require counsel to make me

19   aware of any witnesses that come in that you're

20   concerned about because I don't know who the experts

21   are, or who the witnesses are, as far as that goes,

22   but the rule's been invoked.

23             Let me say something to both of you.  I know

24   that you'll say, "What's he doing that now for,"

25   because you're interested in getting on with your

1  opening statements.  But since I can chastise both of

2  you equally, both of you on voir dire, for future

3  purposes, went a little further than I generally allow

4  you to go, probably the defense more guilty than the

5  plaintiff with the story-telling and getting away from

6  the qualifications of the jurors.

7          I appreciate neither one of you objecting,

8  and I started to impose an objection on my own and

9  didn't for fear of -- but just, you know, in your

10  notes for future reference.  I think voir dire is

11  important but just please don't abuse it.

12                  MR. RICHARDS:  Okay.  My apologies, Your

13  Honor.

14                  THE COURT:  Now --

15                  MR. DEMURO:  Understood, Your Honor.

16                  THE COURT:  Okay.  Are we ready for the

17  jury?  Plaintiff ready?

18                  MR. DEMURO:  Your Honor, we had first

19  discussed preadmitting some exhibits.

20                  THE COURT:  Oh, yes.  Okay.

21                  MR. DEMURO:  So is this a good time to

22  do that?  If I may approach, Your Honor.

23                  THE COURT:  You may.

24                  MR. DEMURO:  Your Honor, at this time,

25  I'd like to move for admission a set of plaintiff's

1   exhibits that have not been objected to that are

2   contained in plaintiff's exhibit lists, including

3   Exhibits 1 through 10, Exhibit 15, Exhibit 15A,

4   Exhibit 16, Exhibits 18 through 62.  I move those into

5   evidence, Your Honor.

6           MR. RICHARDS:  I think it was through

7   61.  We have no objection.

8           MR. DEMURO:  Okay.  I thought we had

9   agreed to that but that's fine.  So 18 through 61; I

10  stand corrected.  I offer those at this time, Your

11  Honor.

12          THE COURT:  Any objection?

13          MR. RICHARDS:  None, Your Honor, as to

14  those.

15          THE COURT:  Okay.  Be admitted without

16  objection.

17          MR. DEMURO:  And I believe the defense

18  also has some exhibits to admit.

19          MR. RICHARDS:  Yes, Your Honor.  At this

20  time, Target would move admission of Exhibits 2

21  through 14 and Exhibits 21 through 24, I believe

22  without objection.

23          MR. DEMURO:  No objection, Your Honor.

24          THE COURT:  Admitted without objection.

25          Are we ready for the jury now?

1              MR. DEMURO:  Plaintiff is ready, Your

2    Honor.

3                   THE COURT:  Defense?

4              MR. RICHARDS:  Defense is ready, Your

5    Honor.

6              *(The jury enters the courtroom)*

7              THE COURT:  You may be seated.  Let the

8    record reflect the jury's in the box, parties are

9    present with counsel.

10             It's now appropriate, members of the jury,

11   that you hear opening statements.  You'll first hear

12   from plaintiff.

13             MR. DEMURO:  May it please the court,

14   Your Honor.

15             We're here today because Mr. Therrien helped

16   Target to try to catch a serious criminal and now

17   Target doesn't want to help Mr. Therrien.  That's why

18   we're here.

19             The evidence will show that Mr. Therrien

20   while shopping at the Super Target came to the aid of

21   a Target employee who was being overwhelmed by a man

22   who was desperate enough to try to stab and kill two

23   people just to steal 12 CDs.  And now after

24   Mr. Therrien helped that employee, Target doesn't want

25   to help him, and that's what all this is about.

1        Immediately after the stabbing that took

2   place in this case, the evidence will show you that

3   Target called Mr. Therrien a hero.  Now Target calls

4   him a zero, and Target will tell you that it's his

5   fault.  First a hero and now a zero.

6             MR. RICHARDS:  I'm sorry.  I'm going to

7   object.  This is argument.

8             THE COURT:  Sustained.

9             MR. DEMURO:  On June 3, 2005, the

10  evidence will show that in that afternoon

11  Mr. Therrien, who is a combat veteran of the Vietnam

12  War and grandfather, went shopping at the Super Target

13  in south Tulsa.  He went there to shop for some things

14  that he needed to use out by his pool at his apartment

15  complex, a towel, bathing suit, headphones, radio

16  headphones.  As he selected those items, he moved to

17  the cashier towards the front of the store.

18        He checked out in one of the lanes that was

19  closest to the exit on the grocery side of the store,

20  and as he checked out and gathered his belongings, put

21  them into his cart, he heard a small child's voice,

22  "Mommy, there's a fight."

23        At that time, there was mostly women and

24  children in the area doing their afternoon

25  grocery-shopping.  Mr. Therrien turned around when the

1   small child shouted that and he turned around and he

2   saw Mr. Pavey, the Target employee, in trouble.  Now,

3   Mr. Therrien came to Target that day to shop for those

4   supplies and he left in an ambulance.

5          Now, before I continue to tell you what the

6   evidence will show about that fight, let me tell you a

7   little bit about Target's security system.

8          They call their employees who work in

9   security "asset protection."  They have several

10  different types of employees with asset protection,

11  one of them is a supervisor, the team manager, the

12  executive manager, that's Ms. Plonczynski sitting here

13  at counsel's table.

14         They also have folks who are plain-clothes in

15  the store who work security as plain-clothes.  They

16  got a fancy name for them too, "asset protection

17  xxxxxxxxxxx."  xxxxx xxxxx-xxxxxxx xxxxxx xxx xxx xxxx

18  xxx xx xxx xxxxx, xxxxx xxxx xx. xxxxxxxxxxx, xxxxxx

19  xxxxxxxxxx xx xxxxxxxx xxxx xx xxxxxxxxxxxx.

20         They also have a third type of employee that

21  works security, and those are the uniform guards,

22  Target protection specialists.  These are the people

23  that wear a Target uniform, blue khaki pants, blue

24  xxxxx xxxxx, x xxxxxx xxxxx.  xxxxx xxxxxxxxx' xxxxx

25  xxx xx xxxxxx xx xxx xxxxxxxxxxxx.  xxxxxxxxx, xxxxx

xxxxxxxxx xxx xxx -- xxx xxxxxxx xxxx xxx xxxxxxxxx xx

xxx xxxxx xx xxx xxxx xx xxxx xxx xxxxx-xxxxxxx

xxxxxxx -- xxxxxx xx -- xxx xxxxx-xxxxxxx xxxxxxxx

xxxxx xxxx xxx xxxxxxxxxxxx.

      xxxxxxx, xxxxxx xxxxxxx xx xxxx xxx

xxxxxxxxxxxx xxxx xxx xxxxxx xxxxxxxxx xx xxx xxx xxx

xxxxxxx xxxx xxx xxxxxx, xxx xxx.  xxx xxxxxxxx xxxx

xxxx xxx xxxx xxxxxx xx xxxxx xxxx xxxxxx xx

xxxxxxxxxxx xxxx xxx xxxxxx xx xxxxxxxxx.

On the day of the incident in this case, June 3, 2005, Target made a decision not to have on staff, not to have working, any uniform security guards.  In the entire huge Super Target, there was only one employee that day who was assigned to work the floor and that was Stacie Pavey.  He was the plain-clothes security guard.  That choice of Target's not to have a person there to help Mr. Pavey was a critical choice, you'll see.

Now, what I can also tell you that the evidence will show you about these employees is there was a lot of pressure in the loss-prevention team at Target to make apprehensions.

MR. RICHARDS:  Your Honor, may we approach the bench, please?

THE COURT:  You may.

1      *(Bench conference outside the hearing of the jury)*

2                  MR. RICHARDS:  Your Honor, I'm going to

3      object to this.  You've ruled that what's at issue

4      here is what happened when this apprehension occurred

5      when Mr. Therrien intervened.  His opening statement

6      is disclosing what Mr. DeMuro apparently intends to

7      put on for evidence regarding Target's policies and

8      procedures regarding how to make an apprehension,

9      which is not relevant to this issue, it's been

10     precluded by the court.

11                 MR. DEMURO:  I don't think I got into

12     that at all.

13          Two points.  There are certain breaches of

14     Target security that lasted after the apprehension was

15     made that I am entitled under your court's ruling to

16     get into.  One of those is they should have had two

17     people at the point of attack before, during, and

18     after the apprehension so that when the fight was

19     ongoing there would have been a second person there.

20     That's all I've talked about.

21          I'm not even sure what he's objecting to.

22     I'm assuming it's my last comment.  With respect to

23     xxxx xxxx xxxxxxx, xxx xx xxxx xxxx xx xxxxxxxx

24     xxxxxxxxxxxxxx xx xxxxxxx xx xxx xxx -- xxx xxx xxxxx

25     xx xxxxx xxx xxxxx xxxxxxx.  xxxx xxxxxx xxx

1    dedicated, Your Honor, to after the fight started.

2              THE COURT:  I haven't heard much of an

3    after-the-fight-started argument.  I mean, it sounds,

4    as counsel suggested, that you are trying to drift

5    into what we've talked about in the matters at

6    pretrial and what we've talked about earlier today.  I

7    relented to some extent to let you tell the story, but

8    the obligation -- the timing of the obligation doesn't

9    change.

10             MR. DEMURO:  I understand that.  But,

11   Your Honor, even under your view, at the time that the

12   fight took place, okay, there were breaches of their

13   policy, and those breaches were that they should have

14   x xxxxxx xxxxxx xxxxx.  x xxxxxx xxxxxx xxxxxx xxxx

15   xxxx xxxxx xxxxx xxx xxxxx xxxxxxx, xxxx xxx xxxxx

16   xxxxxxx.  xx xxxxxx xxx xxx xxxxxxxxxx.

17             xxx xxxx xxxx xxx xxxxx xxxxxxx xxx xxx

18   xxxxxxxx xxxxx xxx xxxx xxx xxxxxxxx xxx xxxxxxx

19   xxxxxxxx, xx xxxxxx xxxx xxx xxx xxxxx xx xxx xxxx

20   xxxx xx xxx xxxxxxxxxxxxxx.

21             I mean, I am working hard to tailor it

22   directly to what Your Honor has limited it to.

23             MR. RICHARDS:  Your Honor, the issue in

24   this case is not whether Target made any reasonable

25   apprehension.  The issue is whether Target acted

1    reasonably to prevent injury to Mr. Therrien after he

2    entered this altercation, and that's not what this is

3    going to.

4         How many people we had on staff that day for

5    asset protection; how many people attempted to make

6    this apprehension, which was before Mr. Therrien was

7    involved; once Mr. Therrien became involved, how many

8    people were there is not the issue.  There's no

9    question there was one person there.  We're getting

10   off -- I mean, we're about to try two different cases,

11   and that's prejudicial to me because I prepared to try

12   the one you told us we're going to try.

13        THE COURT:  That's the one we're going

14   to try.  And, Counsel, what I meant by you could -- I

15   backed off to the extent that I thought you should be

16   able to tell what happened by allowing your plaintiff

17   to say why he got into the fray.  I thought I tried to

18   emphasize that the duty starts with the fight right

19   there.  What did they do after that, not what they did

20   before that, what they did after that.

21        MR. DEMURO:  xxxxxxxxxx.  xxxxx xxxx,

22   xxxx xxxxxx xx xxxx x xxxxxx xxxxxx xxxxx xxxx xxxxx

23   xxxx xxxxxxxxx xxx xxxxxx.  x xxxx, xxxx xxx xx xxxx

24   something, otherwise, Judge, that -- you can't

25   certainly be saying -- or maybe you are -- that

1    there's nothing that they could have done to prevent

2    the injury.  You might as well direct a verdict.

3                    THE COURT:  Well, that's the question.

4                    MR. DEMURO:  What --

5                    THE COURT:  That is the question.

6                    MR. DEMURO:  xxxx xxxx xxxxx xxxx xxxx

7    xx xxxx x xxxxxx xxxxxx xxxxx.  xxxxx xxx xxxxx xxx

8    xxxxxxx, xxxxx xxxxx xxxx xxxx x xxxxxx xxxxxx xxxxx

9    xxxx xxxxxxx xx.

10                   THE COURT:  Well, the question is, after

11   the fight started, were their actions appropriate or

12   inappropriate?

13                   MR. DEMURO:  Right.

14                   THE COURT:  Has nothing to do with the

15   second person.

16                   MR. DEMURO:  Well, that's Target's

17   actions.  Who puts a second person there?

18                   THE COURT:  Well, you're trying

19   to -- you're still trying to go past where -- I've

20   limited the case to, did Target do the

21   appropriate -- take the appropriate action after the

22   scuffle started?

23                   MR. DEMURO:  And I'm --

24                   THE COURT:  It doesn't have anything to

25   do with whether there were two, three, or how many

1  people were there.

2          MR. DEMURO:  Well, if there were two or

3  three people after the fight started, it never would

4  have happened, he wouldn't have got hurt.

5          THE COURT:  That's still not the

6  issue.

7          MR. DEMURO:  I thought that's what you

8  said the issue was, what Target did after the fight

9  started.

10          THE COURT:  Yeah.  What did they do when

11  they knew there was an immediate, imminent danger is

12  what the case law says.  When they knew there was an

13  immediate, imminent danger is when the scuffle

14  started.  From that point on, what did they do, if

15  anything, that was detrimental to your client?

16          MR. DEMURO:  xxxx xxxxxx xxxx x xxxxxx

17  xxxxxx xxxxx xxx xxxx xxxxxx xxx xxx xx xxxx xxxx

18  xxxxxx xxxx.  xx x xxxxx xxx xxxx xxxx, xxx xxxxx xx

19  well direct a verdict right now.

20          MR. RICHARDS:  If the plaintiff is

21  conceding they can't make a case, absent putting on

22  evidence that Target wasn't responsible until the

23  altercation started, maybe the court should direct a

24  verdict.

25          MR. DEMURO:  I'm not conceding anything.

1    I'm not conceding an inch.

2                    THE COURT:  Okay.  Well, within the

3    limits of the orders I've entered, you can try the

4    case.  I mean --

5                    MR. DEMURO:  All I want is a fair

6    fight.

7                    THE COURT:  Well, I'm trying to give you

8    a fight in accordance with how I've interpreted the

9    law, and that may be perceived as fair or unfair.  My

10   job is not to give you a fair fight necessarily, it's

11   to give you a case within the parameters of the law

12   and the Tenth Circuit, which is what I think I've

13   done.

14           I don't disagree that it's very limited.  I

15   mean, the way I've interpreted the law, it's a narrow

16   road you're going down.

17           So objection sustained.

18                    MR. DEMURO:  Thank you.

19                    *(Bench conference concluded)*

20                    MR. DEMURO:  I wonder if they're going

21   to count that break off my time?

22                    THE COURT:  No.  We'll give you time

23   back, Counsel.

24                    MR. DEMURO:  There you go.  Sorry for

25   the interruption.

1          The evidence is going to show, ladies and

2     gentlemen, that Target knew that there are certain

3     risks involved with trying to apprehend a shoplifter.

4     Target knows that shoplifters are attempting to steal

5     and most folks who are attempting to steal don't want

6     to get caught and when people don't want to get caught

7     they tend to resist.  Target knows that shoplifters

8     will physically resist.

9          The evidence will show you that Target knows

10    that shoplifters sometimes carry knives, as in this

11    case.  Oftentimes to be used to rip open packages so

12    they can be easily concealed.  Target knows that

13    sometimes serious criminals with knives are

14    shoplifters and that they will resist when they get

15    apprehended.

16         And that's what happened on the day of June

17    3, 2005, when a lone, 22-year-old, loss-prevention

18    employee from Target with no law enforcement or any

19    type of sophisticated training tried to stop a serious

20    criminal by himself.

21         Now, this Mr. Pavey, who you'll hear from, is

22    the security guard, the plain-clothes security guard,

23    who first picked up surveillance of the criminal and

24    his approach was to use an ambush technique.  At the

25    entranceway of the store, he crouched down behind a

1  cashier after he had followed this criminal for

2  several minutes, he crouched down behind the cashier,

3  and his plan was to try and grab him from behind as he

4  was exiting the store, putting his hand on his

5  shoulder firmly as the criminal was walking out the

6  door with no other Target employee, security or

7  otherwise, to assist him.

8          Now, at that very moment, ladies and

9  gentlemen, just by a stroke of fate, the evidence will

10  show you that Mr. Therrien was turning around to put

11  his goods in his cart and that's when the small child,

12  said, "Mommy, there's a fight."

13          In the blink of an eye, Mr. Therrien turned

14  around and he saw Mr. Pavey being overwhelmed by the

15  criminal inside the vestibule area of the store.

16          If you could put up Plaintiff's Exhibit 6 on

17  your monitors.

18          Now, what had occurred, as you see

19  Plaintiff's Exhibit 6, this is the view that

20  Mr. Therrien saw when he turned around and the small

21  child said, "Mommy, look, there's a fight." Of

22  course, there were people around, women and children

23  primarily. This picture was taken when there were no

24  people at a different time.

25          When Mr. Therrien turned around, he will tell

1  you that he saw Mr. Pavey being overwhelmed by this

2  criminal in the first -- about where the first set of

3  doors are.  There was a violent scuffle going on.

4  Mr. Pavey tried to take the criminal down by pulling

5  his shirt over his head and wrestling him to the

6  ground.  That didn't work.

7         Mr. Pavey then tried to throw the criminal up

8  onto the dividing wall inside the vestibule to put

9  handcuffs on him.  That didn't work.  Mr. Pavey was

10  not in control of the situation, Target's only

11  security guard there, and Mr. Therrien made a decision

12  to help.

13         He went over to the area, into the vestibule,

14  thinking, as trite as it sounds, of the people that

15  were around and thinking to put himself in between the

16  women and children that were there and the scuffle

17  that he saw.  He walked over -- excuse me -- he moved

18  quickly over to the vestibule and then he stood there.

19  He stood there as close as I am to the jury box or

20  closer, as the evidence will show, as Mr. Pavey was

21  struggling with this criminal.

22         In that moment, when Mr. Pavey was trying to

23  drag the criminal back into the store and he was

24  trying to get away, Target's security guard looked at

25  Mr. Pavey and said, "I'm store security.  Help."  And

1  Mr. Therrien did, he helped, he got involved.

2       Now, this was a strong criminal, this was a

3  motivated criminal -- Ms. Wilson, please put up

4  Exhibit 15A, page 3 -- and a fight ensued.  At that

5  time, Mr. Pavey and Mr. Therrien attempted to work

6  together to put the criminal on the ground; they

7  couldn't.  Mr. Therrien tried to -- tried to

8  foot-sweep him.

9       What I'm showing you right now is the view of

10  Mr. Pavey first approaching -- you can see from the

11  picture how fast Mr. Pavey is running from behind,

12  ambushing this criminal from behind.  From that point

13  forward is where the fight started.

14       I will show you a video -- the only video

15  that Target says it has is this view -- and it will be

16  a digital video, meaning that it will be time-lapsed,

17  it will be one second per image.  You'll see some of

18  the scuffle, the starting part of this scuffle, in the

19  video, you won't see it all.

20       Unfortunately, Target's cameras were not

21  working that day apparently so this is the only view

22  we have.  You won't see the stabbing occur, but you

23  will see enough to show you that Mr. Pavey was not in

24  control of the situation when Mr. Therrien rushed over

25  to help.  You'll see some blood on the video, just a

**United States District Court**

1    little bit, and Mr. Therrien's shirt got taken off.

2    We'll let you see it, the whole thing, from start to

3    end.

4              Now, this motivated, determined, young

5    criminal, what was he holding?  He was holding 12 CDs.

6    He was trying to boost 12 CDs.  He was so motivated to

7    leave and get away that he turned around in that fray

8    and he first stabbed Mr. Pavey in the leg, and then as

9    Mr. Pavey backed off and fell off as he was stabbed,

10   the criminal turned around and stabbed Mr. Therrien,

11   and you'll hear the details of that fight.

12             At the time Mr. Therrien was trying to apply

13   a choke-hold and Mr. Pavey said, "Stop.  He's got a

14   knife.  Let him go."  And at first, Mr. Therrien

15   didn't let him go because he was concerned that the

16   guy had a knife or that he was not in control, was

17   concerned for his own safety.  Then he did let him go,

18   and that's when this criminal turned around and

19   stabbed Mr. Therrien.

20             The stab wound penetrated his abdomen into

21   his -- and cut his spleen.  Mr. Pavey fortunately --

22   he was bleeding a lot but it missed his main artery --

23   the cut missed his main artery in his leg, and he

24   recovered very quickly, went to the hospital and was

25   out -- stitched up and released, although he, too, was

1  wounded -- he, too, was wounded, Mr. Pavey was

2  wounded, when he tried to take this criminal down by

3  himself in the doorway -- in the doorway.

4         Now, there are other details of the fight

5  that you will learn when you see the video.

6         Now, Target denies a couple things.  Target

7  denies that Mr. Pavey asked for help.  Target will

8  tell you that Mr. Therrien's lying about that.  Target

9  claims that another employee named Lisa Kreps, who was

10  a cashier supervisor, told Mr. Therrien as he was

11  running out there to help, "Stop.  Don't go."

12        You'll have to evaluate that evidence for

13  yourself.  You will see that when Target's employees

14  made all of their statements, they were Target

15  employees and motivated to spin things their way.  You

16  will see from the video that Lisa Kreps was nowhere

17  near the cashier, was nowhere near the fight, and

18  couldn't have possibly heard what Mr. Pavey told to

19  Mr. Therrien when they were this close inside this

20  vestibule by themselves.  You'll have to evaluate that

21  evidence.

22        Now, we'll be asking for you to compensate

23  Mr. Therrien for his damages.  His damages were

24  severe.  When he got to the hospital, they attempted

25  to fix him with just a laparoscopic procedure; it's

1   sort of like they put a little microscope inside you.

2   That didn't work.

3          The surgeon was concerned that there was

4   bleeding inside his abdomen, so they opened him up

5   fully and they found a cut on his spleen that was

6   bleeding.  Now Mr. Therrien has a scar that's this

7   big, staples in his belly, and he wakes up surprised.

8   That type of abdominal surgery, you'll learn, is

9   life-changing.  Mr. Therrien suffered severe pain for

10  a long time, and he'll tell you about that.

11         Mr. Therrien, this combat vet, will not be in

12  here asking you for some trumped-up damages, I

13  guarantee you that.  He's not going to be in here

14  asking you for mental pain and suffering and emotional

15  pain and suffering.  He's in here asking you for

16  what's fair.  He will ask you that Target be made to

17  pay his medical bills of $34,000 or more and be made

18  to compensate him for his physical pain and suffering,

19  his physical agony, which lasted a long time, a year

20  or more, and perhaps he's not the same today, but I'll

21  let him tell you that.  So physical pain and suffering

22  was tremendous.  But this is not an unreasonable

23  plaintiff; you will find that out.

24         Ms. Wilson, could you put up Exhibit 23?

25         Look at Exhibit 23 I put on the screen,

1    twelve CDs, eleven CDs.  This is the photograph from

2    the police who came quickly to the incident, tried to

3    cordon off the area, and catch this criminal.  They

4    could not catch him -- that's how sophisticated he

5    was -- and he eluded the police but they did recover

6    the merchandise and the bag.

7            That's what this case right there is about.

8    That's why Mr. Pavey and Mr. Therrien were stabbed,

9    over eleven CDs because Target failed to use

10   reasonable care when their 22-year-old employee

11   attempted to ambush this serious criminal from behind

12   in their own doorway.

13           Then thereafter, when Mr. Therrien was

14   xxxxxxx xx xxx xxxxx, xxxxxxx xx xxxx, xxxxxx xxxxxx

15   xx xxx xxxxxxxxxx xxxx xx xxx xxxxxxxxxxx xxxxxxx xxx

16   xxxxx xx, xxx xxx xx, xxxx xxx xxxxx xx.  xxxxxxx,

17   Mr. Pavey tried to handcuff him by himself, and he

18   didn't let this man go even though he was such a grave

19   threat.

20           I'll end like I started.  This case, you're

21   going to hear a lot of evidence, you're going to hear

22   Mr. Therrien, and it's going to come down to whether

23   or not you want to help Mr. Therrien and reward him

24   for the decision -- or compensate him for the decision

25   that he made to help another human being who was in

1  trouble, the Target Corporation.

2         Thank you, Your Honor.

3              THE COURT:  For the defense.

4              MR. RICHARDS:  Thank you, Your Honor.

5  This is a demonstrative to which there is no

6  objection.

7         Ladies and gentlemen, I anticipate I'll be

8  brief.  The issue in this case is not whether

9  Mr. Therrien should be rewarded.  The issue in this

10 case is whether Target at the point that Mr. Therrien

11 entered into an altercation between Stacie Pavey and a

12 shoplifter, if at that point Target did something,

13 failed to act reasonably in such a way to cause

14 Mr. Therrien injury.

15        Now, the evidence in this case will be that

16 on a Friday afternoon, June 3, 2005, Stacie Pavey, an

17 employee of Target, who is an experienced security

18 employee, what Target calls an asset-protection

19 employee, experienced in his job and well trained, was

20 following a shoplifter who had stolen CDs and a bag to

21 put them in as the shoplifter was exiting the store

22 right about in that area over there, what's been

23 referred to -- or what will be referred to as the

24 green side of the store where the grocery's located or

25 the left side as you look at this diagram.

1          Mr. Glass, could you bring up Defendant's

2     Exhibit 13, please?

3          The shoplifter at that point had put these

4     CDs in a bag that he had stolen and had walked past

5     the last place that he could pay for them, had walked

6     past all the checkout lanes, gone around them, and was

7     walking through those first set of doors.

8          Now, as you'll note, there are little towers

9     right in front of those doors.  They appear to be

10    white.  Those are what you'll hear referred to as "EAS

11    towers."  Those are the things that are supposed to

12    pick up the little electronic chips on items and cause

13    an alarm to go off.  This shoplifter knew how to avoid

14    setting that tower off.

15         Now, Target's policy and consistent with that

16    Stacie Pavey was going to stop the shoplifter after he

17    passed that first set of green doors but before he got

18    to the second set.  You'll hear the explanation that

19    xxx xxxxxx xxx xxxx xx xxxx xxxx xx xxxxxxxx xxxx

20    xxxxx xxx xxxxx xxxxxxxx —— xx xxxxx—xxxxxxxxx

21    xxxxxxxx xxx xxxx xxx xxxxxxxxxxx xxxxxxx xxxxxxx

22    xxxxxx xx xxxx.  xxxxx xxx xxxxxx xxxx xxxx xxx xx

23    that vestibule at the time.

24         And, Mr. Glass, if you could bring up

25    2:05:48, please?

1      This is a view taken by a digital camera that

2  day of the exit, and you can see in that view the legs

3  of the shoplifter -- and, Mr. Glass, if you'd go to

4  2:05:49 -- and the shoplifter approaches the

5  antenna -- and 50 -- and Mr. Pavey at that point has

6  caught up with him.

7      Now, obviously the asset-protection employee

8  is not going to stop the shoplifter in the middle of

9  the store because you don't want to have a scuffle

10  xxxxx, xx xx xxxxx xxxxx xx xxxx xxxx xxxx xxxx

11  xxxxxxxx xx xxxx xxx xxxxxxxxxxxx.

12      And if you could go to 51.

13      And the testimony will be from Mr. Pavey --

14  who, by the way, no longer works for Target, he's

15  since left the company, but he's coming to testify

16  about what happened.  Mr. Pavey came around the

17  shoplifter -- and let me make clear that nobody here

18  is questioning that this guy was, in fact, stealing

19  merchandise from Target.

20      Mr. Pavey will testify that as soon as he

21  came around that shoplifter, this man knew exactly

22  what was going on and he began an attempt to run; in

23  other words, he was trying to get Mr. Pavey and out

24  that second set of exit doors.  Mr. Pavey, got an arm

25  around him and -- Mr. Glass, 52 -- stayed between the

1    shoplifter and those outer exits in an attempt to

2    subdue him.

3            Fifty-three, please.  Mr. Pavey will tell you

4    that at this point he thinks that the shoplifter

5    tripped and went down -- 54 -- but Mr. Pavey got him

6    back up and was pushing him towards the wall that was

7    to the right of the picture that you're looking at.

8    It's a glass wall and on the other side of that are

9    shopping carts.

10           Fifty-five.  Now, what's interesting is that

11   at this point, you can see Mr. Therrien running around

12   a customer.  The testimony will be that

13   approximately -- let's see -- four seconds after

14   Mr. Pavey initiated this apprehension, Mr. Therrien

15   ran into this vestibule -- 56, please -- and entered

16   into this apprehension where Mr. Pavey was attempting

17   to get the shoplifter up to the wall and put handcuffs

18   on him.

19           Now, the significance of what happened

20   next -- and everybody agrees that this thing was over

21   in seconds.  As Mr. Pavey was attempting to apprehend

22   the shoplifter, and at every point that he was trying

23   to do so -- you might go back to 51, if you

24   xxxxx -- xxx xxxxx xxxx xxxx xxx xxxx xxxx xx xxx

25   xxxxx xxx xxxxxx xx xxxx xx xx xxxx xxxxx xxx xxxx

1    xxxxxxx xxx xxxxxxxxxx xxx xxx xxxxx xxxx.

2          xxxxxxx xxxxxxxx xxxxxx xx xxxx xxxx xx

3    xxxxxx xxxx xxxxxx xxx xx xxxx xxxxx, xxxx xx xxxx

4    xxxxxxx xxxx xxxxxxxxx, xxxx xxx xxx xx xxxxxxx xxxx

5    xxxxx xxxx xxxxxx xxxxxxx xxx xxx xxx xxxxx.  xxx xx

6    that exit vestibule is a relatively safe area to

7    attempt this apprehension because customers can see

8    what's going on.  They don't come in if there's any

9    kind of altercation.  You can't come in from the

10   outside.  So if there's risks presented, it's

11   presented to the asset-protection personnel and not to

12   customers.

13        Mr. Pavey was attempting to hold on to this

14   man and restrain him to keep him from getting past him

15   and out the door so that he could handcuff him and he

16   was talking to the man as he was doing this.  He was

17   actually talking to the man, trying to get him to just

18   stop, to stop trying to get away.

19        Mr. Therrien came in -- and you'll hear

20   testimony from Lisa Kreps, who also is no longer an

21   employee of Target but is coming here to testify about

22   what happened that day.  Lisa Kreps was then Lisa

23   Bowen; she recently got married.  She was the customer

24   service supervisor on duty that day standing between

25   the checkout lane where Mr. Therrien was making his

purchase and the door where he ran to engage in this
apprehension.

Lisa Kreps will tell you that she saw
Mr. Therrien run past her towards that apprehension in
the vestibule and she yelled at him, "Sir, stop."
Because Lisa Kreps knew that Target's policy was no
one other than a certified asset-protection employee
was to be involved in an apprehension, but
Mr. Therrien ignored her and ran in anyway.

Then you'll hear the testimony of Mr. Pavey
and of Lisa Kreps that as Mr. Therrien ran into that
vestibule and ran up to the point where Mr. Pavey
was working to get control of the shoplifter,
Mr. Pavey yelled, "Back off, back off" to Mr. Therrien
but he didn't follow that instruction either.
Instead, he jumped into the altercation.

Now, Mr. Therrien perceives himself as a
person who's well able to take care of himself in
situations like this. He's been a bouncer in bars
before, he's been in security, he's been a security
guard.

According to Mr. Therrien, whereas Mr. Pavey
had tried to hold the man and restrain him so that he
wouldn't run out the door -- and by the way, the
testimony is clear that up to the point Mr. Therrien

entered into this altercation, no knife had ever been
pulled.  Mr. Pavey was trying to restrain this
shoplifter and get handcuffs on him.

Mr. Therrien came up and tried to kick his
legs out from under him and punched him in the eye and
got -- tried to get him in a right-arm choke-hold but
couldn't do it, then got him in a left-arm choke-hold
and choked this man until he believed that he had
blacked out.  It was at that point, that this
shoplifter pulled out a knife and stabbed Stacie
Pavey, the Target employee, in the groin.  Stacie
Pavey at that point yelled, "Let him go.  He's got a
knife.  Let him go."  And Mr. Therrien didn't do it.

In fact, according to Mr. Therrien, Stacie
Pavey yelled a second time, "Let him go.  He's got a
knife."  And he didn't do it.  He yelled a third time,
"Let him go.  He's got a knife."  And he didn't do it.
And finally he yelled a fourth time, "Let him go.
He's got a knife."  And Mr. Therrien did at that point
because he believed that he had choked this man to the
point that he had blacked out.

At that point, the shoplifter turned and
stabbed Mr. Therrien and did precisely what he had
wanted to do since this apprehension began, he ran out
the door.

```
 1              Ladies and gentlemen, as I mentioned at the
 2     outset, this was over in seconds.  The question for
 3     you is at the end of the evidence, from the point that
 4     Mr. Therrien engaged in this event, from the point
 5     that he went in and grabbed hold of that shoplifter
 6     after having been told by Lisa Kreps not to go there
 7     and having been told by Stacie Pavey to back off, at
 8     that point did Target fail to do something that it
 9     reasonably should have done to protect Mr. Therrien?
10              But the other question is, did Mr. Therrien
11     himself act reasonably in kicking and choking and
12     punching --
13                   MR. DEMURO:  Objection, Your Honor.  Can
14     we approach?
15                   THE COURT:  You may.
16        (Bench conference outside the hearing of the jury)
17                   MR. DEMURO:  Two objections.  First,
18     he's getting into issues of comparative negligence.
19     You haven't made your mind up is what I heard about
20     these tort doctrines --
21                   THE COURT:  That's right.
22                   MR. DEMURO:  -- but we're inclined to be
23     very careful about that.  So I don't think he ought to
24     be able to get into it in his opening.
25                   Secondly, it's misstating the evidence but I
```

1   can deal with that myself.  So the first objection is

2   as stated.

3                   MR. RICHARDS:  Your Honor, I think it

4   goes to causation as well, what was the cause of this

5   man being injured?  Was it Mr. Pavey's conduct or was

6   it his own conduct in escalating this fight?  That's a

7   causation issue.

8                   MR. DEMURO:  It's not how he couched

9   it.

10                  THE COURT:  What was that?

11                  MR. DEMURO:  That's not how he phrased

12  it.  He said there's a second question there about

13  whether or not Mr. Therrien was reasonable in the

14  manner in which he did such and such.

15                  MR. RICHARDS:  That's a fair

16  objection.

17                  THE COURT:  All right.

18                  MR. RICHARDS:  As I stated it, that's

19  true.

20                  THE COURT:  We all agree.  What's the

21  remedy?

22                  MR. DEMURO:  Nada.  Just shut it down.

23                  THE COURT:  All right.

24                  *(Bench conference concluded)*

25                  MR. RICHARDS:  So, ladies and gentlemen,

1    I would ask you to hear the evidence, to hear all the

2    evidence, before you make up your mind, and consider

3    as you hear that evidence, what, if anything, could

4    Target have done differently at the point that

5    Mr. Therrien entered this altercation in the seconds

6    before Mr. Pavey and Mr. Therrien were stabbed and the

7    shoplifter ran out the door?  What could it have done

8    differently to protect Mr. Therrien who chose to jump

9    into this incident?

10          I believe at the end of the evidence you will

11   agree with Target's position, that Target is not at

12   fault for Mr. Therrien's injuries.  It simply is not

13   at fault because he chose to enter into an altercation

14   that he had been twice told to stay away from.

15          Thank you.

16          THE COURT:  Are you ready to call your

17   first witness?

18          MR. DEMURO:  I'd like a conference

19   first, but yes, I am.

20          THE COURT:  Conference with?

21          MR. DEMURO:  With Your Honor.

22          THE COURT:  Okay.

23     *(Bench conference outside the hearing of the jury)*

24          MR. DEMURO:  Your Honor, on at least

25   four separate occasions in Mr. Richards' opening, he

1    mentions Target's policies and what Target's policies

2    required or didn't require with respect how to make

3    the apprehension.

4          He said that it wasn't Target's policies to

5    start the apprehension inside the store.  It was

6    Target's policy to make it at the vestibule.  He said

7    it was Target's policies to make sure that when the

8    apprehension took place, that it was inside the

9    vestibule.  He said it was Target's policies that only

10   certified loss-prevention officers be able to make

11   apprehensions.

12         The point being is that he's now argued to

13   the jury what Target's policies were with respect to

14   how to make an apprehension, which I think demands in

15   fundamental fairness that the court re-evaluate its

16   motion in limine because I ought to be able to rebut

17   that.

18         MR. RICHARDS:  Your Honor, if I may, in

19   plaintiff's opening statement, it was suggested that

20   Mr. Pavey was 22 years old and untrained, it was

21   suggested that Target's policies were violated in the

22   manner in which this apprehension was made, and it was

23   suggested that two people should have been involved if

24   it had been consistent with Target's policies.

25         I'm certainly not trying to open that issue

1    up.

2                THE COURT:  I don't think you did.

3    Let's proceed.

4                *(Bench conference concluded)*

5                THE COURT:  You may call your first

6    witness.

7                MR. DEMURO:  Yes, Your Honor.  I notice

8    there's another witness in the hallway.  With Your

9    Honor's permission, I would like my co-counsel to go

10   out and instruct the witness about the rule.

11               THE COURT:  You may.

12               MR. DEMURO:  Your Honor, at this time

13   the plaintiff calls Mr. Therrien.

14                    **TIMOTHY THERRIEN,**

15   ***after having been first duly sworn, says in reply to***

16   ***the questions propounded as follows, to-wit:***

17                    **DIRECT EXAMINATION**

18   **BY MR. DEMURO:**

19       Q.   Good morning, Mr. Therrien.

20       A.   Good morning.

21       Q.   Afternoon.

22       A.   Afternoon, I guess it is.

23       Q.   Could you please introduce yourself to the

24   jury?

25       A.   My name is Timothy Scott Therrien.

1    Q.   And, Mr. Therrien, where do you live?

2    A.   11123 East 43rd Street in the Huntington

3 Hollow Apartments, 41st and Garnett.

4    Q.   How long have you lived in Tulsa,

5 Mr. Therrien?

6    A.   Since late '98 or early '99.

7    Q.   And how old are you, sir?

8    A.   I'm currently 54.

9    Q.   Okay.  Where were you born?

10   A.   Denver, Colorado.

11   Q.   I'd like to talk a little bit about your

12 educational background.  Do you have a high-school

13 diploma?

14   A.   I have a GED.

15   Q.   Did you attend any community-college classes

16 after getting your GED?

17   A.   Yeah.  Later on.

18   Q.   Okay.  Tell the jury a little bit about your

19 education.

20   A.   I was -- after I got out of the service, I

21 was -- I went to Johnson County Community College

22 studying criminology, psychology, sociology,

23 philosophy.

24   Q.   How many hours did you complete?

25   A.   Total between the three different schools was

1    60 to 65 credit hours.

2         Q.   Have you had any professional training of any

3    kind, Mr. Therrien, for a trade?

4         A.   Yeah, I have.

5         Q.   Okay.  Please describe that for the jury.

6         A.   American Truck Driving School on New Sapulpa

7    Road.

8         Q.   Okay.  What type of training have you had as

9    a truck driver?

10        A.   Over-the-road, close to 500,000 miles

11   accident-free.

12        Q.   Do you have a certificate of any kind for

13   truck driving?

14        A.   From that school, yes.

15        Q.   And what is that certificate?

16        A.   It's a certificate for completing their

17   training -- their training program.

18        Q.   What other work history have you had?  What

19   other things have you done over your 54 years of life

20   on this planet?

21        A.   Wells Fargo security, hotel security, club

22   and lounge security, carpet cleaner, upholstery

23   cleaner, master upholstery cleaner, truck driver, OTR

24   driver.

25        Q.   What's an OTR?

1    A.   Over-the-road.

2    Q.   Okay.  Has there ever been a time in your

3    distant past that you applied to be a police officer?

4    A.   Yes.  When I was studying criminology

5    courses.  That was like 1974, I think.

6    Q.   And whatever happened with that effort?

7    A.   I was too short.  They had requirements then.

8    Q.   And that was -- I'm sorry.  Did you say --

9    how long ago was that?

10   A.   That was in mid '70s.

11   Q.   So over thirty years ago?

12   A.   Yes.

13   Q.   Any other time that you tried to obtain work

14   with a law enforcement entity?

15   A.   When I was 35, I applied for the Yavapai

16   County sheriff, which is in the Prescott area of

17   Arizona.

18   Q.   All right.  And that was over twenty years

19   ago?

20   A.   Yeah.  I'm 54 now, yeah.

21   Q.   Or about twenty?

22   A.   Yeah.

23   Q.   And what happened with that matter?

24   A.   It didn't go through.  I was having marriage

25   problems and I got custody of my two children and

1    moved out of state.

2         Q.   Do you have any prior military experience,

3    sir?

4         A.   I do.

5         Q.   And very briefly, what was your military

6    experience?

7         A.   I was in the U.S. Navy on board the USS

8    Towers.

9         Q.   And what is the USS Towers, what kind of

10   vessel?

11        A.   It's a combat ship, a guided-missle

12   destroyer.

13        Q.   And did you serve during the Vietnam War?

14        A.   I did.

15        Q.   Did you serve in any combat roles?

16        A.   I did.

17        Q.   Did you receive any combat citations or

18   certificates?

19        A.   Yes.

20        Q.   Briefly describe very briefly those.

21        A.   I was awarded two combat-action ribbons, four

22   campaign stars, Vietnam service, and national defense.

23        Q.   And were you discharged under honorable

24   terms?

25        A.   I was.  Honorable conditions.

1      Q.   Let's go right to the day in question.

2           On June 3, 2005, did you happen to go to the

3   Target Supercenter here in Tulsa?

4      A.   I did.

5      Q.   And why did you go to Target that day, sir?

6      A.   I was going to get some articles that I could

7   use by the pool.  I'm a swimmer and I was -- I like

8   being by pools.

9      Q.   Okay.  And was that pool at your house or

10  your apartment?

11     A.   The apartment I was living at.

12          MR. DEMURO:  Ms. Wilson, please bring up

13  Exhibit No. 1.

14     Q.   *(BY MR. DEMURO)*  Sir, do you have a monitor

15  in front of you, Mr. Therrien, that you can see?

16     A.   I do.

17     Q.   Do you recognize Exhibit 1?

18     A.   Yes, I do.

19     Q.   And what is that?

20     A.   It's the Super Target store at 71st and 169

21  on the grocery side.

22     Q.   Is that the side of the store that you

23  entered that day?

24     A.   Yes.

25     Q.   All right.  Do you recall what you were

1  wearing that day, sir?

2      A.   Shorts, a black shirt, a hat, and tennis

3  shoes.

4      Q.   All right.  Approximately how long did it

5  take you, Mr. Therrien, to shop and select your

6  items?

7      A.   I guess I was in there a half hour to 45

8  minutes altogether.

9      Q.   And what did you do after you selected your

10 items?

11     A.   I went through the checkout lane --

12     Q.   Okay.

13     A.   -- paid for them.

14          MR. DEMURO:  Please turn, Ms. Wilson, to

15 Plaintiff's Exhibit No. 2.

16     Q.   *(BY MR. DEMURO)*  Sir, do you recall what

17 checkout lane you stopped in that day?

18     A.   It was one of the -- between 30 and 32.  It

19 was one of the last three closest to the grocery side.

20     Q.   Sir, what do you recall happening as you were

21 checking out?  Who did you see around you?  Paint a

22 little picture for the jury, please.

23     A.   It was pretty busy on the exit side of those

24 registers.  There was a lot of women and children with

25 carts.

1      Q.   Okay.

2                  MR. DEMURO:   Please turn to Exhibit 6,

3      Ms. Wilson.

4      Q.   *(BY MR. DEMURO)*   What did you do after you

5      paid your money and checked out?

6      A.   I paid my money, the clerk put my articles

7      into the Target shopping bag, and I was turning and

8      going to place them in my shopping cart.

9      Q.   Okay.  And what did you hear next,

10     Mr. Therrien?

11     A.   I heard this -- I don't know if it was a

12     little boy or a little girl, but it was a high-pitched

13     voice, real excitedly, "Mommy, there's a fight."

14     Q.   Okay.  And what did you do when you heard

15     this little child say, "Mommy, there's a fight"?

16     A.   Well, I turned around and I looked out

17     towards these doors in this picture, and I saw two men

18     scuffling right at the door on the -- the two doors on

19     the right side of this.

20     Q.   Now, sir, on Exhibit 6, I've put a couple

21     arrows.  Is that a fair approximation of where you

22     first saw the two men in the fight?

23     A.   Yes, uh-huh.

24     Q.   What did these two men look like?

25     A.   It was a tall white man and a shorter black

1    man.

2         Q.   Okay.  And do you know now who the tall white

3    fella was?

4         A.   Yes, sir, I do.

5         Q.   And who was that?

6         A.   The store security, Stacie Pavey.

7         Q.   Okay.  Now, when you first saw these two in a

8    fight, could you tell the jury exactly what you saw

9    them doing?

10        A.   I saw them wrestling and maneuvering for

11   position on each other as they were kind of coasting

12   into that little area between the outer and the inner

13   doors.  They were just, like, wrestling for position

14   with each other.

15        Q.   Did it seem to you, sir, that any one of them

16   was getting the better of the other?

17        A.   Yes, it did.

18        Q.   And how so?

19        A.   It seemed like Mr. Pavey was on the downside

20   of the confrontation and the shoplifter was getting

21   the better of him.

22        Q.   Okay.  Is there any way you could be more

23   specific?

24        A.   Mr. Pavey looked like he was losing the

25   fight.

1      Q.   Okay.  That's pretty specific.

2           What did you do when you saw that Mr. Pavey

3  was losing the fight?

4      A.   I pushed my cart over to the side a little

5  bit to get it out of my way, and I moved around the

6  women and children that were in that area and I

7  started moving toward those doors.

8      Q.   And what did you think was going on at the

9  time that you moved over -- went to the doorway?

10     A.   My impression was, that it was a security

11  matter for that store.

12     Q.   Why did you think that?

13     A.   Because of where it was happening at, the

14  doors.

15     Q.   Okay.  And how quickly did you move over

16  there, sir?

17     A.   I didn't run, I'm not capable of running, but

18  I did move rather quickly, as quickly as I could.

19     Q.   So you moved as quickly as you could?

20     A.   Right.

21          MR. DEMURO:  Ms. Wilson, please bring up

22  Exhibit 7.

23     Q.   *(BY MR. DEMURO)*  Now, after you saw that

24  Mr. Pavey was in trouble, what did you do?

25     A.   I went around -- Mr. Pavey's back was toward

1    that little white wall you see there in this

2    Plaintiff's Exhibit 7 and the shoplifter was closer

3    toward the other side of it.  Mr. Pavey had the

4    shoplifter by his arm, he had a two-handed grip on his

5    arm and was holding him like this.  I went in between

6    the outer doors and the two combatants and I was -- I

7    stood there for a couple of seconds.

8        Q.   Now, before you made your way over to the

9    vestibule, did you hear anyone from Target telling you

10   to stop?  Did you hear anything?

11       A.   No.

12       Q.   Okay.  At what time of day was this?

13       A.   It was around two o'clock, I think.

14       Q.   Okay.  And you said it was how busy?

15       A.   Very busy.  There was lots of women and

16   children in that area.

17       Q.   All right.  Did you see any other Target

18   employee as you made your way into the vestibule area?

19       A.   No, I did not.

20       Q.   Now, when you got over to Mr. Pavey and this

21   shoplifter, how close did you stand to them?

22       A.   Two to four feet away from Mr. Pavey, and I

23   was closer to the shoplifter.

24       Q.   All right.  Now, at that point in time, sir,

25   were you inside the vestibule in between the two sets

1 of doors?

2      A.   Yes, I was, I was.

3      Q.   So if I mark on Exhibit 7, you were somewhere

4 inside that area in there roughly?

5      A.   Yes.  I -- yes.

6      Q.   Now, at that time, had you spilled out into

7 the parking lot?

8      A.   No.

9      Q.   All right.

10          MR. DEMURO:  Turn to Exhibit No. 9,

11 Ms. Wilson.

12      Q.   *(BY MR. DEMURO)*  Do you recognize Exhibit

13 No. 9?

14      A.   Yes.  That's the outer doors to that little

15 vestibule area.

16      Q.   And so when you were standing next to

17 Mr. Pavey as he was struggling with this shoplifter,

18 were you inside those doors?

19      A.   I was right inside of them and they were

20 further inside the store than I was.  I was between

21 them and these outer doors.

22      Q.   All right.  And what happened when you were

23 out there?

24      A.   I noticed Mr. Pavey had the shoplifter by

25 his -- by his right arm and he had a two-handed grip

1    on him like this.

2         Q.   And was the shoplifter trying to get out the

3    door and get away?

4         A.   Yes.

5         Q.   Okay.  What happened next?

6         A.   I looked at Mr. Pavey and he looked at me and

7    said, "I'm store security.  Help me."

8         Q.   Okay.  How close were you to Mr. Pavey when

9    he said that?

10        A.   I could have reached out and touched him.

11        Q.   At that time, was he trying to pull the

12   shoplifter?

13        A.   Yes.  He had him by both of his hands,

14   Mr. Pavey's hands pulling the --

15        Q.   And when Mr. Pavey asked you -- when he told

16   you that he was store security, help me, what did you

17   do?

18        A.   I attempted to help him.

19        Q.   Okay.  How did you do that?

20        A.   I moved toward the shoplifter and tried to

21   get him off his pulling-back stance.  He was

22   pulling -- trying to pull away and I helped him -- he

23   turned out of that and turned to his left a little bit

24   and he came back up on his feet and out of that

25   pulling-away stance.

**United States District Court**

1    Q.   Okay.  And what happened next, sir?

2    A.   I was -- I tried to foot-sweep the young man

3    to take him off his feet, put him to the ground.

4    Q.   Now, at that point, were you working together

5    with Mr. Pavey?

6    A.   Mr. Pavey was -- had him still by the right

7    hand and I had -- I had tried to foot-sweep his left

8    foot, but Mr. Pavey was on his right side and had him

9    by the right hand.  My foot-sweep didn't work.

10   Q.   Was Mr. Pavey also, in your mind, trying to

11   put the shoplifter on the ground?

12   A.   Yes, he was.

13   Q.   Okay.  So at that point, you were working

14   together?

15   A.   Yes.

16   Q.   Okay.  Now, after you tried to foot-sweep the

17   suspect, what happened next?

18   A.   It didn't work and I changed -- I tried to

19   put him into a right-handed arm bar --

20   Q.   Okay.

21   A.   -- across his neck to get control of the

22   person.

23   Q.   And did that work?

24   A.   No, it didn't.  It wasn't available.

25   Q.   And then what happened after that?

1    A.  We shifted a little bit and I was going to

2  try a left arm across him because the right one didn't

3  work.  So I had gone to a left because of the

4  positioning of the shoplifter but right at that time

5  he lunged forward.

6    Q.  Towards whom?

7    A.  Towards Mr. Pavey.

8    Q.  Then what happened?

9    A.  As he came back up, he was in a perfect

10  position for the arm bar around his neck and it just

11  fell right in place.

12    Q.  Mr. Therrien, why did you help?  Why did you

13  choose to help Mr. Pavey?

14    A.  I was in --

15        MR. RICHARDS:  Objection, Your Honor;

16  relevance.

17        THE COURT:  Sustained.

18    A.  Do I answer?

19    Q.  *(BY MR. DEMURO)*  No, you don't.

20        Okay.  What happened -- after you saw the

21  shoplifter lung forward toward Mr. Pavey, what

22  happened next?

23    A.  Mr. Pavey fell back and fell onto the ground.

24  I don't really have a picture of it here.  But he fell

25  back up against the inner doors closer to that white

1  wall that was there.  He was like in the corner of the

2  doors and where the wall came together and he was on

3  the ground out of the confrontation.

4      Q.   And then what happened?

5      A.   I had the man in the left-arm -- left-arm arm

6  bar and he was struggling with me.  He was struggling

7  quite viciously actually.

8      Q.   What he was he doing?

9      A.   He was cutting my arms, he was cutting my

10 arms with a knife.

11     Q.   Mr. Therrien, what happened next?

12     A.   I -- after Mr. Pavey went down on the ground,

13 I had -- I had control of this man and he was fighting

14 me and I applied my arm bar just a little bit harder

15 to quell his disturbance to get control of the

16 situation.

17         At that point, Mr. Pavey said, "Let him go.

18 Let him go.  He's got a knife."

19         And I turned and I looked at him and I said,

20 "Let him go?"  Because the man was still fighting me.

21         He said, "Yeah, let him go."  But the man was

22 still fighting me so I didn't let him go.  I didn't

23 feel safe doing that.

24     Q.   Okay.  Did you let him go eventually?

25     A.   Eventually, yes.

1    Q.   When?

2    A.   He said it a third time, "Let him go," and

3  then he said it a fourth time, "Let him go," but right

4  before he had said it the fourth time, the man went

5  limp in my arms, he just stopped resisting, he stopped

6  fighting, and he was not a threat to me anymore at

7  that point.

8         Mr. -- I'm sorry.

9    Q.   Why didn't you let him go at first?

10   A.   Why didn't I?

11   Q.   Yes.

12   A.   Because he was a threat to me.

13   Q.   Okay.  Now, this other time, the fourth time,

14 when Mr. Pavey said, "Let him go," did you follow his

15 instructions?

16   A.   Yes, I did.

17   Q.   And what happened?

18   A.   I expected the man to slump to the floor, but

19 he -- when I took my arm off of him, he spun around

20 and he stabbed me in the side.

21   Q.   Okay.

22   A.   He was playing possum.

23   Q.   Now, after the stabbing, what happened?

24 After you got stabbed, what happened?

25   A.   I fell immediately to the floor.  It was

1   intense pain.

2        Q.   Okay.   What do you recall happening around

3   you at that time?

4        A.   It was really -- like really blurry to me,

5   but I remember hearing the shoplifter as he circled

6   around behind me.

7        Q.   And what did he say?

8        A.   He said, "I'll teach you to get involved.   I

9   hope I killed you.   I'll be watching."

10       Q.   That was from what, the shoplifter?

11       A.   Yes.

12       Q.   Now, did you hear anything that any of the

13   Target folks may have said?

14       A.   There was no Target people out there except

15   Mr. Pavey.

16       Q.   Okay.   Who was the first Target person that

17   you saw that came to assist Mr. Pavey after you were

18   stabbed?

19       A.   The first one that came -- assist him?

20       Q.   That came out there at all, Mr. Therrien.

21       A.   This one Target employee came in through the

22   doors and looked at us and Mr. Pavey said something to

23   her.   And I said, you know, "Call 911.   We've been

24   stabbed."

25            And then she ran back out of the door and

     1   then the lady at counsel's table --

     2        Q.   Ms. Plonczynski?

     3        A.   -- Ms. Plonczynski -- she came in.

     4        Q.   And do you recall her saying anything?

     5        A.   She was talking to a lot of different people.

     6   She talked to a couple of different.  People, one was

     7   the store manager, one was Mr. Pavey, one was

     8   Mr. Manley that came in about a minute and a half.

     9        Q.   What do you remember -- how do you know that

    10   Ms. Plonczynski was talking to the store manager?

    11        A.   She came in during the -- where everybody was

    12   trying to stem our bleeding and, you know, getting

    13   towels and the confusion of the aftermath of the

    14   fight.  She came in and the store manager came in and

    15   was saying, "How did this happen?  Why didn't he have

    16   somebody with them?"

    17             MR. RICHARDS:  Your Honor, I'm sorry.

    18   I'm going to object.

    19             THE COURT:  Sustained.

    20             MR. DEMURO:  May we approach?

    21             THE COURT:  No.

    22             MR. DEMURO:  I would like to make an

    23   offer of proof, Your Honor.

    24             THE COURT:  You may.

    25             MR. DEMURO:  At the table or from --

1          THE COURT:  No.  At the bench.

2     *(Bench conference outside the hearing of the jury)*

3          MR. DEMURO:  First of all, I don't know

4     what the grounds of the objection were.  You didn't

5     state any grounds for the objection.

6          MR. RICHARDS:  It was relevance in

7     violation of the order.

8          MR. DEMURO:  I'll address the objection

9     first.

10          We're clearly in the period of time that

11     occurred after the altercation, so even by the court's

12     order it would be relevant.  So if that's the

13     objection, then I think I've met that.

14          THE COURT:  Continue.

15          MR. DEMURO:  Thank you.

16          THE COURT:  No.  What's the testimony

17     going to be?

18          MR. DEMURO:  The testimony is that he

19     was talking -- he overheard the conversation between

20     Ms. Plonczynski, the Target asset team leader --

21     asset-protection team leader, and the store manager.

22     The testimony is going to be about that conversation.

23     It's a party opponent.  It's after the altercation

24     arose.

25          MR. RICHARDS:  Your Honor, it's not a

```
1   hearsay objection.  Ms. Plonczynski was not present.
2   And whether she may have said that -- Mr. Therrien has
3   testified as to what happened and his recollection of
4   this incident.  That may be relevant.  But once the
5   stabbing is over and the suspect has escaped, what
6   Ms. Plonczynski may have said about why this happened
7   or whether it was consistent with the company's
8   policies or procedures is not relevant.
9           It's my recollection of Mr. Therrien's
10  testimony that he would suggest that Ms. Plonczynski
11  said -- there was some discussion about why there
12  weren't more people involved in the apprehension.
13                  THE COURT:  Is that the nature of the
14  testimony?
15                  MR. DEMURO:  Yes, sir.
16                  THE COURT:  Sustained.
17                  MR. DEMURO:  And I'll respect you're
18  ruling, but I want to make a full offer of proof.
19                  THE COURT:  You may.
20                  MR. DEMURO:  More people, in terms of
21  the statement, was why aren't there more Target
22  employees here helping -- to have helped Mr. Pavey
23  when he made the apprehension?
24                  THE COURT:  Wait a minute.  Wait, wait,
25  wait, wait.  Wait a minute.
```

1          So the testimony is going to be that she

2   said, "Why weren't there more people here to help him

3   make the arrest?"

4               MR. DEMURO:  No.  The testimony is going

5   to be that he overheard Julie Plonczynski say to

6   the -- the store manager say to Julie Plonczynski,

7   "Why weren't there more people here," meaning more

8   help.

9               THE COURT:  When?

10              MR. DEMURO:  At the time of the

11  apprehension to assist Mr. Pavey.  That was the

12  witness' understanding of the gist of the statement.

13              THE COURT:  So tell me again who this

14  is.

15              MR. DEMURO:  This is the Target store

16  manager making a statement to Ms. Plonczynski who's

17  the Target corporate rep.

18              THE COURT:  Within the hearing of this

19  witness?

20              MR. DEMURO:  Yes.  While he was on the

21  ground.

22              THE COURT:  And her statement was?

23              MR. DEMURO:  Something to the effect of

24  "Why weren't there more people here," meaning her own

25  people, Target employee people.

1          THE COURT:  I think the significant

2     issue is it's either not relevant at all or it's most

3     relevant if it happened -- if she's making -- if she's

4     complaining about they're wanting more people there to

5     help take care of the injured or whether there

6     were --

7          MR. RICHARDS:  No, sir.  That

8     wasn't -- I don't think that's the import of the -- of

9     the -- that's not why this is being suggested as

10    relevant, that there should have been more people

11    helping to take care of the injuries.  That's not the

12    suggestion.

13          THE COURT:  The suggestion is there

14    should have been more people to help with the arrest

15    or the apprehension?

16          MR. DEMURO:  That is correct.

17          THE COURT:  Well, if that's the

18    testimony, he can testify to that.

19          MR. RICHARDS:  Your Honor, if you're

20    going to allow that testimony, will you also give the

21    jury a limiting instruction as to the issue that

22    they're to be concerned with, which is Target's

23    conduct, not as the apprehension was commenced.  But

24    once Mr. Therrien entered into, the issue is whether

25    they acted unreasonably in failing to protect him of

1   that injury to him.

2           Because as we move into his testimony as to

3   what Target should have done in making this

4   apprehension, I think it's misleading the jury as to

5   what they're to be concerned with.

6                   THE COURT:  There's cross-examination.

7                   MR. RICHARDS:  I can't cross-examine him

8   on what the court's order is.

9                   THE COURT:  Well, you can cross-examine

10  about the circumstances of what he heard and when he

11  heard it and the reliability of it.

12                  MR. RICHARDS:  Yes, sir.  Thank you.

13                  *(Bench conference concluded)*

14      Q.  *(BY MR. DEMURO)*  Mr. Therrien, getting back

15  to when you were on the ground after you had been

16  stabbed, I understand you overheard a brief

17  conversation between the Target store manager and

18  Ms. Plonczynski, who was the asset-protection

19  manager?

20      A.  I did.

21      Q.  What did you hear the Target store manager

22  say?

23      A.  She came out and she was talking to

24  Ms. Plonczynski and she said, "How did this happen?

25  Why wasn't there anybody with him?"  That's what I

1  heard.

2      Q.   And what did Ms. Plonczynski say in return?

3      A.   "He was watching this one.  We were watching

4  the other ones."

5      Q.   Okay.  Now --

6           THE COURT:  Wait.  Just -- okay.

7  Counsel.

8   *(Bench conference outside the hearing of the jury)*

9           THE COURT:  Now what he did say is not

10  within the keeping of the court's ruling.  He said she

11  said -- his response to part of that was what was

12  going on before the incident, not at the -- I know

13  I've drawn this real narrow, but what happened before

14  is not to go to the jury, shouldn't be anything about

15  that.

16           MR. DEMURO:  Well, this issue will be

17  one of credibility and credibility is also an issue.

18  There will be inconsistent statements made by Target,

19  and I will link it up, about what was going on and --

20           THE COURT:  But the problem is, that's

21  not -- that's not -- that happened when the -- when

22  the duty starts is when your client was, as a result

23  of the incident, in imminent danger.

24           MR. DEMURO:  If somebody gave him --

25           THE COURT:  But he wasn't in imminent

1  danger, as the way I define "imminent danger,"

2  until he was involved in the fray.  What was happening

3  going up to that, that's what -- I know you want to

4  get it in, but I've ruled it's not admissible.

5                    MR. DEMURO:  If somebody, for example,

6  Your Honor, gave a witness statement -- I'm not saying

7  this happened but just as a hypothetical test --

8                    THE COURT:  No hypothetical.

9                    MR. DEMURO:  There was a witness

10  statement given that's inconsistent with what

11  Ms. Plonczynski told him; therefore, it goes

12  credibility.

13                    THE COURT:  No.  I'm going to ask the

14  jury to disregard the witness' testimony.

15                    MR. DEMURO:  As to which particular

16  point?  Just that last one?

17                    THE COURT:  Well, that one -- you

18  got -- you've got -- I'll let you -- I'm going to ask

19  them to disregard all his testimony and give you a

20  chance to ask your question again within those

21  parameters.

22                    MR. DEMURO:  Okay.  Note my objection.

23                    THE COURT:  Okay.

24                    *(Bench conference concluded)*

25                    THE COURT:  Members of the jury, let me

1   instruct you, if I could have your attention, to

2   disregard the last two answers of this witness.  I'll

3   allow counsel to rephrase the question.

4        Q.   (BY MR. DEMURO)  Okay.  At that point when

5   you overheard the Target store manager talk to

6   Ms. Plonczynski, what did the store manager say?

7        A.   She asked her, "How did this happen and why

8   wasn't anyone with him?"

9        Q.   Okay.  I'm not asking you any further things

10  about what was said in that conversation.  What

11  happened next?

12       A.   There was just the confusion of, you know,

13  stemming the flow of blood on Mr. Pavey and myself.

14  And then another person that came in there -- it was

15  my presumption he worked there -- he went to the first

16  aid of Mr. Pavey.

17       Q.   All right.  And then what happened?

18       A.   He started berating me verbally.

19       Q.   What do you mean?

20       A.   He said -- he was talking to Mr. Pavey --

21            MR. RICHARDS:  I'm sorry, Your Honor.

22  Can I object?  Could there be some identification of

23  who this person was and whether it was a Target

24  employee?

25            MR. DEMURO:  I'm fine with that, Your

1  Honor.

2            THE COURT:  Yes.

3            MR. DEMURO:  I'll rephrase and backtrack

4  a little bit.

5       Q.  *(BY MR. DEMURO)*  Do you know who this person

6  was that started berating you?

7       A.  At that time I didn't.  It was my perception

8  he was a Target employee because Mr. Pavey and

9  Ms. Plonczynski both knew him.

10      Q.  Did you come across information later that

11 let you identify who he was?

12      A.  Yes.

13      Q.  And what was that information?

14      A.  I don't know his first name, but his name

15 last name is Manley, Mr. Manley.

16      Q.  And how did you identify him, sir?  That's

17 what I'm getting at.

18      A.  Oh, from this -- from the video, from

19 Target's video that they supplied.

20      Q.  Okay.  And what did Mr. Manley say?

21           MR. RICHARDS:  Let me object to that,

22 Your Honor.  Mr. Manley is a Sensormatic employee, not

23 a Target employee.  That would be hearsay.

24           THE COURT:  I didn't hear.  You said

25 he's an employee of who?

1    MR. RICHARDS:  He's an employee of a

2    company named "Sensormatic," he's not a Target

3    employee.

4    MR. DEMURO:  Not offered for the truth

5    of the matter asserted, Your Honor.  State of mind.

6    MR. RICHARDS:  Well, I object to the

7    relevance.

8    THE COURT:  What was the -- rephrase the

9    question.  What was the question?

10   Q.   (BY MR. DEMURO)  What did Mr. Manley say to

11   you?

12   THE COURT:  Sustained.

13   Q.   (BY MR. DEMURO)  Did Mr. Pavey, after he was

14   stabbed, do anything to make the criminal go away?

15   A.   After I was stabbed and went down to the

16   floor, that shoplifter circled behind me, said, "I'll

17   teach you to get involved.  I hope I killed you.  I'll

18   be watching."

19   I saw him out of corner of my eye, and

20   Mr. Pavey got back to his feet and stepped forward and

21   told the shoplifter -- shoplifter, "Leave, just leave,

22   leave, leave," did that and then he left

23   Q.   Now, we'll see the video here in a minute.  I

24   promised the jury I'll show it, I'll show it, and I

25   will here in a minute, but I want to set the stage a

1    little bit.

2              Did your shirt happen to come off during this

3    incident?

4        A.   After I was stabbed and on the ground, I took

5    it off so I could look at my wound.

6        Q.   Okay.  And did you get back up off the

7    ground?

8        A.   I did.

9        Q.   Why?

10       A.   I'm not sure.  I was going to go back in and

11   get my -- get the articles I bought and I was -- I was

12   just going to go get my articles.

13       Q.   And what was your mental state at that time

14   after you had been stabbed?

15       A.   I knew I had been stabbed and I thought I

16   should go home.

17       Q.   Is it fair to say you were pretty dazed?

18       A.   Yes.

19              MR. DEMURO:  Your Honor, at this time, I

20   would like the court's permission to play Plaintiff's

21   Exhibit 15.  May take me a moment to cue it up.

22              THE COURT:  You may.

23              MR. DEMURO:  Thank you, Your Honor.

24       Q.   *(BY MR. DEMURO)*  Mr. Therrien, have you seen

25   this video before?

1      A.   I have.

2      Q.   Okay.  And do you understand it's a

3  stop-image video, meaning that every image is one

4  second --

5      A.   Yes, uh-huh.

6      Q.   -- so we're not seeing a continuous flow?

7      A.   I do.

8             MR. DEMURO:  At this time for the

9  record, I will be playing Plaintiff's Exhibit 15, the

10  video of the incident.  It starts at June 3, 2005, at

11  2:05 p.m. and 35 seconds.

12      *(Plaintiff's Exhibit 15 is played for the jury)*

13             MR. DEMURO:  For the record, the video

14  has concluded.

15             Your Honor, with your permission, I'd like to

16  set up a demonstrative in the well.

17             THE COURT:  Has counsel seen it before?

18             MR. DEMURO:  Yes, Your Honor.

19             THE COURT:  You may proceed.

20             MR. DEMURO:  May I have the assistance

21  of co-counsel?

22             THE COURT:  You may.

23             MR. DEMURO:  May I lean these against

24  the well, Your Honor?

25             THE COURT:  You may.

**United States District Court**

1      Q.   *(BY MR. DEMURO)*   Now, Mr. Therrien, I've put

2   up as a demonstrative exhibit an Exhibit 15A which are

3   still shots --

4                THE COURT:  What I frequently do is

5   invite counsel, since you can't see it -- if you

6   desire to get in a position where you can watch, you

7   may.  You may be very familiar with it and you don't

8   need to.

9                MR. RICHARDS:  I think I'm all right

10  right now.  Thank you, Your Honor.

11               MR. DEMURO:  And please let me know,

12  Mr. Richards, if you need to move.

13     Q.   *(BY MR. DEMURO)*   Exhibit 15A, which are the

14  still shots image by image of the video that we just

15  saw -- some of the video that we just saw, and if we

16  could, I'd like to discuss what was going on at

17  various times, okay?

18     A.   Okay.

19     Q.   Now, Mr. Therrien, when the young child said

20  help me -- excuse me.  Strike that.

21               When the young child said, "Mommy, there's a

22  fight," and you were turning around to check out your

23  items, at what point in this Exhibit 15A, which one of

24  these images did you see the fight, if that makes

25  sense?

1    A.   It would be the fourth one in from the jury's

2    left.

3    Q.   Okay.

4              MR. DEMURO:  Now, for the record sake,

5    Mr. Therrien has identified Exhibit 15A, the clip that

6    is 2:05 p.m. and 51 seconds.

7              And, Ms. Wilson, would you please bring up

8    Exhibit 15A on the monitors so that we can scroll

9    through those.  So they're also up right now in our

10   monitors.

11   Q.   *(BY MR. DEMURO)*  Okay.  So at 51 seconds

12   of five minutes after two, the fourth clip, this is

13   when you first saw the fight?

14   A.   To the best of my recollection, yes.

15   Q.   Okay.  Now, we notice you first -- strike

16   that.

17              When do you first see yourself appear in this

18   video?

19   A.   The second line down, second one in from the

20   jury's left.

21   Q.   That would be again at 2:05:55; correct?

22   A.   Yes.

23   Q.   Which is again up on the screen for the

24   jury's view as well.

25              Now, what were you seeing in the next frame?

1    What were you seeing in the next frame in 15A?

2         A.   That's me.

3         Q.   What were you -- as you were --

4         A.   I was moving into the vestibule area.

5         Q.   And what were you seeing, sir?  What did you

6    see?

7         A.   I was seeing these two people going at each

8    other, trying to gain control of each other, the

9    situation.

10        Q.   Is this the point in time when you saw

11   Mr. Pavey being overwhelmed?

12        A.   Yes.  Actually, I think it was before that.

13        Q.   When was that?

14        A.   It was more on the first one on the second

15   line.

16        Q.   2:05:54?

17        A.   Yeah.  He didn't have control even at the

18   beginning on the top line on the right, far right.  He

19   didn't even have control there.

20        Q.   So you saw this fighting progressing, 51, 52,

21   53, 54, 55, and then this is when you made it into the

22   vestibule at 56?

23        A.   Yes.

24        Q.   All right.  Now, we see a lot of empty

25   screens in terms of nobody appearing in the video, and

1  then at 2:06:18, which is about 35 seconds later, we

2  see a woman walking through the doors.

3          Do you remember seeing that woman?

4      A.   Vaguely.

5      Q.   Okay.  By the time that you saw any customer

6  walking through the vestibule, what was going on as

7  far as the fight was concerned?

8      A.   Stacie was over to my right in the corner of

9  that door and that white wall, and I was -- I was --

10  had my back up against that white wall and I had

11  already been stabbed and the fight was already over,

12  the shoplifter had already left.

13          *(Discussion held off the record)*

14      Q.   *(BY MR. DEMURO)*  Okay.  So by the time we see

15  at 2:06:18 on Exhibit 15A, your testimony is you'd

16  already been stabbed by them?

17      A.   The best that I can remember, yes.

18      Q.   If you can, for the jury --

19      A.   Is that me?

20      Q.   You're okay.  If you can for the jury,

21  Mr. Therrien, what frame do you think it was when

22  you -- when Mr. Pavey asked you for his help?

23      A.   It would have been about the second -- second

24  one to the right, the jury's right.

25      Q.   Okay.  That would be 2:05 --

1    A.   Or the one next to it.

2    Q.   Somewhere in between 2:05:58 and 2:05:59?

3    A.   I can't see the numbers but I think, yeah.

4    Q.   Mr. Therrien, you can go ahead and look down

5  on your screen in front of you --

6    A.   Oh, I see it.  Now I see it.

7    Q.   So you've identified 2:05:58 and 2:05:59 as

8  the time when Mr. Pavey asked for your help?

9    A.   In that area, as much as I can tell by these

10  pictures.

11    Q.   That's all I'm asking, sir, is what you can

12  tell.

13    A.   Okay.

14         THE COURT:  Let's take a recess and ask

15  one of the -- we'll take about ten minutes.

16         MR. DEMURO:  Thank you, Your Honor.

17         THE COURT:  Maybe fifteen.

18         Members of the jury, if you'll remember my

19  earlier admonition not to talk among yourselves or

20  allow anybody else to talk with you.  We'll be in

21  recess for about 15 minutes.

22              (Short break)

23         THE COURT:  You may be seated.  The

24  witness may take the witness stand.

25         MR. DEMURO:  Please, Mr. Therrien, go

**United States District Court**

1   ahead and take the stand.

2          Thank you, Your Honor.

3      *Q.   (BY MR. DEMURO)*  Before we had our technical

4   problems, Mr. Therrien, we were reviewing Exhibit 15A.

5   Let's see if we can move through this quickly.

6          Just to reorient the jury, at what point in

7   time in 15A do you believe that you had been stabbed?

8      A.   It would have been about the fifth row down,

9   the third -- second to the fourth one from the jury's

10  left.

11     Q.   Am I pointing to the right one, sir?

12     A.   Second, third, or fourth one, right in that

13  area.

14     Q.   Okay.  You're looking at 2:06:14 or 15; is

15  that correct?

16     A.   Yeah.  Yes.

17     Q.   And by that time you had been stabbed?

18     A.   I believe so, yes.

19     Q.   And, again, to orient the jury, at what

20  times, as far as these images are concerned, did

21  Mr. Pavey ask for your help?

22     A.   It was the second row, the second or the

23  third one -- or the second or the last one to the

24  right of the jury.

25     Q.   And you've identified 2:05:58 or 59 somewhere

1 within those two frames; is that right?

2     A.   Yeah, yeah.  Close as I can remember.

3     Q.   Now, as we move to the second board, can you

4 see the woman going through the --

5     A.   May I move --

6     Q.   -- vestibule at 2:06:20?

7     A.   May I move over there?

8             THE COURT:  You may.

9             MR. DEMURO:  Your Honor, if I may.  If I

10 may, Mr. Therrien, you've got the clips right there.

11 It might be easier to do it that way, if it's okay

12 with Your Honor.

13             THE COURT:  That's fine.

14     A.   I can see the 2:06:20.

15     Q.   *(BY MR. DEMURO)*  Now, by this time, sir, you

16 had been stabbed; correct?

17     A.   Yes.  I was already on the ground.

18     Q.   All right.  Tell me what was going on in

19 between the period of time 2:06:22, where we see this

20 woman looking over in your direction, and the

21 2:05:41 -- excuse me -- 2:06:41, when we next see a

22 Target employee?  What was going on in that time

23 period?

24     A.   Stacie was telling me that he had been

25 stabbed and that he was bleeding real badly and I said

**United States District Court**

1   that I'd been stabbed too.

2        Q.   Okay.  Do you recall seeing this Target

3   employee that first appears at 2:06:41?

4        A.   Yes, uh-huh.

5        Q.   Okay.  Do you know who she is?

6        A.   I do now.

7        Q.   Okay.  Who is she?

8        A.   Ms. Kreps.

9        Q.   Okay.  And do you recall seeing this woman

10  pushing her cart with children in and out of the

11  vestibule?

12       A.   I do.

13       Q.   Okay.  Do you know who appears at 2:06:49?

14       A.   That's Ms. Plonczynski.

15       Q.   Okay.  Ms. Plonczynski, who's sitting over

16  here?

17       A.   Yes.

18       Q.   All right.  And I'm going to fast-forward to

19  something that's in Exhibit 15, not Exhibit 15A.

20            Do you recall these two gentlemen at 2:07:12

21  and 2:07:22 appearing?

22       A.   I remember the fellow on the left.  I'm sure

23  I saw the fellow on the right but -- on the jury's

24  right, but I didn't talk to him or anything.

25       Q.   Who was this gentleman on the left at

1    2:07:12?

2         A.    That's Mr. Manley --

3         Q.    Okay.

4         A.    -- to my knowledge.

5         Q.    The repairman?

6         A.    I believe so.

7         Q.    And this other person that appears at

8    2:07:27, you don't know who that is?

9         A.    Well, I now know him to be an off-duty

10   security person for Target.

11        Q.    Okay.  So he was not on duty at the time?

12        A.    I don't know.

13        Q.    Okay.  Do you know what was going on at this

14   period of time?

15        A.    No.  I -- vaguely but --

16        Q.    Now, Mr. Therrien, did you ever hear

17   Mr. Pavey tell you to back off as you were

18   running -- as you were moving into the vestibule?

19        A.    No, sir.

20        Q.    So before the frame on 15A that's 2:05:56,

21   did you ever hear Mr. Pavey say, "Back up"?

22        A.    Not at all.

23        Q.    Before he asked for your help, did you ever

24   hear Mr. Pavey tell you to back off?

25        A.    Not a word.

1    Q.   Did you ever hear any other Target

2    employee --

3    A.   No.

4    Q.   -- tell you to stop?

5         *(Discussion held off the record)*

6    Q.   (BY MR. DEMURO)  Okay.  Tell us what happened

7    when you got to the hospital.

8    A.   I took the second ambulance to the hospital

9    and they put me in the trauma room at Saint Francis.

10   I think it was Saint Francis.

11   Q.   Okay.

12   A.   And they were putting tubes -- or IVs in me

13   and checking my blood pressure and looking at my wound

14   and just asking me different questions at the

15   beginning.

16   Q.   Okay.  And what were you feeling at that time

17   physically?

18   A.   A lot of pain and real -- just kind of like

19   physical distress.

20   Q.   What did the medical staff tell you about

21   your condition at that time?

22   A.   They told me I had -- I had superficial cuts

23   on my arms and that I had two superficial stab wounds,

24   one on each side of my body, and also this one deep

25   wound.

1      Q.   Okay.  And do you recall being prepared for

2   surgery, prepped for surgery?  Do you recall?

3      A.   Well, they did a CAT scan on me, and when

4   they brought me back I had a blood pressure issue.  My

5   blood pressure went down to 50 and they started

6   putting stuff into the IVs and then they took me

7   immediately into surgery.

8      Q.   All right.  Now, did you injure any other

9   part of your body?

10     A.   My shoulder.

11     Q.   Okay.

12     A.   My left shoulder.

13     Q.   How was your shoulder injured?

14     A.   I believe when I fell and hit the ground

15   after being stabbed.

16     Q.   Okay.  Now, obviously you don't remember what

17   happened in the surgery?

18     A.   No.

19     Q.   What's your understanding of what your injury

20   was with respect to the spleen?

21     A.   That he was -- I was stabbed in the spleen

22   and that I had lost 1500 milliliters of blood.  Most

23   of it was internal bleeding, but there was a small

24   amount that was coming outside from the wound.

25     Q.   Okay.  Now, tell me what happened when you

1    woke up.

2         A.   It was the next day and I woke up in the bed,

3    and I looked down at my belly and I saw this giant

4    scar from my chest all the way down to my navel.

5              And I asked the nurse, "What happened?  What

6    happened here?  What happened to me?"

7              And she said, "You were stabbed."

8              And I said, "I wasn't stabbed here."  And

9    then she told me that's what the surgeon did.

10        Q.   Okay.

11             MR. DEMURO:  Ms. Wilson, could you

12   please put up Plaintiff's Exhibit 18?

13        Q.   *(BY MR. DEMURO)*  Do you recognize that

14   picture?

15        A.   I do.

16        Q.   What is it?

17        A.   That's the entry wound where the third stab

18   wound went in.

19        Q.   Okay.

20             MR. DEMURO:  Ms. Wilson, could you

21   put --

22        Q.   *(BY MR. DEMURO)*  And do you know when that

23   picture was taken?  Was it in the hospital?

24        A.   Yes, in the hospital.

25        Q.   How long did you stay in the hospital

1  postsurgery, sir?

2       A.   Six or seven days.

3       Q.   All right.  Do you recall whether your

4  daughter, Jessica Therrien, visited you in the

5  hospital in the emergency room before your surgery?

6       A.   I don't remember if it was in the trauma

7  room.  I remember seeing her in the hospital room

8  afterwards the next day.

9       Q.   Okay.

10            MR. DEMURO:  Please turn to Exhibit 20,

11  Ms. Wilson -- excuse me -- 19.

12       Q.   *(BY MR. DEMURO)*  What is this picture of,

13  sir?

14       A.   That's me laying in my hospital bed, it looks

15  like about -- I think it was five days -- four or five

16  days after the stabbing.

17       Q.   Okay.  And is that a -- strike that.

18            What wound is that a picture of?

19       A.   That's the -- that's the third stab wound

20  that went into my spleen.

21       Q.   Okay.

22            MR. DEMURO:  Please turn to Exhibit 20,

23  Ms. Wilson.

24       Q.   *(BY MR. DEMURO)*  What is Exhibit 20?

25       A.   That's the surgery scar on my belly.

 1    Q.   Now, just briefly, give the jury some idea of
 2  what your stay in the hospital was like.
 3    A.   Very painful.  I was -- I was reduced to
 4  tears every day, two or three times a day, because of
 5  the pain.  It was just very confusing and lonely,
 6  painful.
 7    Q.   Mr. Therrien, turn -- strike that.
 8         Do you have a scar on your stomach still
 9  today?
10    A.   I do.
11         MR. DEMURO:  Please turn, Ms. Wilson, to
12  Exhibit 21.
13    Q.   *(BY MR. DEMURO)*  Do you recognize that
14  photograph?
15    A.   I do.
16    Q.   And do you know approximately when that was
17  taken?
18    A.   No.
19    Q.   Well, was it within the last six months?
20    A.   It looks like it could have been, yeah, yeah.
21    Q.   Mr. Therrien, is that what your stomach looks
22  like today?
23    A.   Yes.
24    Q.   Let's talk about the first thirty days after
25  you got out of the hospital.

1          Where did you go when you got out of the
2   hospital?
3       A.   I went back to my apartment.  I was living on
4   Peoria and 56th Street at the time.
5       Q.   And did you live with anybody?
6       A.   No.  I lived alone.
7       Q.   Now, in that first thirty days, how did this
8   stab wound and the resulting surgery affect your life
9   physically?
10      A.   I couldn't do anything.  I couldn't -- I
11  couldn't clean up.  I could hardly walk around.  I was
12  in pain all the time.  It was just -- it was still to
13  the point where it was reducing me to tears even with
14  my pain medication.
15      Q.   What type of things were you not able to do
16  that you previously did before?
17      A.   Swim for one, walk normally for another --
18      Q.   Could you drive?
19      A.   -- clean my house.
20      Q.   I'm sorry.  I didn't mean to cut you off.  We
21  have to be careful that we not talk over each other.
22  I apologize for that, Mr. Therrien.
23          What type of things were you not able to do
24  that you could do before other than swimming?
25      A.   I couldn't clean around my apartment.  I had

1    a very hard time even being on my feet, you know,

2    cooking.  I had to -- I couldn't take baths.  They

3    told me I couldn't take baths.  I couldn't get my

4    scars wet because they weren't closed up.

5        Q.   What about sleeping?

6        A.   Five hours a night.

7        Q.   Were you able to play with your grandkids?

8        A.   Well, they'd come over and see me and sit in

9    the chairs and talk to me, but play with them, no.

10   They couldn't get up on my lap or wrestle around with

11   me anymore.

12       Q.   How many grandkids do you have?

13       A.   I have two.

14       Q.   What are their names?

15       A.   Faith Holt, and she's six; and Madison Holt,

16   she's two.

17       Q.   During that first 30 days, how did you spend

18   most of your time?

19       A.   In my chair or in my bed.

20       Q.   And what was your pain level like?

21       A.   On a scale of one to ten, it was eight to

22   ten.

23       Q.   All right.  Now, was anybody helping you out

24   to take care of you?

25       A.   My daughter, Jessica, would come over and,

1  you know, clean up a little bit for me around the

2  house and cook for me a little bit.

3      Q.   Now, over the next three to six months, tell

4  the jury briefly how you progressed.

5      A.   Very slowly, very slowly.  It was very

6  painful.  I'd go see my doctor, you know, when I had

7  an appointment with him.  It was just very painful,

8  just a real slow process of healing, you know.

9  Because of my age, is what I was told, it went

10  slower.

11     Q.   And who told you that?

12     A.   I believe Dr. Traub did.

13     Q.   And who is Dr. Traub?

14     A.   Internal medicine doctor that I know outside

15  of the Veterans Administration.

16     Q.   Okay.  Approximately how long did you see

17  Dr. Traub for this -- for treatment related to your

18  stabbing?

19     A.   About a year, I think.  About a year.

20     Q.   Do you recall the name of your surgeon?

21     A.   Dr. Meese.

22     Q.   Okay.  And is it your understanding that

23  Dr. Meese referred you to another doctor after you got

24  out of surgery?

25     A.   Dr. Traub asked him to take -- if he could

1    take the -- take it from him.

2         Q.   Okay.  And how frequently over the next ten

3    months or so did you see Dr. Traub for this condition?

4         A.   Once a month.  Sometimes he'd want to see me

5    every two weeks, every three weeks, and then a month.

6    As I got better, he gradually -- he didn't want to see

7    me as often but --

8         Q.   And how long a period of time did it take you

9    before you stopped feeling pain every day?

10        A.   I still feel pain every day.

11        Q.   Okay.  How long a period of time did it take

12   before you could get up and around and out of bed and

13   off your chair?

14        A.   I was doing that, you know, immediately

15   because I'd have to get up and move around my

16   apartment.  But I'm not sure what your question is --

17        Q.   Sure.  Did you like to fish before your --

18        A.   All the time.

19        Q.   How long was it before you could fish

20   again?

21        A.   It was about a year.

22        Q.   Okay.  How long was it before you -- you

23   didn't spend most of your time in bed, is what I'm

24   getting at?

25        A.   No, I didn't.  You know, I went from the

**United States District Court**

1    chair to the bed.  You know, I'd try to walk around

2    the apartment complex a little bit.  The doctor told

3    me that with this you have to get out and walk around,

4    you know, and you have to -- you have to try to get up

5    and do things or else it won't get better, it will

6    just get worse.

7        Q.   Okay.  And you said you're still feeling some

8    discomfort today?

9        A.   I do.

10       Q.   Describe that to the jury.

11       A.   The original stab wound over here, I have a

12   dull, aching pain all the time with it.  The area down

13   the front, I workout every day and if I work out too

14   much, it really gets me along the abdominal muscles

15   where the scar is.  I can't do what I used to do but I

16   try.

17       Q.   Now, you are doing better, though; correct?

18       A.   I am.

19       Q.   And you said you're working out.  Describe to

20   the jury what your general activity level is today.

21       A.   I work down -- I workout down at Aspen

22   Athletic Clubs every day -- well, every other day

23   sometimes.  But I workout on the weights and I can

24   swim a mile in 38 minutes.

25       Q.   Okay.  Are you able today to play with your

1   grandchildren actively, lift them up, put them in your

2   lap, etcetera?

3       A.   No.  I play with them but I don't lift them

4   up; that hurts.

5       Q.   Okay.

6               MR. DEMURO:  If you could, Ms. Wilson,

7   turn to Exhibit 38.

8       Q.   *(BY MR. DEMURO)*  Do you recognize Exhibit

9   38?

10      A.   Yes, sir.  A summary of medical bills.

11      Q.   Okay.  And can you tell the jury what this

12  is?

13      A.   I'm sorry?

14      Q.   Can you tell the jury what this is?

15      A.   It's a total.

16      Q.   Okay.  And what is the total of your medical

17  bills for the various services that you were provided?

18      A.   $34,041.67.

19      Q.   Okay.  Now, some of these are

20  self-explanatory, obviously Saint Francis Hospital,

21  the Associated Anesthesiologists, Surgical Associates.

22  What were those related to?

23      A.   The surgery.

24      Q.   Okay.  Tulsa Diagnostic Imaging, do you know

25  what that was related to?

1    A.    That was the CAT scan they did on me while I

2   was in the trauma, I'm sure.

3    Q.    The Oklahoma Physical Therapy?

4    A.    For my arm -- for my shoulder.

5    Q.    Now, did your arm resolve itself pretty

6   quickly, get better pretty quickly?

7    A.    It seems like it is.

8    Q.    Approximately how long was your arm bothering

9   you after the surgery, not that long?

10    A.    A month or two.

11    Q.    Okay.  And the other bills are fairly

12   self-explanatory.  Would you agree?

13    A.    Yes, uh-huh.  They all dealt with the -- with

14   the surgery and from the trauma from the stab wound.

15    Q.    Now, Mr. Therrien, did you ever go back to

16   Target after your stabbing, to the Target Supercenter?

17    A.    Twice to the one I got stabbed at and --

18    Q.    That's the one I'm talking about right now.

19    A.    A couple of them a couple times.

20    Q.    Well, when did you go back to the Target

21   Supercenter that you got stabbed at?

22    A.    The first time was after I got out of the

23   hospital.  I don't remember if it was the same day or

24   the day afterwards, but I went back -- I went -- that

25   was the first -- that would have been the first

1    time.

2         Q.   Okay.  And why did you go back to the Super

3    Target?  I think I've been calling it the wrong thing.

4    Why did you go back to the Super Target that day?

5         A.   To look at the area and kind of be okay with

6    it for myself as to -- because I was having real bad

7    problems in the hospital with it.  It was constantly

8    waking me up with nightmares, and I went back

9    that -- after I got out to be okay with the situation

10   as it had gone down.

11        Q.   Okay.

12        A.   Just revisit, closure.

13        Q.   Now, Mr. Therrien, when you made your way

14   into the vestibule to help Mr. Pavey, did you believe

15   that you could help him?

16        A.   I didn't know I was going to be helping him

17   at that point in that frame you just pointed at.

18        Q.   When did you know?

19        A.   When he identified himself as store security

20   and asked me for my help.

21             MR. DEMURO:  Your Honor, at this time,

22   I'd pass the witness.

23             THE COURT:  You may cross-examine.

24             MR. RICHARDS:  Thank you, Your Honor.

25

1          **CROSS-EXAMINATION**

2   **BY MR. RICHARDS:**

3       Q.   Mr. Therrien, sir, as I understand your

4   testimony, what first drew you -- or drew your

5   attention to this incident in the vestibule was

6   hearing a young boy make a comment -- is that

7   correct? -- or young child.

8       A.   Yeah.  Yes.

9       Q.   All right.

10              MR. RICHARDS:  And, Mr. Glass, could you

11  bring up, say, 2:05:48.

12      Q.   *(BY MR. RICHARDS)*  If you'd look at your

13  monitor, now this is --

14              MR. RICHARDS:  Could we go to 49 and 50

15  and 51?

16      Q.   *(BY MR. RICHARDS)*  Now, it wouldn't have been

17  before this point that you heard anything, would it?

18      A.   No.

19      Q.   All right.  And it certainly would have been

20  a little bit after this point because, unless that boy

21  had pretty quick reactions, he probably wouldn't have

22  recognized there was an issue that fast, would he?

23      A.   I don't understand your question.

24      Q.   Well, when you first looked up, sir --

25              MR. RICHARDS:  Let's go to 52.

**United States District Court**

1    Q.   *(BY MR. RICHARDS)*  -- is that what you saw?

2  Or did you see 53?

3    A.   I saw -- I saw these two men physically

4  confronting each other.

5    Q.   Well, were they standing facing each other or

6  were they moving?

7    A.   Yes, they were standing.  But they were

8  moving in a circular motion into the vestibule area.

9    Q.   They were moving in a circular motion into

10  the vestibule?

11    A.   They were.

12    Q.   Was it one of those pictures that we have

13  seen that was what you first observed from the other

14  side?

15    A.   I'm sorry?

16        MR. RICHARDS:  Well, let's go to

17  50 -- whatever the next one is, 54.  I'm sorry.

18    Q.   *(BY MR. RICHARDS)*  Of those frames we've just

19  looked at, the still images from Target's security

20  cameras, 49, 50, 51 when Mr. Pavey came around in

21  front of the shoplifter, 52, 53, or this one 54, was

22  one of those what you saw when you first looked up?

23    A.   I imagine it was, yes.

24    Q.   Do you know which one it was?

25    A.   I don't.

1      Q.   All right.  Now, we know that in 55, if we
2  could go to that, you're actually running into the
3  vestibule at that point, aren't you?
4      A.   No, sir.
5      Q.   Well, are those your legs that we see --
6      A.   Those are my legs.
7      Q.   All right.  And then let's look at 56.  And
8  that's you, isn't it?
9      A.   Yes, sir.
10     Q.   Now, are you telling us that you're not
11  running there?
12     A.   Yes, sir.  I don't run.
13     Q.   Okay.  But in those two frames, that's you
14  coming in to the vestibule; correct?
15     A.   Yes.
16     Q.   All right.  So clearly at some point before
17  that, you had heard this child make a comment, looked
18  up, seen what you perceived to be a scuffle of some
19  type, and made a decision to move quickly into the
20  vestibule; is that correct?
21     A.   That's correct.
22     Q.   And that all happened within a matter of,
23  well, four seconds or less, didn't it?
24     A.   I believe so.
25     Q.   In other words, if we look at 2:05:51, that's

1   the frame where Mr. Pavey first confronts the

2   shoplifter, isn't it?

3        A.   Yes, sir.

4        Q.   And then by 2:05:55, you've moved at that

5   point from the checkout lane which is some 30 feet

6   back of where you are there; correct?

7        A.   I don't know if it is.

8        Q.   All right.  Well, you moved from the point of

9   the checkout lane, recognized what's going on, and

10  gotten to this point by the exit; correct?

11       A.   Yes.

12       Q.   In a matter of, again, three or four seconds;

13  right?

14       A.   Looks like five seconds to me.

15       Q.   Okay.  And then you said that as we move

16  forward --

17            MR. RICHARDS:  Let's go to 56 and 57.

18       Q.   *(BY MR. RICHARDS)*  And you're out of sight at

19  this point, of course, but as we move forward, you

20  believe it was about, I believe, 2:05:59 that you say

21  Mr. Pavey asked your assistance; correct?

22       A.   About that, yes.

23       Q.   All right.  Now, before that happened, you

24  came into the vestibule and observed the situation,

25  didn't you?

1     A.   I came into the vestibule and moved between

2    the outer doors and the combatants.  I was in between

3    them.

4     Q.   All right.  So you were actually further away

5    from this set of doors than were Mr. Pavey and the

6    shoplifter?

7     A.   They were closer to this set of doors, that's

8    correct.

9     Q.   All right.  And as we move through those

10    frames -- well, let's back up just a minute, if we

11    can, to 58 and let's take them one at a time,

12    57 -- 57, 56, 55, 54, 53, 52, and 51.

13         Now, sir, as we move forward through these,

14    point out to me where the women and children that were

15    by the door are located in these pictures?

16     A.   They're not visible in this; they're back off

17    camera.

18     Q.   So they're further back from where this lady

19    is that you came around in order to get into the

20    vestibule; correct?

21     A.   They were behind her.  She was the closest

22    one to it.

23     Q.   All right.  Let's go up to 50 -- well, I'm

24    sorry -- how about 55.

25         All right.  So they were behind -- they were

far enough back in this frame that as you're coming

around this lady, we can't see them or their feet;

correct?

    A.   Looks like it, yes.

    Q.   All right.  And, in fact, as we go to 56, we

don't see anybody back there, do we, other than this

one lady?

    A.   No.

    Q.   Fifty-seven.  And the lady there at that

point that you came around is actually turning and

walking away, isn't she?

    A.   I don't know what she's doing.

    Q.   Well, let's look at 58, 59, 60.

    All right.  So she's out of the frame at this

point, isn't she?

    A.   Looks like it.

    Q.   And the doors are closing?

    A.   Uh-huh.

    Q.   So you entered into the vestibule and you

stood and got your bearings and tried to understand

what was happening, didn't you?

    A.   I moved into the vestibule and I was closer

to the outside doors than they were, I was between

them.

    Q.   And why did you want to be closer to the

1   outside doors, sir?

2        A.   It was a vantage point.  It was the closest

3   vantage point.

4        Q.   I see.  And you've told us that you couldn't

5   tell immediately who was who, could you?

6        A.   No, I couldn't.  I didn't know the difference

7   between the two people.

8        Q.   All right.  You weren't sure who was the

9   shoplifter -- did you assume that this was the

10  apprehension of a shoplifter that you were

11  observing?

12       A.   I made no assumptions.

13       Q.   All right.  So you didn't have any idea what

14  was going on, did you?

15       A.   I knew there was a fight.

16       Q.   I see.  And it's at that point you've told us

17  that you recall Mr. Pavey asking you for help;

18  correct?

19       A.   A couple of seconds after I positioned myself

20  between the doors and the combatants, I looked at him

21  and he looked me in the eye and he said, "I'm store

22  security.  Help me."

23       Q.   Now, sir, do you recall that at that point,

24  Mr. Pavey, in your observation, had this

25  shoplifter -- had a hold on him and had him at a point

1    where the shoplifter was actually just trying to pull

2    away, wasn't he?

3        A.   He was -- he was trying to get away from the

4    security man, yes.

5        Q.   And Mr. Pavey was holding him, wasn't he?

6        A.   He had him by his right arm with both of his

7    hands.

8        Q.   And he was trying to get him up against the

9    wall, wasn't he?

10       A.   No, he was not.

11       Q.   Well, sir, what was it that you saw up until

12   2:05:59?  In those seconds between your entering the

13   vestibule at 2:05:56 up until 2:05:59 when Mr. Pavey

14   asked you for help, what was it that you saw that

15   caused you to believe that Mr. Pavey was in trouble?

16       A.   It looked like the shoplifter was taking him

17   to the ground and was getting back up and that -- he

18   showed me that he didn't have control of the

19   situation.  And when they both came back up to their

20   feet, that's when he has grabbed his arm, but he was

21   never trying to put him up against the wall.

22            His back -- Mr. Pavey's back was against that

23   wall and the shoplifter was out away from him and he

24   had him like this.  So there's no way he could have

25   been trying to put him up against the wall.

1    Q.   And was this all before you got into the

2  vestibule or afterwards?

3    A.   This was during the fight, when I was

4  standing there before -- a second before he asked me

5  for my help.

6    Q.   Sir, do you recall having given a recorded

7  statement sometime -- well, not too long after this

8  incident occurred on September 21, 2005?

9    A.   Yes.

10   Q.   All right.  And that's an exhibit in this

11 case, although I hate to say I don't have the number

12 right at hand.

13        *(Discussion held off the record)*

14   Q.   *(BY MR. RICHARDS)*  Oh, okay.  I did have the

15 right number on here.  I apologize.  Defendant's

16 Exhibit No. 21.

17        And, sir, do you recall that in that

18 statement being asked -- sorry, I'm on the wrong

19 page -- being asked on page 7:

20        "QUESTION:  Okay.  Was the black male

21 standing up?  Sitting down?  Kneeling?  What was his

22 position?"

23        And you answered, "He was standing up."

24        "QUESTION:  Okay."

25        And you stated, "Kind of scrunched down

```
1   pulling away from him because the security guard had
2   him and he was trying to pull away.  So, you know, he
3   was kind of set back pulling but he was on his feet.
4   Do you understand?"
5            Is that what you told the person that took
6   the recorded statement from you?
7            A.   Yes.
8            Q.   All right.  So the security guard had him at
9   that point, didn't he?
10           A.   He had his right arm.  He had him by the
11  wrist.
12           Q.   Now, you felt like -- and I think you just
13  told Mr. DeMuro this -- you felt like you had the
14  training and experience to help Mr. Pavey at that
15  point, didn't you?
16           A.   I didn't know who I was going to help.  I saw
17  somebody in danger, in trouble.
18           Q.   Sir, when Mr. Pavey said he was store
19  security and asked for your help, you felt like you
20  had the training and experience to help him, didn't
21  you?
22           A.   I didn't think about that.  I thought about
23  helping him because he asked me to.
24           Q.   All right.  Well, you had been an armed
25  security person for Wells Fargo; correct?  You told us
```

1   that?

2       A.   Correct.  Yes.

3       Q.   And you told us that you had studied

4   criminology in Kansas City; right?

5       A.   Yes, sir.

6       Q.   And you told that us you've been a private

7   investigator for Wells Fargo for two or three years?

8       A.   I did that for a little bit, yet.

9       Q.   And that was an armed position as well,

10  wasn't it?

11      A.   No.  I carried no weapon in that.

12      Q.   All right.  Were you CLEET-certified or

13  whatever the equivalent was?

14      A.   In Kansas, yes.

15      Q.   In other words, you were certified by an

16  agency to be an armed security person?

17      A.   Yes.

18      Q.   All right.  And you've been a bouncer;

19  correct?

20      A.   I was security in different clubs, hotels.

21      Q.   Okay.  In fact, you did that for about eight

22  years, didn't you?

23      A.   About that.

24      Q.   I believe you told me in your deposition you

25  were the hotel chief of security for the lounge,

```
 1    weren't you?
 2         A.   I was chief of security for the lounge,
 3    right.
 4         Q.   For two years in North Carolina; is that
 5    right?
 6         A.   I was -- I worked there as security in the
 7    lounge, but I wasn't always the chief of security but
 8    I ended up as the chief of security.
 9         Q.   All right.  And you had done that for five
10    years in Kansas City, hadn't you?
11         A.   Yes.
12         Q.   And you told us you wanted to be a police
13    officer.  You applied to the Overland Park Police
14    Department; right?
15         A.   When I was younger.
16         Q.   And they didn't hire you, did they?
17         A.   I was too short.
18         Q.   And you applied to the Yavapai County
19    Sheriff's Office; right?
20         A.   Yeah, I did.
21         Q.   And you didn't take a position there either;
22    correct?
23         A.   No, I didn't.
24         Q.   And I believe you had some martial arts
25    experience, didn't you?
```

1        A.   I do.

2        Q.   You're self-trained in martial arts; isn't

3   that true?

4        A.   No, sir.

5        Q.   Well, sir, isn't that what you told me in

6   your deposition?

7        A.   No, sir.

8        Q.   Do you recall having testified under oath in

9   your deposition on October 18th of 2007?

10        A.   I do remember telling you I studied martial

11   arts, but I was never self-trained.  I studied in a

12   dojo, Jim Harrison and Bushidokan, in Mission, Kansas.

13        Q.   Well, sir, let me ask you --

14             MR. RICHARDS:  Page 40, Counsel,

15   beginning at line 19.

16        Q.   (BY MR. RICHARDS)  -- do you recall being

17   asked this question and giving this answer under oath

18   in your deposition on October 18, 2007?

19             "QUESTION:  Now, did you have training in,

20   like you say, the physical side of it as opposed to

21   the legal side of it?  Was there training that you got

22   somewhere along the way in the physical side of lounge

23   security?

24             "ANSWER:  I trained myself through about a

25   Bushidokan, Bushidokan martial arts, Shorin Ryu, a

**United States District Court**

1    little bit of Tae Kwan Do, a little bit of Aikido.

2            "QUESTION:  I hate to say this, but other

3    than Tae Kwan Do, I have no idea what you just said.

4              "ANSWER:  Those are different styles of

5    martial arts."

6            Was that your testimony, sir?

7       A.   Yes, sir.

8       Q.   You trained yourself in martial arts.  In

9    fact, you did that by going to a dojo, didn't you?

10      A.   Yes.  I studied at a dojo.

11      Q.   And you told us that you trained there six

12   days a week for five hours a day for years; correct?

13      A.   Yes, I did.

14      Q.   And you had a black belt; is that right?

15      A.   Yes, sir.

16      Q.   And you got that black belt because you

17   bought a white belt with your -- what do you call it,

18   a gi?

19      A.   It came with my gi, yes.

20      Q.   All right.  And that's the outfit you wear

21   for martial arts; right?

22      A.   That's the uniform.

23      Q.   So you got your gi and it had a white belt.

24   And the way you got a black belt was by wearing it and

25   never washing it until it turned black; isn't that

1    true?

2        A.   It is true.

3        Q.   You told us that you got into the mind-set of

4    the Samurai through that training; correct?

5        A.   It's a part of the sport, yes.

6        Q.   And, in fact, you continue to condition

7    yourself as a martial arts person, don't you?

8        A.   I'm sorry?

9        Q.   You continue to condition yourself in martial

10   arts, don't you, even to this day?

11       A.   Yes.

12       Q.   And so you believed with that experience that

13   you were in a position to assist Mr. Pavey when you

14   learned he was Target security, didn't you?

15       A.   I made no assumption of that.  He asked me

16   for my help so I tried to help him.

17       Q.   Okay.  And in trying to help him, isn't it

18   correct that the first thing you did was hit this

19   shoplifter in the eye?

20       A.   I don't know that I hit him in the eye.  I

21   hit something.

22       Q.   Well, again, sir, let me go to your recorded

23   statement that you gave September 21st of 2005, on

24   page 7, and ask you if you recall making this

25   statement.

1      "Okay.  The security guard asked me for my

2   help and I have a lot of years in martial arts, and

3   the first thing I did was to try at the distract the

4   person.  I popped him in the eye with my right hand,

5   and then I tried to foot-sweep him but I couldn't

6   foot-sweep him.  I'm not as young as I used to be.

7      "QUESTION:  So you struck the subject in the

8   eye?

9      "ANSWER:  Well, I was going to try to put him

10  in a right-handed choke-hold but I couldn't get that

11  in and I ended up, you know, popping him.

12     "QUESTION:  Okay.  With a closed fist?

13     "ANSWER:  I always have a closed fist when

14  I'm in a situation like that."

15     Do you remember telling that --

16     A.   Yes.

17     Q.   All right, sir.  So you hit the man in the

18  eye with a closed fist; correct?

19     A.   You didn't read the whole thing, but it

20  sounds from what you read, yes.

21     Q.   Yes, sir.  And then you tried a foot-sweep,

22  didn't you?

23     A.   Yes.

24     Q.   And that's a martial arts technique; is that

25  right?

**United States District Court**

1          A.   Yes, sir.

2          Q.   All right.  But basically, what it really is

3     is trying to kick the person's legs out from under

4     them, isn't it?

5          A.   Same thing.

6          Q.   Okay.  You weren't able to do that, were

7     you?

8          A.   No, sir.

9          Q.   And up to this point now, you had never seen

10    a knife, had you?

11         A.   Not that I can recall, no.

12         Q.   Stacie Pavey wasn't stabbed, was he, not at

13    this point?

14         A.   Not at this point, no.

15         Q.   Okay.  And you hadn't been stabbed at this

16    point, had you?

17         A.   No, sir.

18         Q.   And then after you tried the foot-sweep,

19    tried to kick the man's legs out from under him, and

20    weren't able to, you tried a right-arm choke-hold,

21    didn't you?

22         A.   Yes, sir.

23         Q.   And you couldn't get that, could you?

24         A.   It wasn't available.

25         Q.   And so you tried to get him in a left-arm

1   choke-hold; is that right?

2       A.   I made no attempt right then until he

3   maneuvered himself into it by lunging forward at

4   Mr. Pavey.

5       Q.   And then you got him in a left-arm

6   choke-hold; correct?

7       A.   When he came back up, yeah, he fell right

8   into it.

9       Q.   And you got your arm around his neck; is that

10  correct?

11      A.   Uh-huh, yes.

12      Q.   And you held on; correct?

13      A.   I did.  I did.

14      Q.   And did you hit him in the eye again?

15      A.   No, sir.

16      Q.   You choked him, didn't you?

17      A.   I applied a technique that would protect me

18  and the security guard that had been stabbed and fell

19  to the floor.

20      Q.   Sir, the --

21      A.   It was a controlling technique.

22      Q.   The technique was to choke the man until

23  he --

24      A.   It's a controlling technique.

25      Q.   You choked the man until he went limp, didn't

1    you?

2         A.   I held on to him.

3         Q.   Sir, you choked the man until he went limp,

4    didn't you?

5         A.   I had my arm around his neck.

6         Q.   Yes, sir.  And you applied pressure, didn't

7    you?

8         A.   To quell his violence, yes.

9         Q.   And the man went limp in your arms?

10        A.   He did.

11        Q.   All right.  Now, as you had him in this

12   choke-hold, you saw him reach forward to Stacie Pavey,

13   didn't you?

14        A.   No.

15        Q.   You saw Stacie fall to the ground, didn't

16   you?

17        A.   No.

18        Q.   Was Stacie standing up at that point?

19        A.   No.  He was already stabbed laying on the

20   ground.

21        Q.   He was on the ground.  And he was yelling at

22   you to let this man go because he had a knife, wasn't

23   he?

24        A.   Not right then.

25        Q.   As you were choking him, he wasn't yelling to

1   let him go?

2       A.  Not right then.  There was a second or

3   two -- when he fell back from the confrontation and

4   landed on the ground, that was a couple of seconds.

5   So there was, like, two or three seconds between the

6   time he was stabbed and then he came back and said,

7   "Let him go.  Let him go.  He's got a knife."

8       Q.  So we got another couple seconds in here;

9   correct?

10      A.  I'm sorry?

11      Q.  We got another couple of seconds in here; is

12  that right?

13      A.  I don't know what the question is.

14      Q.  Well, you just said that Mr. Pavey fell down

15  and there was a couple of seconds before he got back

16  up and said, "Let him go.  He's got a knife"?

17      A.  He never got back up then.  He was on the

18  ground and he said, "Let him go.  Let him go.  He's

19  got a knife."  But there was a couple of seconds

20  between when he was stabbed and when he fell down to

21  when he said that to me.

22      Q.  All right.  And you didn't let him go, did

23  you?

24      A.  Not initially.

25      Q.  So he said, "Let him go, he's not a knife"

1    again, didn't he?

2        A.   No.

3        Q.   Didn't he say it three times and --

4        A.   He said it four times.  But he said -- the

5    first two times he said, "Let him go.  Let him go.

6    He's got a knife."

7        Q.   Yes, sir.

8        A.   And I looked at him and said, "Let him go?"

9    This man is slashing at me with a knife and stabbing

10   me two times superficially.  And I said, "Let him go?"

11   The man was still fighting me so I didn't let him go.

12       Q.   Yes, sir.  Mr. Pavey was telling you to let

13   this man go as you were holding him in a choke-hold

14   and he was stabbing you anyway; correct?

15       A.   I'm sorry.  Say that again.

16       Q.   Mr. Pavey told you to let this shoplifter go

17   as you were holding him in a choke-hold and he was

18   stabbing you anyway; isn't that true?

19       A.   That is true.

20       Q.   You were stabbed while you had him in a

21   choke-hold, weren't you?

22       A.   He was slashing at me and stabbing me, yes.

23       Q.   And Mr. Pavey was telling you to let him go

24   so he could run out of the building; correct?

25       A.   We don't know that that would have happened.

1   He was telling me to let him go.

2        Q.   It's what did happen, isn't it?

3        A.   No.

4        Q.   When you let the man go, he ran out of the

5   building, didn't he?

6        A.   No, sir, he did not.

7        Q.   Did he stay in the building and wait for the

8   police?

9        A.   He stayed in the building but he didn't wait

10  for the police, no.

11       Q.   No.  Now, it's your testimony that after you

12  did finally let him go because you thought he was

13  blacked out from -- because he had gone limp in your

14  arms, that he then turned and stabbed you one last

15  time; correct?

16       A.   Correct.

17       Q.   And what did he say to you?

18       A.   After I was on the ground, he -- out of the

19  corner of my eye, I could see him circling behind me,

20  and he said, "I'll teach you for getting involved.  I

21  hope I killed you.  I'll be watching."

22       Q.   And he was talking to you, wasn't he?

23       A.   He was talking to me.

24       Q.   He wasn't talking to Stacie Pavey when he

25  said that, was he?

1        A.   He was talking to me, exactly.

2        Q.   Yeah.   And do you think maybe the reason was

3   because whereas Stacie Pavey had just been trying to

4   hold this man and restraining him from getting him

5   out, you had come in and kicked him and punched him

6   and tried to choke the life out of him?

7             MR. DEMURO:   Objection; speculation --

8   hold on -- argumentative, speculation, facts not in

9   evidence.

10            THE COURT:   Sustained.

11       Q.   *(BY MR. RICHARDS)*   You say that at that point

12  Stacie Pavey moved forward to protect you; is that

13  right?

14       A.   When the shoplifter said that to me, out of

15  the corner of my other eye, I noticed him get up off

16  the ground and he said to the shoplifter, "Leave.

17  Just leave.   Leave."

18       Q.   And he did, didn't he, he ran out the door?

19       A.   That's when he left.

20       Q.   At that point, it's your recollection

21  Mr. Pavey fell back to the ground?

22       A.   Yes.

23       Q.   All right.

24       A.   That's fair.

25       Q.   And you didn't see him get up again, did

1  you?

2      A.   No.  Not until he left on the hospital -- on

3  the ambulance.

4      Q.   This all happened really quickly, didn't it?

5      A.   According to the pictures, yes.  It seemed

6  like it took a lot longer.

7      Q.   But we know that it was over in seconds,

8  don't we?

9      A.   Absolutely.

10     Q.   In fact, we know from the pictures that those

11 outer doors, the reflection we can see, are actually

12 opening at 2:06:08, can't we?

13              MR. RICHARDS:  Would you bring that up,

14 please, Mr. Glass?

15     Q.   *(BY MR. RICHARDS)*  And you've studied these

16 pictures, haven't you?

17     A.   I've looked at them, yes.

18     Q.   And as you look at 2:06:08, you can see the

19 reflection of those outer doors beginning to open,

20 can't you?

21     A.   Yes, I can.

22     Q.   And as you look at 2:06:09, they're open all

23 the way, aren't they?

24     A.   It looks like it but that might be from me.

25 Because I was closer to those doors, they might have

1   opened because I was sitting on the ground with my

2   back up against that little white wall.

3       Q.   Now, because you were sitting on the ground

4   and not moving, do you see yourself in this -- in the

5   reflection?

6       A.   I don't.  Not here, no.

7       Q.   So apparently whatever caused those doors to

8   open wasn't sitting where we can see it, was it?

9       A.   No.

10      Q.   It was something that was moving, wasn't it?

11      A.   I don't know that because I don't see

12  anything in front of the doors moving outside of it.

13      Q.   Certainly by the time this lady came through,

14  that we see walking through at 2:06:20 -- I think

15  actually --

16              MR. RICHARDS:  Would you bring that up,

17  please?

18      Q.   *(BY MR. RICHARDS)*  And, of course, a couple

19  of seconds earlier we can actually see her coming into

20  the picture, but if we go to 20, 21, and 22, we see

21  her looking over to the side where the altercation

22  occurred, don't we?

23      A.   Yes.  We would have been in that area.

24      Q.   And it's certainly well over by then, isn't

25  it?

**United States District Court**

1    A.   I'm sorry?

2    Q.   It's certainly well over by then?  In other

3 words, she's not walking in and through that

4 vestibule --

5    A.   No.  It would have been over by then.

6    Q.   Yes, sir.  You'd been in situations like this

7 before, hadn't you?

8    A.   Not like this, no.

9    Q.   Well, as a bouncer and a security person,

10 isn't it true that you'd been involved in somewhere

11 between 50 and 100 fights or security confrontations

12 involving physical issues?

13    A.   I could say that's fair, yes.

14    Q.   Okay.  And you know that they happen very

15 quickly, don't you?

16    A.   They do.

17    Q.   Never went outside the vestibule that day,

18 did it?

19    A.   I'm sorry?

20    Q.   This incident never went outside that

21 vestibule that day, did it?

22    A.   Not to my knowledge.

23    Q.   In other words, once you entered into the

24 vestibule while the altercation was going on, you

25 never went back out into the store; correct?

1    A.   No, I didn't.

2    Q.   All right.

3    A.   That's correct.

4    Q.   Until it was over?

5    A.   Until it was over.

6    Q.   Nor did Mr. Pavey go into the store while the

7    altercation was going on?

8    A.   Not at all.

9    Q.   Nor did the shoplifter?

10   A.   No.

11   Q.   In other words, the instant happened in the

12   vestibule?

13   A.   It did.

14   Q.   And no customers came through that vestibule

15   while it was going on, did they?

16   A.   I -- I don't recollect.

17   Q.   Sir, you've seen the video.  There are no

18   customers coming through while that's going on, are

19   there?

20   A.   No, there's not.

21   Q.   One last thing, sir.  You mentioned something

22   about the store manager coming up and speaking to

23   Ms. Plonczynski.

24        We just watched this video clip.  Where was

25   the store manager in that video?

1    A.   She wasn't.  She came in after -- after the
2    video cut off.
3    Q.   I see.
4    A.   There also isn't any rescue people in it or
5    people coming back in from the store that
6    Ms. Plonczynski sent to get towels.  You don't see any
7    of that either.
8    Q.   Yes, sir.  You're not critical of Stacie
9    Pavey for not protecting you, are you?  You're not
10   saying that Mr. Pavey should have done something to
11   protect you from being hurt?
12   A.   I'm saying he asked me for my help and I
13   tried to help him in a desperate situation.
14   Q.   Yes, sir.
15            MR. RICHARDS:  Thank you.  I don't have
16   anything further, Your Honor.
17            MR. DEMURO:  I don't have questions,
18   Your Honor.
19            THE COURT:  Sir, you may step down.
20            THE WITNESS:  Thank you.
21            MR. DEMURO:  Your Honor, may I send my
22   co-counsel out to the hallway to retrieve the second
23   witness?
24            THE COURT:  Let me see both counsel at
25   the bench.

1    *(Bench conference outside the hearing of the jury)*

2                    THE COURT:  Who is your next witness?

3                    MR. DEMURO:  That's Jessica Therrien,

4    his daughter.  I've got 15 to 20 on direct max, 20

5    outside.  I'd really like to try to get her in because

6    she's got nursing school but we obviously serve at

7    your pleasure.

8                    THE COURT:  Do you know anything about

9    cross?

10                   MR. RICHARDS:  I've got five minutes

11   probably.  Not very much.

12                   THE COURT:  Okay.  They're going to get

13   anxious at five so hurry.

14                   *(Bench conference concluded)*

15                   THE COURT:  You may call your next

16   witness.

17                   MR. DEMURO:  Okay.  I'll go do it

18   myself.

19                      **JESSICA THERRIEN,**

20   ***after having been first duly sworn, says in reply to***

21   ***the questions propounded as follows, to-wit:***

22                      **DIRECT EXAMINATION**

23   **BY MR. DEMURO:**

24      Q.   I know it's getting close to five so let's be

25   as brief as we can, shall we?

1          Could you please introduce yourself to the

2    ladies and gentlemen of the jury?

3         A.   My name is Jessica Therrien.

4         Q.   And, Ms. Therrien, are you related in any way

5    to the defendant?

6         A.   Yes.

7         Q.   Excuse me.  To the plaintiff?

8         A.   Yes.

9         Q.   And how so?

10        A.   I'm his daughter.

11        Q.   Okay.  And, Ms. Therrien, where do you live?

12        A.   Tulsa, Mohawk Manor Apartments.

13        Q.   And how long have you lived in Tulsa?

14        A.   Since I was twelve.

15        Q.   Okay.  And how old are you?

16        A.   Twenty-seven -- twenty-six.  I'm sorry.

17        Q.   Go ahead.  I'm sorry?

18        A.   I'm 26.

19        Q.   And, Ms. Therrien, do you have any

20    children?

21        A.   Yes.  I have two daughters.

22        Q.   Okay.  And without telling me their names,

23    could you tell me their ages?

24        A.   Six and two.

25        Q.   Tell me just a little bit about your

1    educational background.  Where did you go to high

2    school?

3         A.   Jenks High School.

4         Q.   All right.  What year did you graduate from

5    Jenks?

6         A.   2000.

7         Q.   Have you had any college?

8         A.   Yes.

9         Q.   Just briefly describe your college experience

10   to the jury.

11        A.   I'm currently going for my LPN nursing

12   degree.  I've recently -- or in the past, I've done my

13   medical assisting and also surgery technologist.

14        Q.   And where did you go -- strike that.

15             When you say medical assisting and surgical

16   assistant, did you get any particular certificates or

17   anything?

18        A.   Yes.  I received certificates.

19        Q.   From what institutions?

20        A.   My surgery tech was from Platt College where

21   I'm currently attending, and my medical assisting was

22   Community Care College.

23        Q.   And you are currently attending nursing

24   school; is that what you said?

25        A.   Yes.

1     Q.  All right.  Do you have any other siblings,

2  any other brothers or sisters?

3     A.  Yes.

4     Q.  And who?

5     A.  Jay Therrien is my brother.

6     Q.  Okay.  Is that Mr. Therrien's natural son?

7     A.  Yes, yes.

8     Q.  All right.  Let's get right to the day of the

9  incident.

10     Do you remember the day that your father was

11  stabbed?

12     A.  Yes.

13     Q.  What were you doing that day?

14     A.  I was at work.

15     Q.  Where did you work at that time?

16     A.  Springer Clinic.

17     Q.  Here in Tulsa?

18     A.  Yes.

19     Q.  And what were your job responsibilities at

20  Springer?

21     A.  I performed electrocardiograms.

22     Q.  Okay.  How did you first become aware,

23  Ms. Therrien, that your father had been stabbed?

24     A.  I received a phone call.

25     Q.  Tell me about that.  From whom?

1          A.   I answered the phone and it was my father and

2     I couldn't understand him, and he passed the phone on

3     to Julie.

4          Q.   Did you understand where your father was when

5     he made that call?

6          A.   Not until I spoke to Julie.

7          Q.   Okay.  Now, when you say "Julie," are you

8     referring to Ms. Plonczynski?

9          A.   Yes.

10         Q.   And take us through that phone call.

11         A.   I answered the phone and I heard my name --

12    or my dad said "Jessie."  I couldn't remember the

13    rest -- or I couldn't understand the rest of what he

14    had said.  Then I heard him say, "Here, you tell her,"

15    and then that is when she got on the phone.

16         Q.   And what did Ms. Plonczynski say when she got

17    on the phone with you?

18         A.   She had told me that my dad had been stabbed

19    in the process of helping with a shoplifter and that

20    they were waiting on the ambulance and she wasn't sure

21    what hospital they were going to be going to.

22         Q.   Anything else you can recall from that

23    conversation with Ms. Plonczynski?

24         A.   No.

25         Q.   Okay.  What did you do when you found out

1  that your dad had been stabbed at the Super Target?

2      A.   I pretty much panicked.  I told my -- my boss

3  and my other fellow employees and then I just waited.

4  Then I called Saint Francis Hospital to see if he had

5  been admitted.

6      Q.   Okay.  Did Ms. Plonczynski when she talked to

7  you tell you what hospital he was taken to?

8      A.   No.

9      Q.   Okay.  And after you called Saint Francis,

10  what did you find out?

11      A.   That they did have him there.

12      Q.   What did you do next, Ms. Therrien?

13      A.   I went up to the hospital.

14      Q.   And then what happened?

15      A.   I visited my dad.

16      Q.   Okay.  What did you see and hear when you

17  were at the hospital visiting your dad?

18      A.   He was laying on the bed and was holding

19  his -- the bandaging over his -- where he had been

20  stabbed at.

21      Q.   When you first came to the hospital to see

22  your dad, was he in the emergency room?

23      A.   Yes.

24      Q.   All right.  And what was your understanding

25  of what was going on at that time with him medically?

1        A.   I wasn't too sure.

2        Q.   Okay.  Now, how long did you stay in the

3    emergency room?

4        A.   I can't remember.

5        Q.   Okay.  What did you do after you saw your dad

6    on the emergency room bed holding his bandage?

7        A.   What do you mean?

8        Q.   What did you do next?  Did you leave -- did

9    you happen to leave the emergency room?

10       A.   I stayed there for a little while and then I

11   did leave and I eventually went back up to Target.

12       Q.   Okay.  If you can -- if you can just give us

13   your best estimate, how long were you in the emergency

14   room before you went back to Target?

15       A.   I believe I was there at least thirty

16   minutes.

17       Q.   All right.  And why did you go back to Target

18   that day?

19       A.   I had to get my dad's vehicle and his -- the

20   stuff he had purchased.

21       Q.   And how did you get back to Target?

22       A.   I drove.

23       Q.   Now, at the time you had left to go back to

24   Target to pickup your dad's car, had your dad been in

25   surgery yet?

    1           A.   No.

    2           Q.   All right.  What happened -- well, strike

    3      that.

    4                Who did you, if anyone, go back to Target

    5      with?

    6           A.   I went with my boyfriend.

    7           Q.   Okay.  Is he still your boyfriend?

    8           A.   No.

    9           Q.   What's his name?

   10           A.   Stephen Holt.

   11           Q.   All right.  Now, what happened when you got

   12      to the Target?

   13           A.   I went in and I found Julie and I spoke with

   14      her and she gave me his -- his belongings.

   15           Q.   Okay.  And where did this conversation take

   16      place?

   17           A.   In the front of the store, right about where

   18      her office was.

   19           Q.   Okay.  And what do you recall about that

   20      conversation?

   21           A.   She had asked me how my dad was doing, she

   22      had told me that she hopes he gets better soon, and

   23      she had said that in their hearts he's a hero.

   24           Q.   Now, when she told you that in their hearts

   25      your dad was a hero, was there anybody else there?

1    A.   Yes.

2    Q.   Who was there?

3    A.   Stephen Holt was there and also another

4 employee.

5    Q.   And what was that other employee doing when

6 Ms. Plonczynski told you that your dad -- in their

7 hearts your dad was a hero?

8    A.   Nodding in --

9    Q.   You mean --

10    A.   -- "agreeance."

11    Q.   I'm sorry.  I talked over you.

12    A.   Yes.  Nodding in "agreeance."

13    Q.   How long did your conversation with

14 Ms. Plonczynski last when you went back to the Super

15 Target on June 3, 2005?

16    A.   It was pretty brief.  Maybe ten, maybe even

17 fifteen minutes, maybe not even that long.

18    Q.   Okay.  That's a pretty long time.  Do you

19 think it was that long?

20    A.   Yeah.  Maybe -- maybe five to ten.  I'm

21 sorry.

22    Q.   That's okay.  Do you have -- well, strike

23 that.  Leave it at that.

24         Okay.  Did you -- what did you do after you

25 left the Super Target that day?

1       A.   I believe I left, I went home, and then I

2   eventually went back up to the hospital.

3       Q.   Okay.  And did you visit your dad anytime

4   when he was in the hospital for that week?

5       A.   Yes.

6       Q.   And tell me what you saw and what you heard

7   during that week.

8       A.   A lot of pain --

9       Q.   Okay.

10      A.   -- moaning, he couldn't get up and move

11  around, and --

12      Q.   All right.  Did you ask your dad what had

13  happened?

14      A.   Yes.

15      Q.   And what did he say?

16      A.   He had told me that he was at Target

17  shopping, and while he was checking out he heard -- he

18  heard somebody hollering for help and went to help.

19  He said that he had grabbed the shoplifter and had him

20  in a hold and was told to release him and so he did.

21      Q.   All right.  Now, did you spend any time with

22  your father after he got out of the hospital the first

23  thirty days, let's say?

24      A.   I didn't stay overnight any but I did

25  visit.

1    Q.   During the first thirty days?

2    A.   Yes.

3    Q.   Please tell the jury, Miss, what you did with

4  your father during those first thirty days after he

5  got out of the hospital?

6    A.   I cleaned his house and did his shopping for

7  him, helped with, you know, food and stuff like that,

8  his --

9    Q.   Did your -- I'm sorry.  Go ahead.

10    A.   -- just his normal activities.

11    Q.   Okay.  Was your father living with anybody at

12  that time?

13    A.   No.

14    Q.   Did anybody else from your family -- was

15  anybody else from your family able to help him during

16  that time period?

17    A.   No.

18    Q.   Did your father seem like he was in pain

19  during that first thirty days?

20    A.   Yes.

21    Q.   How do you know that?

22    A.   Guarding himself, moaning, and just by him

23  saying he was in pain.

24    Q.   Now, during the next, let's say, thirty days

25  to six months out from the surgery, did you from time

1   to time visit your dad?

2       A.   Yes.

3       Q.   And how frequently would you visit him during

4   that time period?

5       A.   At least once a week, I believe, if not more.

6       Q.   Okay.  And tell the jury how your dad was

7   progressing during that time period up to about six

8   months postsurgery.

9       A.   He was still very slowly getting around and

10  doing the things he needed to do and still guarding

11  himself in pain.

12      Q.   Okay.  And that's at about the six-month

13  phase still?

14      A.   Yes.

15      Q.   What type of things did your dad like to do

16  before the surgery activity-wise?

17      A.   He would always take my daughter to the park

18  and play with her, he would babysit.  I worked a lot

19  and so he would spend a lot of time with her.

20      Q.   Now, in that thirty-day to six-month

21  postsurgery time, did you observe him being able to do

22  any of those things?

23      A.   No.

24      Q.   Okay.  What about the next, let's say, six

25  months; did you also visit your dad from time to

1    time --

2         A.   Yes.

3         Q.   -- within that first year -- from six months

4    to a year after his surgery?

5         A.   Yes.

6         Q.   And tell us what you saw about how your dad

7    was doing.

8         A.   He was slowly progressing.  He still wasn't

9    able to do things with my daughter like he had been

10   able to.  She couldn't sit on his lap.

11        Q.   How's your dad doing now?

12        A.   He's doing better.

13        Q.   Okay.

14        A.   He's pretty good.

15        Q.   All right.

16             MR. DEMURO:  Your Honor, I pass the

17   witness.  Thank you, Ms. Therrien.

18                    **CROSS-EXAMINATION**

19   **BY MR. RICHARDS:**

20        Q.   Ms. Therrien, just a few questions.

21             You say you were the one that helped your

22   father after he was discharged from the hospital?

23        A.   Yes.

24        Q.   All right.  He didn't have any home health or

25   anything like that that his doctor required?

1      A.   Right.

2      Q.   Do you know how he got to his doctors'

3 appointments?

4      A.   No.

5      Q.   You didn't take him, did you?

6      A.   No.

7      Q.   Did he have physical therapy?

8      A.   I don't know.

9      Q.   Okay.  He was living alone, you say, at that

10 point?

11     A.   Yes.

12     Q.   Okay.  And you say he's pretty active now?

13     A.   Yes.

14     Q.   Okay.  You told us he's exercising and that

15 sort of thing?

16     A.   Yes.

17     Q.   Now, you actually -- you saw him in the

18 emergency department of Saint Francis; correct?

19     A.   Yes.

20     Q.   And that was as soon as you could get away

21 from Springer Clinic to get over there to see him?

22     A.   Yes.

23     Q.   And this was on the day of the stabbing, of

24 course, I'm talking about?

25     A.   Yes.

1      Q.   When you saw him over there, he was alert and
2  he was awake; correct?
3      A.   Yes.
4      Q.   All right.  And at that point, in fact, he
5  told you that he was paying for merchandise when he
6  heard a security guard hollering for help as he was at
7  the cashier lane; is that right?
8      A.   Yes.
9           MR. RICHARDS:  Okay.  I don't have
10 anything further.  Thank you.
11          MR. DEMURO:  No further questions from
12 me either, Your Honor.
13          THE COURT:  May this witness be excused?
14          MR. DEMURO:  Yes, sir.
15          THE COURT:  Defense --
16          MR. RICHARDS:  Oh, yes.  I'm sorry.
17          THE COURT:  Do you have any objection to
18 this witness being excused?
19          MR. RICHARDS:  None at all, Your
20 Honor.
21          THE COURT:  Ma'am, thank you for your
22 testimony.  You may step down.  You may be excused.
23          Members of the jury, we'll take the evening
24 recess.  I'll ask you to be back just a little before
25 nine in the morning and we'll continue the trial.

1          Remember the admonition not to discuss this

2     among yourselves or allow anyone else to discuss it

3     with you and that includes family members.  So if

4     you'll just, if possible, put it out of your mind

5     until in the morning.

6          I'll ask everyone in the courtroom to please

7     remained seated as the jury leaves.  And you'll report

8     back to the deliberation room in the morning.

9          Is that correct, Pam?

10              THE CLERK:  (Nods head)

11          *(The jury exits the courtroom)*

12              THE COURT:  Let the record reflect the

13    jury's departed the courtroom.

14          Anything to take up outside the hearing of

15    the jury in behalf of plaintiff?

16              MR. DEMURO:  Not at this time, Your

17    Honor.

18              THE COURT:  Defense?

19              MR. RICHARDS:  No, Your Honor.

20              THE COURT:  We'll be in recess.

21          *(The proceedings were recessed)*

22

23

24

25

1                    C E R T I F I C A T E

2

3

4              I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11             I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16             In witness whereof, I have hereunto set my

17   hand this 10th day of June 2008.

18
                        s/ Brian P. Neil
19          _____
                 Brian P. Neil, CSR-RPR, CRR, RMR
20               United States Court Reporter

21

22

23

24

25

**United States District Court**