IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

TIMOTHY S. THERRIEN,          )
an individual,                )
                              )
            Plaintiff,        )
                              )
-vs-                          ) No. 06-CV-217-JHP
                              )
TARGET CORPORATION,           )
a Minnesota corporation,      )          **VOLUME III**
                              )
            Defendant.        )


TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**BEFORE THE HONORABLE JAMES H. PAYNE**
**UNITED STATES DISTRICT JUDGE**

MAY 20, 2008




A P P E A R A N C E S


    **Paul DeMuro and Dustin J. Vanderhoof**, attorneys
at law, Frederic Dorwart Lawyers, 124 East Fourth
Street, Tulsa, Oklahoma, 74103, attorneys on behalf of
the Plaintiff;

    **Phil R. Richards and Jason L. Glass**, attorneys at
law, Richards & Connor, 525 South Main Street, 12th
Floor, Tulsa, Oklahoma, 74103, attorneys on behalf of
the Defendant.



*REPORTED BY:*          ***BRIAN P. NEIL, CSR-RPR, RMR, CRR***
                        *United States Court Reporter*


**United States District Court**

1                                I N D E X

2
                                                              Page
3

4     *WITNESSES ON BEHALF OF THE PLAINTIFF*

5

      **STACIE PAVEY**
6

      Direct Examination by Mr. DeMuro                         176
7     Cross-Examination by Mr. Richards                        252
      Redirect Examination by Mr. DeMuro                       273
8     Recross-Examination by Mr. Richards                      280
      Further Redirect Examination by Mr. DeMuro               281

9

10    **JULIE PLONCZYNSKI**

11    Direct Examination by Mr. DeMuro                         285
      Cross-Examination by Mr. Richards                        314
12    Redirect Examination by Mr. DeMuro                       320

13

      **SCOTT MANLEY**
14

      Direct Examination by Mr. DeMuro                         325
15    Cross-Examination by Mr. Richards                        330
      Redirect Examination by Mr. DeMuro                       333

16

17

18

19

20

21

22

23

24

25

                        Tuesday, May 20, 2008

                            * * * * *

1          THE COURT:  Let the record reflect the

2    parties are present with counsel.

3          Anything to take up before I bring the jury

4    in for plaintiff?

5              MR. DEMURO:  No, Your Honor.

6              THE COURT:  For the defense?

7              MR. RICHARDS:  No, Your Honor.

8              THE COURT:  If you could just bring the

9    jury in.

10              *(The jury enters the courtroom)*

11              THE COURT:  You may be seated.  Let the

12   record reflect the jury's in the box, parties are

13   present.

14          You may call your next witness.

15              MR. DEMURO:  Your Honor, may it please

16   the court, may I go in the hallway and get Mr. Pavey?

17              THE COURT:  You may.

18              MR. DEMURO:  Thank you, sir.

19          Your Honor, at this time the plaintiff calls

20   Mr. Stacie Pavey.

21              THE COURT:  Mr. Pavey, raise your right

22   hand and be sworn, please.

1          *STACIE PAVEY,*

2     *after having been first duly sworn, says in reply to*

3     *the questions propounded as follows, to-wit:*

4                    **DIRECT EXAMINATION**

5     **BY MR. DEMURO:**

6          Q.   Good morning, Mr. Pavey.

7          A.   Good morning.

8          Q.   Please tell the jury your full name.

9          A.   Stacie Keith Pavey.

10         Q.   And, Mr. Pavey, where do you live?

11         A.   Tulsa.

12         Q.   How long have you lived in Tulsa?

13         A.   Pretty much my whole life.

14         Q.   Okay.  And how old are you, sir?

15         A.   Twenty-five.

16         Q.   Now, let me get some preliminaries out of the

17    way.

18              You understand that you've had your

19    deposition taken in this case before?

20         A.   Yes, sir.

21         Q.   And at that deposition, Target's counsel

22    represented you?

23         A.   Yes, sir.

24         Q.   And he helped you prepare for that

25    deposition?

1    A.   Yes, he did.

2    Q.   And you met with Target's counsel in

3  preparation for your deposition?

4    A.   I did.

5    Q.   And do you understand, too, sir, that

6  Target's counsel is representing you for purposes of

7  this trial?

8    A.   I do.

9    Q.   And you've met with Target's counsel in

10  preparation for this trial?

11    A.   I have.

12    Q.   **XXXX XXXXXX, XX X XXX XXXX, XXX XXX XX XXXXXX**

13  **X XXXXXX XXXXXXXX; XXXXXXX**?

14    A.   **XXXXXXX.**

15    Q.   **XXX XXXX XXXXXX XX XXXXXXX XX XXXX**?

16    A.   **XXXXXXX.**

17    Q.   **XXXXX XXXXX X XXX XXXXX XXXX XXX XXXXXXX**?

18    A.   **XXX, XXX.**

19    Q.   **XXX XXX XXXX XX XXXXXX X XXXXXX XX, X**

20  **XXXXXXX, XXXXXXXXX XXXXXX**?

21    A.   **XXX.**

22    Q.   **XXXX.   XX XXXX XXXX XXXXXX XXXXX XXXXX**?

23    A.   **XXX, XXX.**

24    Q.   All right.  And that was just a few days

25  before you gave your deposition when you left?

1    A.   Correct.

2    Q.   Right.  Now, as I understand it, sir, you did

3  graduate from high school in 2001?

4    A.   I did.

5    Q.   And you pursued some college at Tulsa

6  Community College?

7    A.   Correct.

8    Q.   But when we last visited as of January of

9  2008, you had not yet obtained a degree?

10   A.   Correct.

11   Q.   Is that still the case?

12   A.   Yes, sir.

13   Q.   Okay.  Now, Mr. Pavey, at the time of this

14  stabbing, your position with Target was what was known

15  as an asset-protection specialist; right?

16   A.   Correct.

17   Q.   And an asset-protection specialist was

18  basically a plain-clothes asset-protection employee?

19   A.   Correct.

20   Q.   And your job was to detect, observe, follow,

21  and attempt to apprehend folks who were stealing from

22  Target?

23   A.   Yes, sir.

24   Q.   Now, there were other security positions at

25  Target when you were there; correct?

1          A.   Correct.

2          Q.   Including what's called a Target protection

3    specialist --

4          A.   Yes.

5          Q.   -- right?

6               And the Target protection specialists were

7    the individuals who actually wore uniforms?

8          A.   That's correct.

9          Q.   Like a Target uniform, khaki pants, khaki

10   shirt, little badge maybe?

11         A.   I'm not sure what the colors of the uniform

12   were at the time, but yes.

13         Q.   They were clearly identifiable --

14         A.   Right.  Correct.

15         Q.   -- as a Target security person; right?

16         A.   Yes.

17         Q.   We may not remember the exact uniform, but

18   they were khaki uniforms, they looked like a security

19   guard?

20         A.   Right.

21         Q.   And their job usually was to be stationed

22   near the front of the store to help act as a

23   deterrent?

24         A.   That's correct.

25         Q.   A deterrent to those who might shoplift?

1        A.   Correct.

2        Q.   And their job also was to assist people like

3   you, the plain-clothes employees, to make

4   apprehensions; correct?

5        A.   That's correct.

6        Q.   Only people that were certified by Target to

7   make apprehensions could make apprehensions?

8        A.   That's correct.

9        Q.   And those folks were the people that were

10  certified as the plain-clothes people,

11  asset-protection specialists?

12       A.   Correct.

13       Q.   Like yourself?

14       A.   Right.

15       Q.   xxx xxxxxxx xxxxxx, xxxxx xxxxx xx

16  xxxxxxxxxxxxxx xxxxx xx xx xxxx xxxx xxxxxxxxxxxxx xxx

17  xxx xx xxxxxxxx xxxx xxxxxxxxxx; xxxxx?

18       A.   That's correct.

19       Q.   And typically the way you like to do it was

20  to have a uniformed guard positioned at the front of

21  the store --

22            MR. RICHARDS:  Objection, Your Honor.

23  This is --

24            MR. DEMURO:  Can I finish my question?

25    *(Bench conference outside the hearing of the jury)*

**United States District Court**

1          MR. RICHARDS:  Your Honor, my objection

2     is going into the typically what he would do, that

3     they would typically like to have a Target protection

4     specialist standing outside the doors to assist is

5     getting into an area that the court has said is not

6     what this case is about.  He's not talking about this

7     apprehension.  He's talking about other methods to do

8     an apprehension in this case.

9          MR. DEMURO:  This is all proper

10    foundation, getting into what happened in this

11    apprehension, all of it.

12         THE COURT:  What's the question?

13         MR. DEMURO:  The question will be:  Do

14    you usually position a Target protection specialist in

15    the front of the store when you make an apprehension?

16         THE COURT:  The objection's sustained.

17         MR. DEMURO:  I need to make an offer of

18    proof on that.

19         THE COURT:  Go ahead and make it.

20         MR. DEMURO:  May I get my material?

21         THE COURT:  You may.

22         MR. DEMURO:  This whole issue goes to a

23    breach that occurred after the altercation took place

24    and fits within your order, which is they should have

25    had a second guard there afterwards.

1            THE COURT:  Well, that wasn't the

2    question but --

3            MR. DEMURO:  That's what it went to,

4    Your Honor.

5            MR. RICHARDS:  Your Honor, after the

6    altercation was over, there was no -- what happened

7    didn't cause an injury to Mr. Therrien.  The injury

8    occurred in the altercation.

9            MR. DEMURO:  The whole theory is -- and

10    I'm working hard to try to fit your --

11            THE COURT:  I want you to understand it

12    is very narrow and there's a reason that you have to

13    work hard.

14            MR. DEMURO:  Well, I ought to be able to

15    have an opportunity -- it's narrow but it's not

16    closed.  If it was closed, then we shouldn't even be

17    here, so it's narrow so I can get in there.

18            THE COURT:  Okay.  What's your question?

19            MR. DEMURO:  My point is, that the issue

20    of whether or not there should have been a second

21    security guard there persisted during and after the

22    fight.  If there was a second security guard there,

23    nobody would have got hurt.  That's my theory and that

24    fits within your order.

25            THE COURT:  The --

1          MR. RICHARDS:  May I respond, Your

2    Honor?

3          THE COURT:  You may.

4          MR. RICHARDS:  What the plaintiff's

5    suggesting is that the altercation never would have

6    occurred had there been a second security guard there.

7    First of all, it's obviously speculation because there

8    wasn't and we can't know that that's true.  The same

9    instance may have occurred if there was a second

10   security guard.

11          The court's order is that the duty to Target

12   only arose at the point that Mr. Therrien entered into

13   the altercation.  The evidence is absolutely beyond

14   question that it was at that point that he was injured

15   and that at that point only Mr. Pavey was engaged in

16   apprehending the shoplifter.  So whether there could

17   have or theoretically should have been a second

18   asset-protection employee present at the time, there

19   was not and it's not relevant under the court's order.

20          Whether there could or should have been

21   someone there after the fact is irrelevant because

22   Mr. Therrien was already injured at that point.  It

23   couldn't have caused him injury that there wasn't

24   somebody there after the fact.

25          MR. DEMURO:  If there was a second guard

**United States District Court**

1   there when Mr. Therrien entered the altercation, the

2   altercation would have been different and Mr. Therrien

3   wouldn't have been hurt.

4           THE COURT:  Objection's sustained.

5           MR. DEMURO:  My offer of proof, Your

6   Honor, is that this witness would testify that he

7   xxxxx xxxx -- xx xxxxx xxx xx xxxxxxxxx xx xxxx, xx

8   xxxxx xxxx xxxxxx xxx xxxx xxxxxx xxxxxxxxxx

9   xxxxxxxxxx xx xxxxxxxx xxxxxxx xx xxx xxxxx xx xxx

10  xxxxx xx xxxx xxx xx xxx xxxxxxxxxxx.  xx xxxxxx xx

11  that because one wasn't on duty.  This witness will

12  testify that that was his usual and preferred practice

13  because it was safer.

14          THE COURT:  Okay.

15          *(Bench conference concluded)*

16      Q.  *(BY MR. DEMURO)*  Okay.  Let's get back to it.

17          On the day of the stabbing, you were the only

18  asset-protection specialist in the store that was

19  solely dedicated to working the floor; correct?

20      A.  Correct.

21      Q.  And that's for the entire Super Target --

22      A.  Yes, sir.

23      Q.  -- right?

24          There was no other uniform guard on the

25  store; correct?

1          A.   I don't recall.

2          Q.   You don't recall one way or another?

3          A.   If there was another uniform guard, I don't

4    remember.

5          Q.   I want to get clear on this point.

6               Are you saying that --

7                    MR. RICHARDS:  Your Honor, let me

8    object.  This is exactly what we talked about; this is

9    not relevant.

10                   MR. DEMURO:  The fact of whether or not

11   there was someone there to help him is not relevant?

12                   MR. RICHARDS:  It's not relevant to the

13   circumstances of this apprehension.

14                   MR. DEMURO:  And now it goes to

15   credibility because this witness said something

16   different before about whether or not there's --

17                   THE COURT:  I'll allow you to rephrase

18   the question and give counsel an opportunity to object

19   to your new question.

20         Q.   *(BY MR. DEMURO)*  Now, Mr. Pavey, you recall,

21   don't you, that there wasn't a Target protection

22   specialist, a uniform guy, working that day; correct?

23                   MR. RICHARDS:  I object to the

24   relevance, Your Honor.

25                   THE COURT:  Sustained.

**United States District Court**

1        MR. DEMURO:  Again, Your Honor, it goes

2   to credibility.

3        THE COURT:  I understand but it's

4   sustained.

5        MR. DEMURO:  I need to make an offer of

6   proof.

7        THE COURT:  You may.

8    *(Bench conference outside the hearing of the jury)*

9        MR. DEMURO:  This witness would have

10  xxxxxxxxx, xx xxxxxxxxxx xxxx xxx xxxxxxxxxx, "xxxxxxx

11  xx xxxxx xxx x xxxxxx xxxxxxxxxx xxxxxxxxxx xx xxxx

12  xxx xxx xxxxxxxxx, xxxx x xxxx, xxx xxxx, xxxx xxxx,

13  xxx xxxx, xxxx xxxxxxxx xxxx xxxxxxx xxx xxxx xxxxx xx

14  xxxx xxxx xx xxxxx x xxxx xx xx xxxxxx xxxx, xxx xxxx

15  xx.  xxxxxx xx xxxxx xxxxxxxxx.  xxx xx xxx xx x xxxx,

16  there wasn't a certified TPS working that day.

17        "QUESTION:  And when there had been one

18  working with them, how would you relay the information

19  to them?

20        "By walkie-talkie.

21        "QUESTION:  If there had been another

22  asset-prevention team member in the store at that

23  time, do you think you would have called for his or

24  her assistance?

25        "ANSWER:  I would have."

**United States District Court**

1    Now it goes to credibility and credibility is

2    always an issue separate from the --

3         THE COURT:  It's not in evidence.  It's

4    not relevant.

5         *(Bench conference concluded)*

6    Q.    *(BY MR. DEMURO)*  Now, Mr. Pavey, you know

7    that all apprehensions that you make have a potential

8    for risk of harm, don't you?

9    A.    Yes, sir.

10   Q.    Every time that you know that you're going to

11   make a physical confrontation with a shoplifter, you

12   know there's a danger?

13   A.    Correct.

14   Q.    Because you're apprehending somebody who is

15   basically someone who you think is a thief?

16   A.    Correct.

17   Q.    And most thieves want to get away?

18   A.    Correct.

19   Q.    xxx, xxx xxx xxxxx xxxx xxxxxx xxxxx xx xxxxx

20   xxx xxxxxx xx xxxx xxxxx xxxxxxxxxxxxx xx xxx-xxx xx

21   xxxxxxxx, xx xxxxxx xx xxxxxx x xxxxx xx xxxxxxxx;

22   xxxxxxx?

23   A.    Correct.

24   Q.    Because you're aware that if there is a scene

25   that's created, if a confrontation erupts, that it can

**United States District Court**

```
 1    be a risk to those that are involved; correct?
 2         A.   Correct.
 3         Q.   And it could potentially cause injury to
 4    yourself?
 5         A.   Correct.
 6         Q.   And if an altercation occurs and a physical
 7    confrontation erupts, it could potentially attract
 8    guests to the area?
 9         A.   Correct.
10         Q.   And it could potentially end up harming the
11    guests --
12         A.   Correct.
13         Q.   -- if an apprehension gets out of control?
14         A.   Correct.
15         Q.   xxx xxxxxx xxx xxx xxxxxx xxx xxxxxxxx xx xxx
16    x xxxxxxxx xxxxxxxxxxx xs x xxxx xxxxxx; xxxxxxx?
17         A.   Correct.
18         Q.   xxxx xx -- xxxx xx -- xxx xxxxx xxxxxxxx xx
19    xxxxxxxx xxx xxxxxxxxxx xxxx xxx xxx xx xxx xxxxxxxx
20    xxxxx; xxxxxxx?
21         A.   That's correct.
22         Q.   And that's, again, because you know that
23    physical confrontations create a risk of harm to
24    guests?
25         A.   Correct.
```

1    Q.   You also know, don't you, sir, that sometimes

2  shoplifters carry weapons?

3    A.   Correct.

4    Q.   And sometimes shoplifters carry knives, for

5  example?

6    A.   Correct.

7    Q.   Sometimes shoplifters use knives to tear open

8  the packages that they're concealing?

9    A.   Correct.

10    Q.   And so it's foreseeable, is it not, that

11  shoplifters that you're trying to apprehend may be

12  carrying a knife?

13            MR. RICHARDS:  I'll object to it as

14  calling for a legal conclusion.

15            THE COURT:  Argument, Counsel?

16            MR. DEMURO:  I'm just asking for his

17  view of whether it's foreseeable.  I don't think

18  that's legal; that's a fact question.

19            THE COURT:  Overruled.  You may answer.

20    A.   Could you repeat question?

21    Q.   *(BY MR. DEMURO)* Sure.  Given all we've just

22  said about shoplifters carrying weapons and

23  shoplifters resisting, it's foreseeable, isn't it,

24  that when you make an apprehension, a shoplifter who

25  may be carrying a knife may resist?

**United States District Court**

1          A.   Correct.

2          Q.   And that's why you got to be as careful as

3     possible to follow all the rules and guidelines there

4     are about safe apprehensions?

5          A.   Correct.

6          Q.   xxx xxx xx xxx xxxxx xxx xxxxxxxxxx xxxx xx

7     xxxx xxxxxxxxx xx xxxx xxxxx xxxxxxxx xxxxx xx xxxx

8     xxxxxxxxxx xxxxxxxxx xx x xxxx xxxxxx?

9          A.   That's correct.

10         Q.   xxx xxxxxxx xxxxxxxxx xx xxxxx xx xxxxx xx

11    xxxx x xxxxxxxxxx xxxx xxxxxx xxxxx xxxxxx xxxxxxxxxx

12    xxxxxxxx; xxxxxxx?

13         A.   Correct.

14         Q.   That's one of the things that ensures a safe

15    apprehension; right?

16         A.   Correct.

17         Q.   Because if you touch or grab somebody from

18    behind before you get in front of them and identify

19    yourself, that could cause a violent eruption?

20         A.   Possibly.

21         Q.   At least that's what you've been taught by

22    Target?

23         A.   Correct.

24         Q.   Do you have an exhibit --

25              MR. DEMURO:  Does the witness have an

1    exhibit notebook, Ms. Wilson, a plaintiff's exhibit

2    notebook.

3         Q.   *(BY MR. DEMURO)*   Sir, is there a plaintiff's

4    exhibit notebook in front of you?  Do you have a

5    plaintiff's exhibit notebook in front of you, sir?

6         A.   Yes, sir.

7         Q.   Could you please turn to Exhibit 63?

8         A.   *(Witness complies)*.

9         Q.   Do you have that in front of you?

10        A.   I believe so.

11        Q.   These were documents that were produced by

12   Target as the part of the asset AP academy training

13   materials.  Do you recognize those?

14        A.   Yes, sir.

15        Q.   Do you recognize those as being Target's

16   training materials, as it's been represented to us,

17   that existed at the time of this apprehension?

18        A.   Well, I believe that the training I had was

19   similar.

20        Q.   Okay.

21        A.   This looks like a little bit newer version.

22        Q.   Let's -- let's -- and I'll represent to you

23   again that these were documents produced by Target's

24   counsel in this case, represented to be the AP academy

25   that were in effect at the time that this stabbing

**United States District Court**

1    took place.

2         A.   Okay.

3         Q.   Do you have any reason to dispute that?

4         A.   No.

5         Q.   Could you turn to the 6th page of Exhibit 63,

6    which is the bottom of -- the page number's at the

7    bottom middle.

8         A.   *(Witness complies)*.

9         Q.   And this particular page is entitled:

10   "Apprehending the shoplifter, things not to do."

11                  MR. RICHARDS:  Your Honor, let me object

12   at this point.  It's actually entitled:  "Approaching

13   the shoplifter."  And this all precedes -- these

14   documents precede the involvement of Mr. Therrien in

15   this altercation and under the court's ruling it's not

16   relevant.  Therefore, I object to reference to them.

17                  THE COURT:  Counsel?

18                  MR. DEMURO:  Yeah, two things, Your

19   Honor.

20                  This witness has already testified without

21   objection that grabbing somebody from behind can

22   create a risk of a violent confrontation.  That's what

23   happened in this case and that's the point at which

24   Mr. Therrien became involved.

25                  So this is merely an extension of the

1  evidence that's already been presented.  The evidence

2  has been that Mr. Therrien didn't get involved until

3  he saw a fight.

4    *(Bench conference outside the hearing of the jury)*

5            THE COURT:  It's my fault, not your

6  fault, but the speaking objections when we're talking

7  about issues that are at least arguably part of the

8  motion in limine are not appropriate, but I should

9  have stopped you quicker.

10            MR. RICHARDS:  My point is simply this:

11  I cannot object constantly to Mr. DeMuro getting

12  outside the court's ruling without risking prejudicing

13  the jury against Target.  So far I've given -- trying

14  to give some latitude on this to lay some kind of

15  predicate about how Mr. Pavey initiated this

16  apprehension because I think that's obviously some

17  background information that the jury needs to know.

18            But at this point, we're getting into

19  policies and procedures that are absolutely irrelevant

20  because they precede the point of Mr. Therrien's

21  involvement and it's outside the scope of what the

22  court said is admissible testimony.

23            I'm having a problem here with having to

24  object repeatedly to testimony that goes outside what

25  happened when Mr. Therrien got in this thing.  It's

1  just putting me in a bad light with the jury.

2          MR. DEMURO:  This testimony is exactly

3  the point in time when Mr. Therrien got involved.

4  Mr. Therrien turned around and saw the fight and ran

5  towards it.  The point that the fight started is

6  exactly when he got involved.  That's what this is

7  geared to do.

8          THE COURT:  I don't think so.

9  Sustained.

10          MR. DEMURO:  I would like to make an

11  offer of proof on that.

12          THE COURT:  You may.

13          MR. DEMURO:  This witness will testify

14  xxxx xxxxxx xxx x xxxxxx xxxxxxxx xx xxxxxxx xx-x,

15  xxxx xx xxx xxxx xx xxxxxxx xxxxxxxxxx xxxx xxxx xxx

16  xxx xxx xxxxx xxx x xxxxxxx xxxxxxxxxxxxx, xxxxxxx

17  xxxxxx xxxx xxxx x xxxxxxxxxx, xxxxx xxxxx xx xxxx xxx

18  xxxxxxxxxxxx xxx xxxxxx xxx xxxx xxxx x xxxxxx xx xxxx

19  xxxx xxxx xxx xxxxx xxxxxxxxxxxxx, xxxx xx xxxxx

20  happened in this case, and he's already testified to

21  that.

22              *(Bench conference concluded)*

23      Q.   *(BY MR. DEMURO)*  Mr. Pavey, would you agree

24  that everybody -- well, strike that.

25          Would you agree that when you were working in

1   loss prevention at Target, that you felt pressure to

2   make apprehensions?

3                 MR. RICHARDS:  I'm going to object to

4   the relevance.

5                 THE COURT:  Sustained.

6                 MR. DEMURO:  I would like to make an

7   offer of proof.

8                 THE COURT:  You may.

9     *(Bench conference outside the hearing of the jury)*

10                MR. DEMURO:  This witness would testify

11  that he believed that Target had a quota system in

12  place for apprehensions at the time --

13                THE COURT:  No.  I don't know if you

14  didn't get the message, but I know you have real

15  strong evidence of what the training required, the

16  training manuals, and all those things, but in my

17  wisdom, or lack of wisdom, I've ruled that that's not

18  the appropriate evidence to come in.

19           The kickoff point is when in the -- in the

20  case that when there was an immediate event that

21  caused danger to Mr. Therrien, that event, not before

22  that.  You're trying to establish that this is a

23  standard negligence case and it's not.  I mean, that's

24  your view but that's not the court's view.

25                MR. DEMURO:  I'm just trying --

1          THE COURT:  Or you can make your --

2          MR. DEMURO:  Let me respond to that.

3          THE COURT:  No, I don't want you to

4    respond.  I'm just trying to help you to see how I see

5    the case, but you can make your offer.

6          MR. DEMURO:  Well, I object to what Your

7    Honor just said.

8          THE COURT:  That's my rule.

9          MR. DEMURO:  The evidence --

10         THE COURT:  So that's why we're having

11   this frustration is, I've ruled one way and I'm trying

12   to keep you within that and you're trying to go back

13   as if I haven't ruled, and that's okay.

14         MR. DEMURO:  What I'm trying to do now

15   is abide by Your Honor's rulings.

16         THE COURT:  Okay.  You haven't.  You can

17   make your offer of proof.

18         MR. DEMURO:  This witness will testify

19   that there's a quota system at Target that there's a

20   color-coded system -- red, yellow, and green -- that

21   they were under significant pressure to make

22   apprehensions based on that.  It's called a

23   key-performance measure.  They were reviewed in part

24   by their supervisors on the number of apprehensions

25   they made, and that at the time of this apprehension,

1  Mr. Pavey was low in his apprehensions and had been

2  criticized for not making enough apprehensions in the

3  review that preceded this apprehension, which is

4  relevant to the reason why he was so aggressive after

5  the point in time when the fight got started and after

6  the point in time Mr. Therrien got involved in the

7  fight.

8       That's why it's relevant pursuant to the

9  court's order.

10       THE COURT:  Offer of proof is made.

11       MR. RICHARDS:  Your Honor, I would say

12  on behalf of Target, we would dispute that that would

13  be the evidence.  We obviously don't think it's

14  relevant, and at this point I'm going to move for a

15  mistrial on the basis that there have been repeated

16  interjections of evidence outside of what the court

17  has ordered is permissible in this case.

18       It's prejudicing the defendants because

19  obviously we are trying to try this case with a set of

20  not relevant evidence.  I'm concerned that the jury is

21  becoming bias against Target simply because we're

22  repeatedly objecting to improper questions.

23       THE COURT:  Okay.  I'm going to overrule

24  your motion for mistrial but with this admonition.

25       Whether I'm right or whether I'm wrong, I'm

**United States District Court**

1    the judge and I'm required to set the rules and

2    standards by which we try this case.  And it may be a

3    simplistic view of what the law is, but where the

4    plaintiff's case should be started and ending is

5    with -- at the very earliest with what did Target do

6    after the skirmish started.

7              I mean, that's the most liberal view, what

8    did Target do, if anything, after that, not before,

9    not what the policies were, not how many people that

10   came there and shoplifted before.  I mean, I think the

11   law is very clear about that.  When the incident

12   happened, what did Target do after the incident

13   started?

14             If you go -- if you -- and I think it can

15   even be refined that there's a question of

16   whether -- there might be a question as to whether the

17   plaintiff was in danger when the scuffle started.  He

18   wasn't in the scuffle when it started as I understand

19   the facts.

20                  MR. DEMURO:  Your Honor, this witness --

21                  THE COURT:  Nothing that happened before

22   that is relevant.

23                  MR. DEMURO:  This witness just testified

24   that anytime there's a physical confrontation --

25                  THE COURT:  That has nothing --

1    "anytime" has nothing to do with this.  This is what

2    did Target do in this instance.  That's what I think

3    the law is and I think that's what evidence is

4    relevant.

5                 MR. DEMURO:  Well, I'd like to respond.

6    If he's objecting to my offer of proof, then I would

7    like a hearing --

8                 THE COURT:  He's already asked for a

9    mistrial, I've overruled it, and I've given you those

10   thoughts going forward.

11                MR. DEMURO:  My point is, if he's going

12   to object to my offer of proof, I want the opportunity

13   to get it out through the witness outside the presence

14   of the jury.

15                MR. RICHARDS:  It's based on deposition

16   testimony that he submitted in writing.  There's no

17   reason to delay proceedings by having a hearing in

18   camera.

19                MR. DEMURO:  You know what was testified

20   to.  I told the judge exactly what was testified to.

21   If you're going to object to it, I got a right to put

22   it on.

23                THE COURT:  I mean, my understanding --

24   he can speak for himself -- my understanding was the

25   truth of what you put on was not the issue, it's just

1    the fact that you were raising that issue and causing

2    him to have to object was prejudicing his client.

3                    MR. DEMURO:  Is that correct,

4    Mr. Richards?

5                    MR. RICHARDS:  That's the issue on the

6    question of mistrial.  I would take issue with

7    Mr. DeMuro's offer of proof to the extent that he's

8    suggesting that Mr. Pavey testified -- that he

9    testified that he was under significant pressure

10   because of quotas.  That was not his testimony, about

11   being under significant pressure.  It may be an

12   interpretation of the situation but it's still not

13   relevant.

14                   THE COURT:  Now --

15                   MR. DEMURO:  I'll remove the word

16   "significant" to move things along.  But the offer of

17   proof is that he felt he was under pressure to make

18   his quotas, that he had been criticized for the making

19   of apprehensions prior, and in his review previous to

20   this incident, I think there was a three-colored

21   system to track their apprehensions, and that they

22   didn't get credit if the guy got away.

23                   MR. RICHARDS:  You know, my suggestion

24   is, I'd be happy to submit the testimony in a

25   written -- in writing to the court, file it as the

**United States District Court**

1    testimony of Mr. Pavey on those issues.  I think

2    that's the best evidence of what he said.

3                  MR. DEMURO:  I mean, you know the

4    deposition, Phil, that's what he testified to.

5                  MR. RICHARDS:  I don't think that he

6    said he was criticized.

7                  MR. DEMURO:  But the testimony is what

8    it is.  I'll submit it in writing, file it with the

9    court.

10                 THE COURT:  Is that satisfactory with

11   plaintiff, to submit the deposition as part of the

12   offer of proof?

13                 MR. DEMURO:  Yes.  And an exhibit.

14                 THE COURT:  When you say "exhibit," I

15   didn't understand what you meant.

16                 MR. DEMURO:  There's an exhibit, his

17   performance review evaluation, that makes that point

18   that's criticized --

19                 THE COURT:  What's the exhibit number?

20                 MR. DEMURO:  It's probably Exhibit 74,

21   Plaintiff's Exhibit 74.

22                 THE COURT:  And you're making that as

23   part of the offer of proof?

24                 MR. DEMURO:  Yes, sir.

25                 THE COURT:  Exhibit 74, which is what?

1          MR. DEMURO:  Which is Mr. Pavey's

2    performance review evaluation, the one that was

3    immediately prior to this incident, the most recent

4    one.

5          THE COURT:  And what does it reflect?

6          MR. DEMURO:  It says, quote, you need to

7    increase your apprehensions, and that he had not been

8    meeting his quotas for apprehensions.

9          THE COURT:  Do you have any doubt about

10   the --

11         MR. RICHARDS:  It says what it says.

12         THE COURT:  Okay.  Seventy-four will be

13   part of the offer of proof and the deposition.

14         MR. DEMURO:  I'll submit that at a break

15   or at the end of the day.

16         MR. RICHARDS:  As far as I'm concerned,

17   you can do it after the trial is over.  I'm not going

18   to object if it comes in after the trial.

19         THE COURT:  My practice generally is

20   before we close is to call you forward and check with

21   the clerk to be sure if there's anything -- you can do

22   that either at the next break or at the close of the

23   trial.

24         *(Bench conference concluded)*

25      *Q.   (BY MR. DEMURO)*  Okay.  Let's see if we can

1   reorient ourselves, Mr. Pavey.

2              xxxx xx xxx xxxx xxxxxxxxxx, xx xxxx xxxxxxx

3   xxxxx xxx xxxx xx xxxx xx xxxxxxxxxxxx xx xxx-xxx xx

4   xxxxxxxx.  xx xxx xxxxxx xxxx?

5       A.   Yes, sir.

6       Q.   And, again, the need to do that is to avoid

7   potential injuries to guests?

8       A.   Correct.

9       Q.   Because if an apprehension gets out of

10  control, guests can get attracted to the area and get

11  involved in the melee?

12      A.   Possibly.

13      Q.   Now, you've had a situation before this, have

14  you not, when a guest got involved in an

15  apprehension?

16              MR. RICHARDS:  Object.  The court's

17  ruled on this that situations before this are not

18  xxxxxxxx.

19              THE COURT:  xxxxxxxxx.

20              MR. DEMURO:  x xxxxx xxxx xx xxxx xx

21  xxxxx xx xxxxx xx xxxx xx xxxxxxxx xxxx xxx xxxxxxxxxx

22  exhibit.

23              THE COURT:  And what is that exhibit?

24              MR. DEMURO:  Exhibit 72 -- and I stand

25  corrected -- Exhibit 71.

1    THE COURT:  Exhibit 71 is your offer of

2    proof?

3        MR. DEMURO:  And 72, Your Honor.

4        THE COURT:  Any comment that counsel for

5    the defense would like to make in regard to that?  I'm

6    trusting that you have the permission to approach the

7    bench, if you think appropriate.

8        MR. RICHARDS:  I don't think it's

9    necessary, Your Honor.  I have no objection to the

10   plaintiff submitting those documents as an offer of

11   proof.

12       THE COURT:  Be accepted as an offer of

13   proof.

14       Next question.

15       Q.  *(BY MR. DEMURO)*  Mr. Pavey, could you get

16   fired for violating Target's policies and procedures?

17       A.  Possibly.

18       Q.  Was it against Target's policies and

19   procedures to ask for help of a customer to help you

20   subdue a criminal?  Would that be against Target's

21   policies?

22       A.  That would.

23       Q.  Now, Mr. Pavey, don't you agree that this

24   apprehension that went bad would have been a lot safer

25   if there was a second Target security guard on the

**United States District Court**

1    scene?

2                    MR. RICHARDS:  Same objection.  We've

3    just had --

4                    THE COURT:  Sustained.

5        Q.    *(BY MR. DEMURO)*  Let's talk about that day.

6             Do you recall on June 3rd what time you got

7    to work?

8        A.    I don't recall exactly.

9        Q.    Now, I recall that that day the only other

10   person in the store who had any loss-prevention

11   capabilities was Ms. Plonczynski.  Correct?

12       A.    I believe so.

13       Q.    Okay.  Do you need to be refreshed on that

14   point?

15                   MR. RICHARDS:  Judge, I object to the

16   relevancy at this point.

17                   MR. DEMURO:  Just background of how many

18   store security were in the store at the time.

19                   THE COURT:  Objection overruled.  You

20   may answer.

21       Q.    *(BY MR. DEMURO)*  Do you remember anyone else

22   but you and Julie who were in the asset-protection

23   team being on duty that day?

24       A.    I remember working with Julie, but I don't

25   recall if there were any Target protection specialists

1    off the top of my head, no.  If you could enlighten

2    me.

3         Q.  I'd be glad to.

4              MR. RICHARDS:  Your Honor, if this is

5    refreshing recollection, perhaps letting him read it

6    himself would be better because I'm -- unless he can

7    be told what he's about to read.

8              MR. DEMURO:  I'm going to refresh his

9    recollection with his deposition testimony on this

10   particular --

11             MR. RICHARDS:  The same testimony that

12   Mr. DeMuro read at the bench conference a moment ago.

13   The court's already ruled it's inadmissible for any

14   purpose.

15             THE COURT:  Is that the nature of the

16   evidence?

17             MR. DEMURO:  Partially.

18             THE COURT:  Sustained.

19        Q.  *(BY MR. DEMURO)*  Let's put it this way,

20   Mr. Pavey.

21             You don't recall any other security people on

22   duty at the time, do you?

23        A.  No.

24        Q.  Okay.  As I understand it, that afternoon of

25   June 3rd, you initially identified a group of four

1   people in the music section of the store who grabbed

2   your -- who got your attention as potential

3   shoplifters?

4        A.   I don't recall the exact number, but I would

5   say around four, give or take.

6        Q.   All right.  And at that time, you called

7   Ms. Plonczynski to come join you --

8        A.   Correct.

9        Q.   -- to help you watch these people?

10       A.   Correct.

11       Q.   And at some point when you and

12  Ms. Plonczynski were watching this group of people

13  that you suspected to be shoplifters, one of them, who

14  eventually is the stabber in this case, broke off from

15  the other three; is that right?

16       A.   Correct.

17       Q.   And then that person who broke off from the

18  other three came back into the music and entertainment

19  section with a cart?

20       A.   Correct.

21       Q.   And the cart had some merchandise on it?

22       A.   Correct.

23       Q.   Okay.  Could you please turn to Exhibit 12?

24            Do you recognize what Plaintiff's Exhibit 12

25  is a photograph of?

1     A.   It's very blurry but it looks like the

2  subject.

3     Q.   Okay.  You've seen a lot of photographs

4  from -- or images from Target security cameras,

5  haven't you, sir --

6     A.   I've seen a few.

7     Q.   -- over the course of your years working for

8  Target?

9     A.   Correct.

10     Q.   I mean, you've seen a bunch, haven't you?

11     A.   Right.

12     Q.   And you know that this is one of the Target

13  security camera's view outside -- pointed outside the

14  exit doors?

15     A.   Correct.

16     Q.   Okay.  And you know this was a photo taken in

17  this case of the stabbing suspect when he entered the

18  store; correct?

19     A.   That's correct.

20     Q.   That's who it appears to be?

21     A.   Right.

22     Q.   And the time is 1:43:48 p.m. on June 3rd?

23     A.   Yes, sir.

24          MR. DEMURO:  Your Honor, at this time

25  I'd move Plaintiff's 12 into evidence.

1          MR. RICHARDS:  I would object on the

2    basis of relevance, Your Honor.  What we are concerned

3    with is the point at which the altercation --

4          THE COURT:  Sustained.

5          MR. DEMURO:  I offer Plaintiff's 12 as

6    an offer of proof.

7          THE COURT:  Accepted as an offer of

8    proof.

9          Q.  *(BY MR. DEMURO)*  Turn to Plaintiff's Exhibit

10   14.

11         A.  *(Witness complies)*.

12         Q.  Now, Exhibit 14 is a photograph of this

13   criminal who ended up stabbing you and Mr. Therrien

14   while he's pushing the cart in the music section;

15   right?

16         A.  Yes, sir.

17         Q.  And that photograph was an image taken from

18   Target's digital cameras that were working that day;

19   correct?

20         A.  Correct.

21         Q.  And that photograph was taken a few minutes

22   later at 1:56:02?

23         A.  Correct.

24         Q.  And that appears to be about the time that

25   you started to follow this shoplifter yourself from

1    your recollection; right?

2         A.   I believe so, yes.

3         Q.   About the time he picked up the merchandise,

4    put it in his cart, and started heading out of the

5    music section?

6         A.   Correct.

7              MR. DEMURO:  Your Honor, at this time I

8    move Plaintiff's 14.

9              MR. RICHARDS:  I'd offer the same

10   objection, Your Honor.

11             THE COURT:  Objection sustained.

12             MR. DEMURO:  Your Honor, I offer

13   Plaintiff's 14 as an offer of proof relevant to

14   show --

15             THE COURT:  Be accepted as an offer of

16   proof.

17        Q.   *(BY MR. DEMURO)*  At that time when you saw

18   the shoplifter in the music section pushing that cart,

19   did you suspect that he was a shoplifter at that time?

20        A.   Yes, sir.

21        Q.   Why?

22        A.   The amount of merchandise that he had, his

23   demeanor.

24        Q.   And what was his demeanor?

25        A.   Appeared to be looking around, kind of going

```
1   in circles, selecting merchandise without really

2   paying attention to what he was selecting.

3                  MR. DEMURO:  Your Honor, may I approach

4   the well and set an exhibit up?

5                  THE COURT:  You may.

6                  MR. DEMURO:  Thank you.

7                  THE COURT:  Is this one that's admitted?

8                  MR. DEMURO:  It's one of Target's

9   demonstrative exhibits, sir.  So the answer I guess

10  would be no.

11                 THE COURT:  So it's not an exhibit; it's

12  a demonstrative aid?

13                 MR. DEMURO:  It's a demonstrative aid.

14                 THE COURT:  It's not in evidence?

15                 MR. DEMURO:  That is correct, Your

16  Honor.

17                 THE COURT:  Okay.

18      Q.   (BY MR. DEMURO)  I'm going to hand you the

19  pointer here.

20          Now, the music department of the store is

21  located in the left-hand corner of the Target store;

22  correct?

23      A.   Correct.

24      Q.   And for the record sake, we are, as His Honor

25  pointed out, looking at a demonstrative aid that is a
```

1   graphic layout of the store?

2        A.   Yes, sir.

3        Q.   Is that right, the Super Target where this

4   took place?

5        A.   Yes.

6        Q.   Okay.  Now, you first -- when you first broke

7   off from the other kids and started following the

8   shoplifter, he started weaving in and out in this

9   direction; right?

10       A.   Yes, sir.

11       Q.   And at that time, Ms. Plonczynski went to

12  follow the other three kids that you thought to be

13  suspicious at the time?

14       A.   Correct.

15       Q.   Those three kids turned out to be completely

16  innocent, doing nothing wrong; right?

17       A.   As far as I know.

18       Q.   I mean, they didn't get arrested or

19  apprehended, at some point along the process Target

20  determined they were not shoplifters as far as you

21  know?

22       A.   As far as I know.

23       Q.   Right.  Now, as the shoplifter was coming

24  back here to automotive and sports and toys and games

25  and domestics and winding his way around the store, he

1   was weaving in and out taking evasive maneuvers;

2   correct?

3       A.   Correct.

4       Q.   You interpreted that, based on your

5   experience, as being somebody who really knew what

6   they were doing as far as being a thief; right?

7       A.   Correct.

8       Q.   This was a much more sophisticated shoplifter

9   than you encounter usually?

10      A.   Correct.

11      Q.   So during this weaving in and out of the

12  store -- excuse me -- in and out of the various

13  aisles, you also heard him ripping open packages?

14      A.   Correct.

15      Q.   Ripping open what you thought to be CDs

16  perhaps?

17      A.   Yes.

18      Q.   And, of course, that's a major indication to

19  you that this guy is trying to conceal merchandise --

20      A.   Correct.

21      Q.   -- correct?

22           So at that point -- around this point in the

23  store up here near sporting goods, you were certain

24  almost -- you were certain that he was trying to

25  shoplift?

1    A.   Yes, sir.

2    Q.   And you knew at that point in that corner of

3  the store, that you were going to try to apprehend

4  him; right?

5    A.   Yes, sir.

6    Q.   And you knew that the apprehension was going

7  to take place in the front entranceway of the store;

8  correct?

9    A.   Not necessarily the one you pointed to.  It

10  could have been either one.

11    Q.   xxxx xxxxxx.  xxx xxxx xxxx xxx xxxx xxxxx xx

12  xxx xx xxxx xxxx xxxxxxxxxxxx xxxxx xxx xxxxxxx

13  xxxxxxx xxx xxxxxxxxx xxxxx xxx xxxxx xx xxxx xxx

14  xxxxx xxxxxxx xxx xx xxx xxxx xxxxxxxxx; xxxxx?

15    A.   That was the plan.

16    Q.   Okay.  Now, you knew -- that was in your

17  mind, you knew you were going to follow him, however

18  long it took, follow him around the rest of the store,

19  until he tried to leave by one of the major

20  entrances?

21         MR. RICHARDS:  Your Honor, at this point

22  I'll object as getting beyond background.  This is not

23  relevant.

24         THE COURT:  Sustained.

25    Q.   *(BY MR. DEMURO)*  How long a period of time do

 1  you think it was between the time that you knew that

 2  you were going to make an apprehension and the time

 3  that you actually tried to make the apprehension?

 4          MR. RICHARDS:  Same objection.

 5          THE COURT:  Overruled.  You may answer.

 6      A.  It seemed like a long time.  I don't know.

 7  It was probably around 15 minutes or so.

 8      Q.  *(BY MR. DEMURO)*  Now, all that while, that 15

 9  minutes or so -- and I understand that's an

10  estimate -- you were following the suspect through the

11  store and you knew that you were going to try to stop

12  him at one of these exits?

13      A.  Correct.

14      Q.  You did not, as I understand it, attempt to

15  call Ms. Plonczynski to have her help you?

16      A.  Correct.

17      Q.  You did not call any other Target security

18  personnel because there were none on duty; correct?

19      A.  Correct.

20      Q.  You didn't call the police during that 15

21  minutes even though they respond quickly to situations

22  like this; correct?

23      A.  Not always.

24      Q.  Did you call the police?

25      A.  I did not call the police.

1      Q.   Target had a good relationship with the

2   police, didn't they?

3      A.   We did.

4      Q.   They were here within minutes after --

5              MR. RICHARDS:  Your Honor, I object to

6   the relevance.

7              THE COURT:  Sustained.

8      Q.   *(BY MR. DEMURO)*  How long did it take the

9   police to get here after this incident?

10     A.   As I recall, they were there within a few

11  minutes.

12     Q.   So as you were following this criminal around

13  the store, you didn't make any of those calls, did

14  you?

15     A.   No.

16     Q.   Now, at some point towards the front of the

17  store, near the pharmacy section, the criminal, the

18  shoplifter, got rid of his cart?

19     A.   Yes, sir.

20     Q.   And he concealed -- had already concealed his

21  merchandise in what you believed to be either a bag of

22  some sort or in his pants directly?

23     A.   I believe it was both.

24     Q.   Right.  And you thought that at that time he

25  was stealing a bunch of CDs that you had heard him

1    unwrapping throughout the store?

2        A.    Correct.

3        Q.    Okay.  And your plan was that you were going

4    to crouch behind one of these aisles, one of these

5    checkout aisles, and let him walk towards the exit on

6    the grocery side; correct?

7        A.    I wouldn't say that was my plan.  I mean, I

8    did what I needed to do to remain unseen.

9        Q.    Well, that's what you did?

10       A.    That's what I did.

11       Q.    You crouched behind -- as the suspect was

12   leaving the store, you crouched behind one of these

13   aisles --

14       A.    I believe I did.

15       Q.    -- like this?

16             Crouched down like this so that he could walk

17   by you and he wouldn't see you; right?

18       A.    Correct.

19       Q.    So that you could come up from behind him;

20   correct?

21       A.    Correct.

22       Q.    Okay.  At that point when the shoplifter got

23   to the exit past this electronic-monitoring device,

24   you ran out from behind the cashier's lane that you

25   were crouching behind and you ran up behind him to

1  make contact with him; correct?

2       A.   I'm not sure I waited that long to begin my

3  approach, but what you're saying is kind of

4  accurate.

5       Q.   Well, I don't want to be kind of accurate.

6       A.   I understand.

7       Q.   I want to be real accurate.

8            You were crouching down behind a lane down

9  here; right?

10      A.   Right.

11      Q.   Waiting so that the shoplifter wouldn't see

12  you as he was walking towards the exit?

13      A.   Right.

14      Q.   And when he got to the exit, you sprung out

15  from behind where you were crouching and you ran to

16  grab the shoplifter?

17      A.   Well, I don't recall specifically, but I

18  don't think I would have waited that long, again, to

19  start my approach.

20      Q.   Now, let's see if we can be a little bit more

21  specific.

22           You were crouching behind the cashier --

23  right? -- and at some point, however much time it was,

24  you ran from where you were crouching to grab the

25  shoplifter from behind.

**United States District Court**

1      A.   Either ran or walked very briskly.

2      Q.   Okay.  I'll take that.  You ran or walked

3  very briskly from behind the shoplifter; correct?

4      A.   Correct.

5      Q.   And your attention was to put your arm on him

6  from behind to stop him --

7      A.   No.

8      Q.   -- right?

9      A.   No.

10     Q.   Isn't that what happened?

11     A.   Kind of.

12     Q.   Now, when you were running towards the

13 shoplifter, Mr. Pavey, did you have your walkie-talkie

14 in your hand?

15     A.   I don't believe I had it in my hand.

16     Q.   Did you have it anywhere on you?

17     A.   Probably would have been clipped on the back

18 of my belt.

19     Q.   Did you have anything in your hand, a weapon

20 or anything of any kind?

21     A.   No.

22     Q.   Anything at all in your hand?

23     A.   Possibly.  I would have either had my badge

24 in my hand or hanging around my neck; I don't recall

25 which.

**United States District Court**

1      Q.    Okay.

2                  MR. DEMURO:  So, Ms. Wilson, please put

3      up Exhibit 15A and we'll go through this.  Ms. Wilson,

4      do you have 15A up, please, up on the screen?

5                  THE COURT:  Is your screen on?

6                  THE WITNESS:  Yes, sir.

7                  THE COURT:  We had some trouble earlier.

8      You may proceed.

9                  MR. DEMURO:  Thank you, Your Honor.

10     Q.    *(BY MR. DEMURO)*  Okay.  Now, as we scroll

11     through there, the second frame of Exhibit 15, you see

12     the shoplifter entering the frame; correct?

13     A.    Correct.

14     Q.    The third frame, you see that you have --

15     your leg first appears in the frame?

16     A.    Correct.

17     Q.    And we don't see your leg or any part of you

18     here, so that in one second your leg was out in front

19     here, out in front of him?

20     A.    Right.

21     Q.    And we can tell from the spread of your leg,

22     the gait of your leg, that you were moving pretty

23     fast?

24     A.    Yes, sir.

25     Q.    Looks like you were running; correct?

1     A.   Yes, sir.

2     Q.   Now, isn't it true that the first thing that

3 you did was you put your arm on the shoplifter's

4 shoulder?

5     A.   Possibly his shoulder, upper arm.

6     Q.   Okay.  So the first thing you did is put your

7 arm on his upper shoulder or his arm; correct?

8     A.   Right.  As well as, you know, identified

9 myself.

10    Q.   But at the time that you claim that you

11 identified yourself, you had already had a hold of

12 him; right?

13    A.   I believe I would have done them

14 simultaneously.

15    Q.   My question is, when you first identified

16 yourself, Mr. Pavey, to the shoplifter, you already

17 had a hold of his arm from behind; correct?

18    A.   I don't know about from behind.

19    Q.   Didn't you first grab him from behind?  Isn't

20 that what you just said?

21    A.   No, it's not what I said.

22    Q.   Okay.  When you came from behind him, what

23 did you do?

24    A.   I went around him, attempted to get in front

25 of him, identified myself as Target security --

1    Q.   Okay.

2    A.   -- and I had my hand on his arm.

3    Q.   What hand did you first put on his arm?

4    A.   I don't recall which --

5    Q.   Which one of your hands?

6    A.   I don't recall which one.

7    Q.   Right or left?

8    A.   From the looks of the video, I would think

9    left, but I don't recall.

10   Q.   All right.  But that's the way the video

11   looks --

12   A.   Right.

13   Q.   -- right?

14        And you've got from this point to this point

15   all in one second?

16   A.   Right.

17   Q.   Right.  Now, by the time that you first

18   identified him, you had already had a hold of his arm;

19   correct?

20   A.   Like I said, I think I would have done it

21   simultaneously.  I don't think I would grab somebody

22   and then decide to tell them who I am.

23   Q.   Okay.

24        MR. DEMURO:  Ms. Wilson, please bring up

25   Mr. Pavey's deposition.

1          Q.   *(BY MR. DEMURO)*  You remember taking your

2     deposition in this case?

3          A.   I do.

4          Q.   And we had an opportunity to visit in

5     Mr. Richards' office and ask questions under oath --

6          A.   I remember.

7          Q.   -- about this case?

8               And I went threw in some detail the

9     circumstances of the apprehension; do you remember

10    that?

11         A.   I do.

12         Q.   Okay.  Now, if you turn to your deposition,

13    page 139 --

14              MR. RICHARDS:  Your Honor, let me object

15    to displaying the testimony.  Asking him about it is,

16    I think, fair impeachment, it's fair impeachment, but

17    it shouldn't be displayed because undoubtedly there's

18    more on that page other than the question and answer

19    we're about to go to.

20              MR. DEMURO:  I'm kind of flabbergasted.

21    Of course it's proper to display impeachment material.

22    This is a witness -- this is a party --

23              THE COURT:  Well, listen, listen,

24    listen.  Counsel's concern is not the impeachment as

25    what's on the page.  Is that your intention?

1          MR. DEMURO:  No.  I'm just going to

2   highlight --

3          THE COURT:  No.  I mean, is

4   your intention -- I mean, is everything on the page

5   impeachment or is there extraneous material there

6   perhaps?  I haven't looked at it.

7          MR. DEMURO:  I'm going to highlight -- I

8   can understand why counsel doesn't want this on --

9          THE COURT:  No.  Listen -- approach.

10          MR. DEMURO:  But I'm going to highlight

11   the page.

12     *(Bench conference outside the hearing of the jury)*

13          THE COURT:  Now, don't refer to what

14   counsel doesn't like or what he does like.  I don't

15   want you arguing with each other in front of the jury.

16   If you got an argument, you have an open door to come

17   -- just ask my permission to come up here.  When in

18   doubt, do that.

19          MR. DEMURO:  Okay.

20          THE COURT:  Okay.

21          MR. DEMURO:  All I'm going to show him

22   is a question and answer.

23          THE COURT:  I guess my questions is,

24   it's normal for me -- at least I'll say generally in

25   the practice I've observed over the years, the

1  deposition is used to refresh the words, not the -- I

2  don't know why it's necessary to put the page up.

3           My only concern, without knowing what the

4  answer's going to be, is whether there's anything else

5  on the page that could be distractive to the jury.

6           MR. DEMURO:  There's nothing -- I'm

7  going to carefully blow up these two sections --

8           THE COURT:  What is it?

9           MR. DEMURO:  It's a question and answer

10  and they're all about the same question.

11          THE COURT:  You're going to -- this is

12  impeachment?

13          MR. DEMURO:  That's right.  And

14  substantive evidence because he was a party opponent

15  when he made the statement.  So it's substantive

16  evidence as well, it's Target's agent.

17          MR. RICHARDS:  Your Honor, he's a

18  witness.  He was not presented as a corporate

19  representative.  This is not a --

20          THE COURT:  30(b)(6)?

21          MR. RICHARDS:  No, sir.

22          MR. DEMURO:  It doesn't matter.  He was

23  an employee.  He's making statements relevant to the

24  course and scope of his employment to things that came

25  out of his employment.

1        THE COURT:  You can ask him questions,

2   but you can't use his deposition except to impeach

3   him.  If you're going to impeach him, well, now tell

4   me what it is that you -- what has he said that's

5   inconsistent with his prior testimony?

6        MR. DEMURO:  He said that he's not sure

7   whether he grabbed him.  By the time he identified

8   him, he had already grabbed him.

9        MR. RICHARDS:  That's not impeachment,

10   Your Honor.  That's what he's being saying here.

11        MR. DEMURO:  No.  That's what he said

12   here.  This is what I'm going to impeachment him on,

13   what he said on impeachment --

14        THE COURT:  What does he say in the

15   deposition?

16        MR. DEMURO:  He says he did have him

17   grabbed by the time he identified him.

18        MR. RICHARDS:  Where is that?

19        MR. DEMURO:  139.

20        THE COURT:  Let me see what you're

21   talking about.  Well, I think that's -- I think that's

22   what he had in answer to your question.

23        MR. DEMURO:  No.

24        THE COURT:  Yeah, it is.  That's how he

25   answered it.  He said, I had a hold of him, I was

1  trying to get around in front of him when I identified

2  myself.

3           MR. DEMURO:  Well, maybe I'm incorrect

4  then.

5           THE COURT:  Okay.

6           *(Bench conference concluded)*

7           THE COURT:  You may proceed.

8      Q.  *(BY MR. DEMURO)*  Mr. Pavey, isn't it true

9  that by the time you had first identified yourself to

10  the shoplifter, you had already had a hold of his arm

11  just to let him know that you had a hold of him?

12     A.  I don't recall.

13     Q.  All right.  Please look at page 139 of your

14  deposition.

15           MR. DEMURO:  Do you have it up yet,

16  Ms. Wilson?

17           MR. RICHARDS:  Your Honor, again,

18  displaying the page I object to.  If he wants to show

19  him -- or I'd be happy to let him borrow my copy to

20  show him.

21           MR. DEMURO:  There's nothing improper

22  with showing the deposition if I --

23           THE COURT:  Well, I think there is.  The

24  specific question is what we're after, and you have a

25  deposition with more than one or two questions on the

1    page.

2              MR. DEMURO:  Sure.

3              THE COURT:  So at least from that

4    technical point of view, it's not proper.  Whether

5    there's anything else that's objectionable on that

6    page, it's not been brought to my attention.  So the

7    safest thing would be for him to look at the

8    deposition.

9              MR. DEMURO:  All right, Your Honor.  If

10   I can approach, I'll give him a copy.

11             THE COURT:  You may.

12        Q.   *(BY MR. DEMURO)*  Look at page 139 of your

13   deposition down on line 22.  Are you tracking me?

14        A.   I see it, yes, sir.

15        Q.   And I asked you:

16        "QUESTION:  When you first identified him,

17   Mr. Pavey, did you already have -- did you already

18   have your arm here?"  Meaning on him.

19        "ANSWER:  Well, yeah.  I didn't have -- I

20   don't, you know, squeeze it but just to let him know

21   I've got a hold of you."

22             Do you see that?

23        A.   I see that.

24        Q.   Does this refresh your recollection that at

25   the time that you first identified yourself to the

1    shoplifter, you already had a hold of his arm just to

2    let him know that when you identified yourself you had

3    a hold of him?

4        A.   That's what I testified to.

5        Q.   You don't want to change that today, do you?

6        A.   No.  I have no argument with that.

7        Q.   Now, Mr. Pavey --

8            MR. DEMURO:  Ms. Wilson, please put 15A

9    back up on --

10       Q.   *(BY MR. DEMURO)*  Now, after you grabbed his

11   arm when you identified him, he immediately started to

12   struggle with you, didn't he?

13       A.   Yes, sir.

14       Q.   He immediately tried to flee?

15       A.   Yes, sir.

16       Q.   But you didn't let him go, did you?

17       A.   No.

18       Q.   You tried as we see --

19           MR. DEMURO:  Ms. Wilson, please click

20   through the frames a little bit slow.

21       Q.   *(BY MR. DEMURO)*  You tried here to resist him

22   even though he was trying to flee; correct?

23       A.   Correct.

24       Q.   The next frame, you tried again to resist him

25   by pulling -- it looks like you're pulling at his

 1   shirt to try to pull him down?

 2        A.   No.   I mean, we're at a second later here.   I

 3   mean, I believe that's just kind of a continuation of

 4   the frame before that's --

 5        Q.   What are you trying to do here?

 6        A.   I'm trying to stop him from going out the

 7   door.

 8        Q.   Okay.   Are you trying to pull him down on the

 9   ground?

10        A.   No.

11        Q.   Really?   The next frame, what's happening

12   there, when we don't see him and you look like you're

13   bending down to the ground?

14        A.   He may have fallen down.

15        Q.   Right.   Because you were trying to push him

16   down or he just happened to fall?

17        A.   In the struggle, he probably fell down.

18        Q.   Were you applying pressure to him, pushing

19   him down?

20        A.   No.

21        Q.   He just fell on his own?

22        A.   Right.

23        Q.   The next frame, he's getting back up, isn't

24   he?

25        A.   Yes.

 1      Q.   And he's moving off the frame after that, and
 2   we don't see you ever again on this video, do we?
 3      A.   No.
 4      Q.   Mr. Pavey, isn't it true, when he was
 5   struggling to flee out of the store in this frame,
 6   2:05:54, in your mind, you were going to try to put
 7   handcuffs on him?
 8      A.   Correct.
 9      Q.   And in your mind, to do that you were going
10   to try to push him up against the wall?
11      A.   Correct.
12      Q.   But that didn't happen, did it?
13      A.   No.
14      Q.   So when you initially tried to stop him, you
15   couldn't initially stop him; right?
16      A.   Right.
17      Q.   And when you initially tried to restrain him
18   again, you couldn't restrain him, he got back up;
19   correct?
20      A.   Well, I just have an issue with your using
21   the word "again."  Like I said, I mean, it's a -- it
22   was a constant thing.  There wasn't a let's try to
23   stop him, break off, try to stop him again, break off.
24   That's not how it happened.
25      Q.   No.  It's a fluid thing?

1    A.    Right.

2    Q.    A fight is a fluid thing?

3    A.    I wouldn't call it a fight.

4    Q.    You wouldn't call this a fight?

5    A.    No.

6    Q.    You wouldn't call a situation where somebody

7    stabbed you and another man a fight?

8    A.    I would call it an altercation but there were

9    no punches thrown.

10   Q.    Nobody through any punches that you saw?

11   A.    No.

12   Q.    Not even Mr. Therrien?

13   A.    No.

14   Q.    Interesting.  Okay.  I'll use your word,

15   "altercation."

16         The first part of the altercation you try to

17   stop him when he was standing up, stop him from

18   fleeing; right?

19   A.    Correct.

20   Q.    And he didn't.

21         MR. DEMURO:  And, Ms. Wilson, if you

22   could please attempt to track me on the ones that I'm

23   going on for the jury.

24   Q.    *(BY MR. DEMURO)*  So when he was standing up

25   at 51, that didn't work, did it, didn't stop him?

1          A.   No.

2          Q.   Then he tried somehow to wrestle down and

3     wrestle away from you; right?

4          A.   Right.

5          Q.   And it looks like he got back up at some

6     point; right?

7          A.   Correct.

8          Q.   And so you weren't able to keep him down on

9     the ground -- correct? -- at that point?

10         A.   Right.

11         Q.   And then your thought was, you were going to

12    try to throw him into the wall that's over here on the

13    frame that we can't see?

14                   THE COURT:  Counsel, let's take a

15    recess.

16              Members of the jury, if you'll remember my

17    admonition not to discuss this matter among yourselves

18    or allow anyone else to discuss it with you.  We'll be

19    in recess for about ten minutes.

20                   *(The jury exits the courtroom)*

21                   THE COURT:  You may step down.

22                   THE WITNESS:  Thank you, sir.

23                   THE COURT:  If you'd step out in the

24    hall, please, sir, and wait until you're called.

25                   *(Discussion held off the record)*

**United States District Court**

1          THE COURT:  Let the record reflect the

2     jury has departed the courtroom.  The witness has

3     departed the courtroom.

4          Counsel, I know that you -- I'm attempting to

5     give you some leeway, background leeway, but you

6     understand my ruling is that what you're demonstrating

7     to the jury, Mr. Therrien is not even there.  Until

8     there's a threat to him, there's no duty on the part

9     of the Target.  That's what I've ruled.

10          This preliminary buildup, I just don't see,

11     other than this broad term I've used, "background," is

12     going to be helpful to determining the truth as to

13     what the issues are in this case.  What did Target do

14     after there was an immediate danger to your client,

15     after, not before, after, starting there.

16          MR. DEMURO:  The first point is, he's

17     testified that there's an immediate danger anytime

18     you're trying to take down a criminal.

19          THE COURT:  No.  Immediate danger to

20     your client is the issue.

21          MR. DEMURO:  That's the evidence, that

22     he knows that shoplifters carry weapons, including

23     knives, that they resist, and that anytime he makes an

24     altercation, it's a danger to guests.  That's the

25     evidence.

```
 1              THE COURT:  That may be the evidence,
 2   but that's not what's relevant under the law in
 3   Oklahoma and in the Tenth Circuit.
 4              MR. DEMURO:  Now, respect to your -- to
 5   which I obviously object.
 6              But with respect to your questioning about
 7   why I'm doing this, I'm at a loss to why you've
 8   interrupted my direct examination because I'm only
 9   talking about frames that are one or two seconds
10   before we see Mr. Therrien enter.  I thought from the
11   prior rulings, that you said one or two seconds was
12   okay?
13              THE COURT:  Well, at best, when
14   Mr. Therrien comes into the picture -- now, there's a
15   place where he comes into the picture; that would be
16   the place to start.  Anything that happened before
17   that -- I mean, I think I've given you leeway to set
18   up what the background is, but you're going into the
19   takedown and the scuffle before, which there's no
20   immediate danger to your client in that period of
21   time.
22              MR. DEMURO:  First of all, this frame is
23   a limited frame.  It shows --
24              THE COURT:  Let me tell you, I'm not
25   going to argue with you.  Listen, listen.
```

**United States District Court**

1          MR. DEMURO:  It shows only inside the

2    vestibule.

3          THE COURT:  I'm not going to argue with

4    you anymore.  I'm just trying to refresh your mind as

5    to what the in limine order directed.

6          MR. DEMURO:  Well --

7          THE COURT:  And when your client, if

8    ever, was in immediate danger, what, if anything, did

9    Target do inappropriately.

10         MR. DEMURO:  I understand that's your

11   ruling.  You also said you'd give me a couple seconds.

12   I'm here two seconds before --

13         THE COURT:  I've given you -- here's --

14         MR. DEMURO:  -- two or three seconds

15   before the fight.

16         THE COURT:  Here's the purpose.  You've

17   had all that I'm going to give you.  I want to get on

18   with your case as it relates to your client and him

19   being in danger.

20         MR. DEMURO:  I believe one of my last

21   questions was, did you see Mr. Therrien throw a punch?

22   That's squarely within your ruling.  So I don't know

23   why --

24         THE COURT:  Then if that's the case,

25   you've apparently skipped over some buildup.

1        But the point of having the recess is to

2   remind you of where this case -- I've given you more

3   than, I think, adequate latitude to build up to where

4   the case starts with this witness.

5                MR. DEMURO:  Okay.

6                THE COURT:  We'll be in recess for about

7   five more minutes.

8                     *(Short break)*

9                THE COURT:  Let me ask the witness to

10  return to the stand.

11               MR. DEMURO:  May I go get the witness,

12  Your Honor?

13               THE COURT:  You may.  Sir, if you'll

14  take your seat in the witness stand, we'll proceed.

15      Q.   *(BY MR. DEMURO)*  Mr. Pavey, I'd like to

16  change topics for a moment and talk about the injuries

17  you suffered.

18               I understand you were stabbed in this

19  incident?

20      A.   Yes, sir.

21      Q.   In your -- was it left leg?

22      A.   It was actually in the groin area on the left

23  side.

24      Q.   Okay.  And at the time it bled -- it bled a

25  lot, didn't it?

**United States District Court**

1   A.   Yes, sir.

2   Q.   As it turned out luckily, the stab wound

3   didn't hit any of the major arteries in that area, did

4   it?

5   A.   Correct.

6   Q.   How quickly were you released from the

7   hospital?

8   A.   I believe I was released the next morning.

9   Q.   Okay.  What did the doctors do to sew you up?

10  A.   As I recall, they -- I had some kind of drain

11  coming out of the wound.  I forget the technical term

12  for it.  I remember I had -- they had taken some kind

13  of camera or scope through my belly button and then

14  through another hole in my right abdomen.  All three

15  were stitched up.  I had the drain for about a week.

16  Q.   Okay.  Do you have any -- strike that.

17       You don't have any problems from that injury

18  today, do you?

19  A.   Not really, no.

20  Q.   Now, getting back to the incident in

21  question --

22            MR. DEMURO:  Ms. Wilson, Exhibit 15.

23  Q.   *(BY MR. DEMURO)*  -- at the point immediately

24  before Mr. Therrien entered into the fray, you first

25  attempted to stop the shoplifter while he was standing

1    up; correct?

2         A.   Correct.

3         Q.   And then the shoplifter went down to the

4    ground in some fashion; correct?

5         A.   Correct.

6         Q.   But you couldn't keep him on the ground and

7    he started to get back up; correct?

8         A.   Correct.

9         Q.   And at that point, you were going to throw

10   him against -- try to throw him against the wall to

11   possibly put handcuffs on him?

12        A.   Well, again, I wouldn't use the word "throw,"

13   but yes.

14        Q.   You were going to place him gently against

15   the wall?

16        A.   Well, I wasn't going to just smash his head

17   into the wall.

18        Q.   Where were your handcuffs at the time?

19        A.   Would have been on a -- in a pouch on my belt

20   on the back, back of my belt.

21        Q.   And so your intention was to handcuff this

22   man?

23        A.   Correct.

24        Q.   Now, was it at that point that you observed

25   Mr. Therrien coming in; correct?

1      A.   Correct.

2      Q.   And you deny that Mr. Therrien -- strike

3  that.

4           You deny that you asked Mr. Therrien to help

5  you; correct?

6      A.   Yes, sir.

7      Q.   And you claim that as Mr. Therrien was coming

8  in, you told him to back away?

9      A.   Yes, sir.

10     Q.   You claim that you said that when he was

11 running towards the fight; correct?

12     A.   As soon as I saw him run by me is when I told

13 him to back away.

14     Q.   Now, when you saw Mr. Therrien run by you,

15 were you still holding onto the shoplifter?

16     A.   Yes, sir.

17     Q.   And what position were you in?

18     A.   I believe we were up against -- you can't see

19 it in the frame there, but there's a wall --

20     Q.   Right.

21     A.   -- and we were up there against that wall.

22     Q.   Against the left wall between -- that

23 separates the two sides of the exits and entryway?

24     A.   Correct.

25     Q.   And that's when you saw Mr. Therrien come

1    in?

2         A.   Right.

3         Q.   Now, at that point, did you let the

4    shoplifter go?

5         A.   No.

6         Q.   Now, you recall giving a statement -- strike

7    that.

8              Is it your testimony that before you tried to

9    get in front of the shoplifter, you showed him your

10   badge, your security badge?

11        A.   It would had to have been after I got in

12   front of him, otherwise he wouldn't have been able to

13   see it.

14        Q.   So is it your testimony that you showed him

15   your security badge in this altercation?

16        A.   Like I said, I either would have -- I'm just

17   telling you what I would have -- either I would have

18   had it in my hand or I would have had it hanging

19   around my neck.

20        Q.   Did you attempt to identify yourself with

21   your security badge?

22        A.   Yes.

23        Q.   Did you show it to him?

24        A.   I identified myself as Target security.

25        Q.   Did you show your badge to him?

1      A.   I don't recall.

2      Q.   Do you remember giving a statement in

3  this -- about this matter that your employer Target

4  would use to put in its database, a handwritten

5  statement?

6      A.   I don't recall actually, you know, doing it

7  but I know that I did.

8      Q.   Turn to Exhibit 55 which has already been

9  admitted into evidence.

10     A.   *(Witness complies).*

11     Q.   Is 55 the statement that you made out for

12 Target's use as your description of the events?

13     A.   Yes, sir.

14     Q.   Okay.  This is the statement that you handed

15 to your supervisor, is it not?

16     A.   Yes, sir.

17     Q.   That your supervisor would have used to input

18 into the Target database that tracks these types of

19 incidents?

20     A.   I assume so.

21     Q.   That's the CIRS database, C-I-R-S?  You're

22 aware of that; correct?

23     A.   Yes.

24     Q.   And that is your handwriting and you signed

25 this?

1    A.   Yes, sir.

2    Q.   And you believed it to be an accurate

3    statement?

4    A.   Yes, sir.

5    Q.   Okay.  Look at the -- well, strike that.

6         You agree with me that your statement, your

7    contention that you told Mr. Therrien to back away,

8    that's an important fact, isn't it?

9    A.   Yes, sir.

10    Q.   Because it's important to Target to show

11    that -- allegedly show that Mr. Therrien was being

12    told to stay away and he allegedly came in any way;

13    right?

14    A.   Correct.

15    Q.   It's important.  Now, if we look at your

16    statement and go to the second page --

17         MR. DEMURO:  Ms. Wilson, if you could

18    blow up this portion.

19    Q.   (BY MR. DEMURO)  Now, beginning with this

20    sentence right here --

21         MR. DEMURO:  Is there any way,

22    Ms. Wilson, you can highlight this section?  Go all

23    the way down, please, Ms. Wilson.

24    Q.   (BY MR. DEMURO)  Now, correct me if I'm

25    wrong.  I'm going to read from your statement.

1        "I approached the subject, identified myself

2    both verbally and by badge as Target security, and

3    attempted to peacefully escort him to the security

4    office."

5        You wrote that; correct?

6    A.   Correct.

7    Q.   "The subject, however, tried to flee so I

8    placed him against the wall in an attempt to handcuff

9    him.  At the time, a guest later identified as Tim

10   Therrien, decided to provide unsolicited assistance

11   and grabbed the suspect's left arm as I held his

12   right."

13       Do you see that?

14   A.   I see that.

15   Q.   Now, tell me, sir, where in here in these

16   frames were you identifying yourself by badge as you

17   stated in this statement that you gave to your

18   employer.

19   A.   When I say I identified myself, that doesn't

20   necessarily mean that I took the badge in my hand and

21   put it in their face.  Like I said, I either would

22   have had it my hand or I would have had it hanging

23   right here on my chest.

24   Q.   So you didn't identify -- as you state here,

25   you did not identify yourself by badge to this

    1    shoplifter, did you?

    2         A.    Well, I had my badge hanging right there

    3    where the shoplifter can see it.

    4         Q.    And that's what you meant to convey here?

    5         A.    Correct.

    6         Q.    That your badge was hanging down?

    7         A.    Right.

    8         Q.    And that identified you?

    9         A.    Yeah.

   10         Q.    You didn't put it up in his face like this?

   11         A.    No.

   12         Q.    Because you couldn't because things were

   13    moving too fast; right?

   14         A.    Correct.

   15         Q.    Now, isn't it important -- isn't it true that

   16    that's the same language you use in all your reports,

   17    "I approached the subject, identified myself, both

   18    verbally and by badge," because that's what Target

   19    requires you to put off to check-off you've done the

   20    right things?  Do you use that language, "identified

   21    myself by badge"?

   22         A.    Yes.

   23         Q.    Even though in this case you didn't?

   24         A.    Well, I disagree.  I believe I did.

   25         Q.    Just by letting it hang there?

1      A.   Right.  Because usually I keep it hidden.

2      Q.   And, of course, we can't see the badge in

3  these pictures; correct?

4      A.   Correct.

5      Q.   Now, you also described this as, "I

6  approached the shoplifter and attempted to peacefully

7  escort him to the security office."  That's your

8  description of this event?

9      A.   Yes.  That was my intent.

10      Q.   Further down in your statement, you say that

11  as you attempted to put the subject in a prone

12  position, "he was able to reach into his shorts, which

13  I believe to be his left hand, and produced a knife."

14          Do you see that?

15      A.   Yes, sir.

16      Q.   Now, you also say that Mr. Therrien was

17  holding his left arm and you were holding his right

18  arm; correct?

19      A.   Right.

20      Q.   And you were working together to try to put

21  him in a prone position?

22      A.   Well, I wouldn't exactly call it "working

23  together."

24      Q.   Well, did you say, "Mr. Therrien decided to

25  provide unsolicited assistance"?

1        A.   I did say that.

2        Q.   Okay.  And you were grabbing his right arm,

3   he was grabbing the left, and you were both trying to

4   put him on the ground; correct?

5        A.   I'm not sure what Mr. Therrien was trying to

6   do.  I had a hold of his -- one of his arms.

7        Q.   Now, do you also say here, sir -- prone

8   position, that means you were trying -- that means on

9   the ground; right?

10       A.   No.

11       Q.   I'm sorry?

12       A.   No, it does not.

13       Q.   What did you mean -- what do you mean by

14   "prone position"?

15       A.   Well, what I was attempting to do was kind of

16   get him bent over and get his arm out to kind of

17   immobilize his feet so he couldn't, you know, really

18   do anything with them.

19       Q.   Now, you were trying to do that with

20   Mr. Therrien grabbing one arm and you grabbing the

21   other?

22       A.   That's what I was trying to do from the

23   beginning.

24       Q.   That's not what I'm focusing on.  I'm

25   focusing on the point in time when Mr. Therrien is

1  with you in the struggle, okay?

2          At that point he had one arm, you had the

3  other, and you were both trying to put him in a prone

4  position?

5      A.   Like I said, I don't presume to know what

6  Mr. Therrien was attempting to do.

7      Q.   Really?  Let's look at what you said in your

8  statement to Target.  As we attempted to put the

9  subject in a prone position, he was able to do such

10 and such.

11         So when you wrote this, you wrote it as "we,"

12 meaning you and Mr. Therrien; correct?  That's who

13 you're referring to when you say "we"?

14     A.   Correct.

15     Q.   Right.  And that's who you were referring to

16 when you say, "we attempted to put him in a prone

17 position"?

18     A.   Correct.

19     Q.   Now, this statement was made on June 6th,

20 '05, and you had been out of the hospital for a couple

21 of days; correct?

22     A.   Yes, sir.

23     Q.   And the incident had been a couple of days

24 old at that point, three days old?

25     A.   Yes, sir.

1        Q.   Now, nowhere in this statement that you gave

2    to your employer, do you use the words you told

3    Mr. Pavey -- Mr. Therrien to back off, did you?

4        A.   No, sir.

5        Q.   Even though that's a very, very important

6    point, a very important fact, nowhere in this

7    statement do you say you advised Mr. Therrien to back

8    off, did you?

9        A.   Right.

10       Q.   Now, you also made another statement to the

11   police the day that the incident occurred, didn't you?

12       A.   I believe so.

13            MR. DEMURO:   Turn to Exhibit 54,

14   Ms. Wilson, which also has been entered in evidence.

15       Q.   *(BY MR. DEMURO)*  Do you have Exhibit 54 in

16   front of you?

17       A.   Yes, sir.

18            MR. DEMURO:   Now, Ms. Wilson, could you

19   blow up the second paragraph?

20       Q.   *(BY MR. DEMURO)*  And before --

21            MR. DEMURO:   I'm sorry, Ms. Wilson.

22   Back out and blow up his signature at the bottom.

23       Q.   *(BY MR. DEMURO)*  That's your signature at the

24   bottom; correct?

25       A.   Yes, sir.

1    Q.   Now, this was a report that was taken by a

2    police officer, it looks like an officer named

3    "Moore," taking down what you said; correct?

4    A.   Kind of.

5           MR. DEMURO:  Put it back up again,

6    Ms. Wilson.

7    Q.   *(BY MR. DEMURO)*  Well, if you notice, it says

8    that this statement was dictated to the officer at my

9    request and then you signed it?

10   A.   Correct.

11   Q.   Okay.  So this is something you signed;

12   right?

13   A.   Right.

14   Q.   Okay.  Now, if we look at the second

15   paragraph, the officer writes of what you told him.

16   "The BM" -- referring to black male -- "refused to

17   come back in the store so I grabbed him and we began

18   to wrestle.  A customer helped me try and subdue the

19   black male, but he pulled out a knife and stabbed both

20   of us so we let him go."  It goes on to describe the

21   knife.

22          That's a copy of the statement that you

23   signed that the police made; correct?

24   A.   Correct.

25   Q.   All right.  Now, nowhere in this statement

1  does it reflect or say that you told the police that

2  you told Mr. Therrien to back off in this statement;

3  right?

4      A.  Correct.

5      Q.  And this was the statement -- the first

6  statement that was made after the incident, this was

7  June 3, 2005, when the police officer took your

8  statement down; correct?

9      A.  Correct.  And I don't know if it was the

10  first but it was that date.

11      Q.  Did you give any other statements to anybody

12  other than the police and your handwritten statement

13  in Exhibit 55?

14      A.  I don't recall.  I don't know.

15      Q.  Did you talk to, for example, Target's

16  investigator that took the statements from

17  Ms. Plonczynski and Ms. Kreps and Mr. Therrien?

18  Wouldn't they have interviewed you as well, sir?

19      A.  You know, I don't remember exactly who I

20  talked to; some people from Target.  I don't remember

21  who they were.

22      Q.  Didn't you take a tape-recorded statement,

23  sir, that was recorded by Target's investigative team?

24      A.  I don't recall.

25      Q.  Now, Mr. Pavey, you understood at that time

 1   that if you actually did -- if you had asked

 2   Mr. Therrien for his help, that was something that you

 3   could have been fired for; correct?

 4       A.   Yes, sir.

 5            MR. DEMURO:  No further questions, Your

 6   Honor?

 7            THE COURT:  You may cross-examine.

 8            MR. RICHARDS:  Thank you, Your Honor.

 9   Could you please bring up 51, 2:05:51?

10                    **CROSS-EXAMINATION**

11   **BY MR. RICHARDS:**

12       Q.   Mr. Pavey, as I understand your testimony,

13   this is the point at which you first had contact with

14   the shoplifter; is that correct?

15       A.   Yes, sir.

16       Q.   All right.  Now, was there any question in

17   your mind that this man was, in fact, stealing from

18   Target?

19       A.   No.

20       Q.   And, in fact, ultimately, although he

21   escaped, there was evidence left, that being the bag

22   and the CDs, that he was trying to carry out;

23   correct?

24       A.   Yes, sir.

25       Q.   Now, sir, tell me -- and perhaps we can go

1    back a frame to 2:05:50.

2              As you're approaching that exit, what is that

3    white thing that's by your leg there sticking up from

4    the floor?

5         A.   Are you referring to the EAS tower?

6         Q.   Yes, I am.  Let's see if I can borrow the

7    pointer.

8              Yes.  That little thing, is that the EAS

9    tower?

10        A.   I can't see what you're pointing at but --

11             THE COURT:  The witness, you can step up

12   and look at --

13        Q.   *(BY MR. RICHARDS)*  I think that is what I'm

14   talking about.

15        A.   This?

16        Q.   Yes, sir.

17        A.   Yes, that's what that is.

18        Q.   And what is that tower?

19        A.   It's part of our electronic article

20   surveillance system.  Basically, it's kind of a

21   magnetic security system.  It beeps whenever a sticker

22   that's not been demagnetized that's placed on

23   high-value merchandise or high-theft merchandise goes

24   out the door.

25        Q.   All right.  And then just past that are the

**United States District Court**

1    doors that we're looking at, the first set of exit

2    doors?

3        A.   Yes, sir.

4            MR. RICHARDS:   And could you bring up,

5    please, Exhibit 13?

6        Q.   *(BY MR. RICHARDS)*   And are we looking here at

7    the first set of exit doors with that EAS tower just

8    in front of it?

9        A.   Yes.

10       Q.   All right, sir.   Now, as --

11           MR. RICHARDS:   I'm sorry.   If we could

12   now go back to 50.

13       Q.   *(BY MR. RICHARDS)*   As you're passing that EAS

14   tower, am I correct that you're also passing the

15   shoplifter?

16       A.   Yes, sir.   Attempting to.

17       Q.   All right, sir.   And as we go to 51, tell me

18   what's happening here.

19       A.   Well, that's the point at which I identified

20   myself.

21       Q.   And what did you say exactly?

22       A.   "I'm Target security.   I need you to come

23   back inside."   It seemed like, you know, the second I

24   got in front of him, he was -- he's trying to flee.

25       Q.   All right.   Now, tell me about that.

 1            Were you able to get the words out before he

 2   responded?

 3        A.   I believe -- like I said, as soon as I got in

 4   front of him, I believe he knew what was about to

 5   happen, as far as, you know, he was -- that I knew

 6   what he was doing and I was going to try to apprehend

 7   him.

 8        Q.   All right, sir.  And what did he do when he

 9   responded?

10        A.   He attempted to break for the door.

11        Q.   All right.  And how did he do that?  Just

12   kind of rush forward?

13        A.   Right.

14        Q.   What did you do?

15        A.   I attempted to stop him, you know.  I

16   attempted to gain control of his hands.

17        Q.   And how physically were you attempting to

18   stop him from going to the door?

19        A.   Well, like I said, I was -- I was in front of

20   him, just trying to, like I said, you know, maintain

21   control of his hands.  I was trying to get him

22   up -- up against a wall.  You know, I believe his

23   momentum, you know, took him down to the ground.

24        Q.   When he appears to be tripping or going down

25   later?

1    A.   Right.

2    Q.   In this frame, you can see that your right

3  arm appears to be sort of out in front of him; is that

4  correct?

5    A.   Yes, sir.

6    Q.   And what were you doing with your arm there?

7    A.   I believe I was trying to get him turned

8  around so I could get back behind him and get control

9  of his hands.

10   Q.   Were you trying to position yourself anywhere

11  in relation to the exit doors?

12   A.   I was trying to be between him and the exit

13  doors.

14   Q.   And why was that?

15   A.   Because he was attempting to flee and I

16  wanted him to come back inside with me.

17   Q.   And how large a fellow was this that you were

18  trying to restrain?

19   A.   Very medium, average.  I mean, I

20  couldn't -- I mean, probably 5-8, 5-10.

21   Q.   And do you have any estimate of what he

22  weighed?

23   A.   Maybe 140, 150.

24   Q.   All right.  So relatively slight.

25        What was your size and weight at that time,

1  height and weight?

2      A.   6-3, about 170, 175.

3      Q.   All right, sir.  Now, as we go through the

4  next couple of frames to 51, 52 -- and this is where

5  you think he may have kind of tripped?

6      A.   Yes, sir.

7      Q.   -- and then 53 and 54.  In looking at 54,

8  sir, it's a little bit hard to see but down right

9  where your neck is --

10          MR. RICHARDS:  Oh, thanks.  I didn't

11  know you could do that.

12      Q.   *(BY MR. RICHARDS)*  -- down right where your

13  neck is, it looks like there's a black ribbon or

14  something around your neck.  What is that?

15      A.   That's the badge we use to identify

16  ourselves.  Actually, I think you can see it on the

17  frame before --

18      Q.   Can you?

19      A.   -- kind of flying in the breeze.

20      Q.   Let's go back to 53 and see if we can see

21  that.

22      A.   Yeah.  Right there in front of my face.

23      Q.   Oh, so that spot is your badge?

24      A.   Yes, sir.  I believe it is.

25      Q.   All right.  And it's obviously on the outside

 1    of your shirt, isn't it?

 2         A.   Yes, sir.

 3         Q.   Okay.  Now, in frame 54, if we could, and

 4    then -- I'm sorry.  As we are going through this, now

 5    we've looked at approximately three seconds now from

 6    the point that you initiated this apprehension until

 7    now, and I think this is the last frame that we can

 8    actually see you in.

 9              Tell me what's happening here.  What are you

10    doing?

11         A.   I think he may have fallen down at that point

12    and I would have been trying to get him back up and,

13    you know, towards the wall.

14         Q.   And now in 55, we see Mr. Therrien coming

15    into the frame; is that correct?

16         A.   Yeah.  I believe those are the shorts he had

17    on that day.

18         Q.   And 56, Mr. Therrien is coming through the

19    door; correct?

20         A.   Correct.

21         Q.   Now, sir, up to this point from where you

22    initiated the apprehension at 2:05:51 until

23    Mr. Therrien enters the exit vestibule at 2:05:56, was

24    there anyone in that exit vestibule other than you and

25    the shoplifter?

1     A.   I don't believe so, sir.

2     Q.   At any point up to this moment when

3 Mr. Therrien runs into the exit vestibule, had you

4 ever punched or struck the shoplifter?

5     A.   No, sir.

6     Q.   Did you ever kick him?

7     A.   No.

8     Q.   Did you ever bite him?

9     A.   No.

10     Q.   Did you ever get him in a choke-hold?

11     A.   No.

12     Q.   Did you do anything other than try to hold on

13 to him and keep him from going out the door?

14     A.   No, sir.

15     Q.   Was the shoplifter trying to do anything

16 other than get past you to get out the door?

17     A.   No, sir.

18     Q.   Had you seen a knife?

19     A.   No, sir.

20     Q.   All right.  Did the shoplifter have a knife

21 pulled at that point?

22     A.   No, sir.

23     Q.   All right.  When Mr. Therrien came into the

24 exit vestibule, you said in your statement that

25 Mr. DeMuro referred to, Plaintiff's Exhibit 55, that

1    "he decided to provide unsolicited assistance."

2         Now, by that, do you mean that you didn't ask

3    him for help?

4         A.   Correct.

5         Q.   All right.  So if Mr. Therrien testified

6    yesterday that he ran into the exit vestibule and

7    stood for a moment to kind of take in the situation

8    and see who was who and you said, "Help me, help me,"

9    that would be incorrect?

10        A.   Correct.

11        Q.   And likewise, if his daughter testified

12   yesterday that in the hospital, in the emergency

13   department, on the day of this incident, that

14   Mr. Therrien told her that he had been standing at the

15   checkout lane and heard somebody -- heard you as the

16   security officer yell for help, that would be

17   incorrect?

18        A.   Yes, sir.

19        Q.   All right.  Did you ever ask Mr. Therrien for

20   help?

21        A.   No, sir.

22        Q.   Did you speak to Mr. Therrien?

23        A.   Other than telling him to back away, no.

24        Q.   All right.  And what precisely did you tell

25   him?

1  A. I told him to back off.

2  Q. When did you tell him that?

3  A. As soon as I saw him fly by me.

4  Q. All right.  And when he flew by you, that was

5 when you were in the exit vestibule?

6  A. Yes, sir.

7  Q. And where did he go at that point?

8  A. He attempted to grab -- I had a hold of one

9 arm of the subject and he grabbed the other arm.

10  Q. And it seems from your statement, the

11 handwritten statement, Plaintiff's Exhibit 55, that he

12 grabbed the left arm of the shoplifter.  Is that your

13 recollection?

14  A. Correct.

15  Q. All right.  And then what happened when

16 Mr. Therrien grabbed the shoplifter's left arm?

17  A. I remember feeling as if I had been

18 punched.

19  Q. Was that immediately after he grabbed the

20 man's arm?

21  A. Yes.

22  Q. And where did you feel like you had been

23 punched?

24  A. In the groin area.

25  Q. Is that the area where -- the place where you

1    were ultimately determined to have been stabbed?

2         A.   Yes, sir.

3         Q.   And what happened when you felt that punch or

4    that stab?

5         A.   I guess I was shocked.  I guess I just kind

6    of stumbled back.  I remember yelling at Mr. Therrien

7    to let him go, let him go, you know, that he's got a

8    knife.

9         Q.   And were you able to see when he pulled the

10   knife out?

11        A.   No.

12        Q.   Now, you had his right arm; is that correct?

13        A.   Yes, sir.

14        Q.   Did he ever get his right arm inside his

15   pockets or his pants to get a knife?

16        A.   I really don't -- don't know.

17        Q.   In fact, in your statement that was

18   Plaintiff's Exhibit 55, you said he was able to reach

19   into his shorts with what I believe was his left hand

20   and produced a large knife.

21             Was that the one Mr. Therrien was holding on

22   to?

23        A.   Yes, sir.

24        Q.   All right.  And what happened after you were

25   stabbed and fell back?

1    A.   I remember telling Mr. Therrien to let him

2  go, you know, that he has a knife.  I remember

3  Mr. Therrien having him in kind of a bear hug.  I

4  remember seeing Mr. Therrien be stabbed.

5    Q.   Now, tell me, a bear hug around where?

6    A.   Kind of around -- I want to say right around

7  his -- kind of his shoulders.  I mean, he was just

8  kind of holding him, you know, holding him there.

9    Q.   Was he holding him in such a way that the

10  shoplifter couldn't move his arms or his hands?

11    A.   No.

12    Q.   Was the shoplifter able to move his arms

13  around?

14    A.   Yes.

15    Q.   And what did the shoplifter do?

16    A.   He appeared to be stabbing Mr. Therrien.

17    Q.   All right.  So this is after you've been

18  stabbed, Mr. Therrien gets him in some kind of a bear

19  hug around his shoulders and he's stabbing

20  Mr. Therrien?

21    A.   Correct.

22    Q.   And were you able to see where he was

23  stabbing Mr. Therrien?

24    A.   I remember one in particular.  It seemed like

25  it was -- I don't recall which side but it was here on

1    either side.  I remember seeing that happen.  And

2    I -- I mean, again, I'm not sure if Mr. Therrien -- I

3    mean, in the adrenalin of the moment, I'm not sure if

4    he realized that that was -- that he had been stabbed,

5    you know, at least that badly.

6         Q.   And what happened after you saw the

7    shoplifter -- and was he getting his arm around behind

8    him to stab Mr. Therrien?

9         A.   Yes, sir.

10        Q.   All right.  What happened after he reached

11   around behind him and stabbed Mr. Therrien?

12        A.   I just remember Mr. Therrien finally did

13   comply and let go of him and he bolted straight for

14   the door.

15        Q.   When Mr. Therrien let the shoplifter go, he

16   ran straight out the door?

17        A.   Yes, sir.

18        Q.   Did he stop and say anything to Mr. Therrien?

19        A.   No, sir.

20        Q.   Did he say anything to you?

21        A.   No.  Not a word.

22        Q.   Did you ever hear the shoplifter say a single

23   word during this entire incident?

24        A.   No.

25        Q.   Now, did you ever speak to the shoplifter

1    during this incident?

2         A.   Other than identifying myself, no.  I may

3    have said, you know, "stop resisting" or something

4    along those lines.

5         Q.   Would that be something you would typically

6    say as a --

7         A.   If they were struggling, yes.

8         Q.   Now, we know that you first had contact with

9    this individual at 2:05:51 p.m. on June 3rd.  How long

10   did this entire incident last, sir?

11        A.   It seemed like it was over in five seconds.

12   I mean, it was very, very fast.

13        Q.   I know that in the -- of course, we've only

14   got video of this first exit door, but we do seem to

15   have somewhere where we can pick up the reflection of

16   the door behind.

17             MR. RICHARDS:  If we could bring up

18   2:06:08, please.

19        Q.   *(BY MR. RICHARDS)*  It appears as we're

20   looking at this exit view, that we can see the

21   reflection of the door behind; correct?

22        A.   Correct.

23        Q.   And that door that we're seeing the

24   reflection of is actually the exit out into the

25   sidewalk in the parking lot, isn't it?

1    A.   Yes, sir.

2    Q.   All right, sir.  And if we go to 2:06:09,

3 that door is all the way open, isn't it?

4    A.   Yes, sir.

5    Q.   Do you know, sir, is that period of eight

6 seconds and nine seconds after 2:06, is that when the

7 shoplifter appears to have escaped?

8    A.   Possibly.  Like I said, it was -- it was just

9 a matter of seconds.

10   Q.   Do you know of anything else that might have

11 caused that door to open?  I mean, there's nothing in

12 the view or the reflection.

13   A.   No.  Unless somehow we would have triggered

14 the sensor, but I don't see how we would have done it

15 on that side.

16   Q.   And you mentioned "that side."

17        MR. RICHARDS:  If we could go back to

18 13, please.

19   Q.   *(BY MR. RICHARDS)*  There are sort of two

20 sides to this exit, aren't there?

21   A.   Yes, sir.

22   Q.   And on the right side is a set of doors and

23 then there's an EAS tower in between them and then on

24 the left side there's a second set?

25   A.   Yes, sir.

1    Q.    Are both of those automatic doors?

2    A.    No, sir.

3    Q.    Which are the automatic doors?

4    A.    The ones on the right in the picture.

5    Q.    And the video that we're watching is the

6    video of the automatic doors?

7    A.    Yes, sir.

8    Q.    All right, sir.  Sir, in the seconds that

9    this incident occurred after Mr. Therrien got

10   involved, did you ever see him try to do a leg-sweep

11   or some kind of martial arts move like that?

12   A.    No, sir.

13   Q.    Did you ever see him punch the shoplifter?

14   A.    No.

15   Q.    Punch him in the eye?

16   A.    No.

17   Q.    Did you ever see him try to get him in a

18   right-arm choke-hold around his neck?

19   A.    No, sir.

20   Q.    Did you ever see him get him in a left-arm

21   choke-hold and hold him while he was going limp and

22   blacking out?

23   A.    No, sir.

24   Q.    Did you hear the shoplifter after

25   Mr. Therrien fell down to the ground loom over him and

1   say, "That will teach you to get involved, I hope I

2   killed you"?

3        A.   No, sir.

4        Q.   Did you ever get in between Mr. Therrien and

5   the shoplifter as Mr. Therrien was lying on the ground

6   and say, "Just go, get away, go out the door"?

7        A.   No, sir.

8        Q.   From the point that Mr. Therrien entered into

9   this incident, was there time to do anything in order

10  to protect Mr. Therrien?

11       A.   No, sir.

12       Q.   Now, Mr. Pavey, Mr. Therrien suggested

13  yesterday in his testimony that as he came into the

14  altercation after he looked up at, I guess, 2:05:51 or

15  52 and saw that you were apprehending this person and

16  that the person was trying to flee, he said that he

17  looked and saw that the shoplifter was getting the

18  better of you and that's why he got involved, that the

19  shoplifter had you down, and that you were losing the

20  fight.

21            Is that an accurate statement as to what was

22  occurring prior to Mr. Therrien getting involved?

23       A.   No, sir.

24       Q.   Did the shoplifter ever have you down?

25       A.   No, sir.

1      Q.   Was it ever your perception that the

2   shoplifter was getting the better of you?

3      A.   No, sir.

4      Q.   In fact, was it ever your perception that the

5   shoplifter was trying to do anything other than get

6   out the door?

7      A.   No, sir.

8      Q.   And the shoplifter never pulled a knife

9   before Mr. Therrien arrived, did he?

10     A.   That's correct.

11     Q.   As a matter of fact, he didn't pull a knife

12  until Mr. Therrien grabbed hold of him, did he?

13     A.   Correct.

14     Q.   **XXX XX XXX XXX, XXX:   XXX XXXX XXX XXX XXXX**

15  **XX XXXXXX**?

16     A.   **XX, XXXX XXX X XXXX XXXXX.**

17     Q.   **XXX XXX XXXX XXX XXXX XXX XXXXXXX**?

18     A.   **XXXXXXX.**

19     Q.   **XXXX.   XXX, XXXX XXX XX XXXXX XXXXXXXXXX XXXX**

20  **XXX XXXXXXX XX XXXXXX**?

21     A.   **XX, XXX.**

22     Q.   **XXXX XXX XXX XXXXX XX**?

23     A.   **X XXXXX XX XXX X XXXXXXX XXXX XXXXXXXXX,**

24  **XXXXXXXX XXX XXXXXX.**

25     Q.   **XXX XXX XXX XXXX XXXXXXX XXXXXXXXX XXXXXXXXX**

**United States District Court**

1    **XXXXX XXX XXXX XXXXX**?

2         A.   **XXX, XXX.**

3         Q.   **XXXX XXXXX XX XXXX XXX XXX XXXX XXXXXX XXXX**

4    **XXXXX**?

5         A.   **X XXX XX XXXXXXXXX XXXXXX.   X XXXXXX XX XXX**

6    **XXXXXXXX XXXXXXXXXX, X XXXXXX XX XXXXXX XXX XXXXXXXXX**

7    **XXXXXXXXXXX XX XXX XXXXX, XXXXXX XX XXX XXXX XXXX.**

8         Q.   **XXXX XXX XXX XXXX XX XXXXX XXXXXXXXXX**?

9         A.   **X XXXXX XX XXX XXXXX XXXX.**

10        Q.   **XXXX.   XXX XXXX XXX XXX XXX XXXX XX XXXX**

11   **XXXXX**?

12        A.   **X XXX X XXXXXX XXXXXXXXXX XXXXXXXXXX.**

13        Q.   **XXX XXXXXXXXX XXXXXXXX XXXXXXX**?

14        A.   **XXX, XXX.**

15        Q.   All right.  And did Target give you training

16   before it put you in that position?

17        A.   Yes, sir.

18        Q.   **XXX XXXX XXXX XXX XXX XXXX XX XXXXXX XX**

19   **XXXXXXXXXXXXXXXX XXXXXXXXXX**?

20        A.   **XXXX XXXXX XXXX XXXX XXXX XXX XXXXXX XX XXXX**

21   **XXXX.**

22        Q.   **XXXX.   XX XXXXXXXX XX XXX XXXXXX XX XXXX**?

23        A.   **XXX, XXX.**

24        Q.   And did you also have training to take that

25   position?

1      A.   Yes, sir.

2      Q.   Did the training involve studying of written

3  materials and that sort of thing?

4      A.   Yes, sir.

5      Q.   Was it online at that time?

6      A.   I believe part of it was.

7      Q.   Okay.  And then was there some role-playing

8  or on-the-job training?

9      A.   Yes, sir.

10      Q.   At some point, did Target -- we've heard

11  reference to having to be a certified asset-protection

12  employee to make an apprehension.  At some point, were

13  you certified?

14      A.   Yes, sir.

15      Q.   Was that in 2003?

16      A.   Yes, sir.

17      Q.   All right.  And that was the position you

18  held at the time this incident occurred; correct?

19      A.   Correct.

20      Q.   **XXX XXX XXXXXX XX XXXXX XXXXXXXXXX XXXXX XXX**

21  **XX XXXXX XXXX XXXXXXXX XXXXXXXX**?

22      A.   **X XXX**.

23      Q.   **XXX XXX XXX XXXXXXXX XX XXXXX XXXXXXXXXX**

24  **XXXXX XXX XXXX XXXXX**t?

25      A.   **XX**.

1    Q.  **XXXX XXX XXX XXXX X XXXXXX**?

2    A.  **XX, XX XXX XXXXX XX XXXXX XX XXXX, X XXXXXXX.**

3    Q.  **XXX XXX XXX XXX XXXXXX, XXX**?

4    A.  **XXXXXXXX XXXXXXX.  X XXX XXXX XX XX, XXX**

5 **XXXX, XX XXXX, XX XX XXXXXX XX XXX XXXX, XXX XXX**

6 **XXXXXX XXXXXX XX XX XXXX XXXXX XXXXXXXX, XXX XXXXX**

7 **XXXX XXXXX, XXX XXX XXX XXXXXX XXXXXX XX XX XXX XXX**

8 **XXXX XXXXX XX XXX XXXXXXXX.**

9    Q.  **XXX XXXXX.  XXX XXXX XXX XXX XX XXXX XX XXXX**

10 **XXXXX**?

11    A.  **X XXXX XXX XXXX XXXXXX XX XXXXXXX XXX XX XXX**

12 **XXXXXXXXXXX XXX XXXXXXXXXXXXX XXXXXXXXXXX.**

13    Q.  **XXX XX XXXX XXX XXXXXXXX XXX XXXX XXXX XXX**

14 **XXXX XXXXXX**?

15    A.  **XXX, XXX.**

16    Q.  **XXX XXXX XXX XXX XXXXX XXXXXX**?

17    A.  **XXXXXXX XX XXXXX XX X XXXXX XXX XXXXX XXXX XX**

18 **XXXXXXX XX XXXX XXXX.**

19    Q.  **XXXX.  XXX XXX XXX XXX XXX XXXXXXX XXX**?

20    A.  **XXXX XXXXXXXX.**

21          MR. RICHARDS:  Mr. Pavey, I don't think

22 I have any further questions for you.  Thank you,

23 sir.

24          THE WITNESS:  Thank you.

25          MR. DEMURO:  Please put up 15A,

 1    Ms. Wilson.

 2                    **REDIRECT EXAMINATION**

 3    **BY MR. DEMURO:**

 4        Q.   You just told Mr. Richards, I think, that you

 5    believe you were in control of the situation when

 6    Mr. Therrien came in?

 7        A.   Correct.

 8        Q.   All right.  So at first, you couldn't stop

 9    him when he was standing up; right?

10        A.   Correct.

11        Q.   And then he struggled to get away from you in

12    the next frame; right?

13        A.   Correct.

14        Q.   Then he was on the ground and you were trying

15    to keep him on the ground or control him when he was

16    on the ground; correct?

17        A.   No.  I was trying to pick him back up.

18        Q.   Okay.  Then he looks like he's getting back

19    up; correct?

20        A.   Correct.

21        Q.   And you are attempting to throw or, in your

22    words, place him against the wall to put on handcuffs;

23    right?

24        A.   Correct.

25        Q.   That didn't happen, did it?

1          A.   No.

2          Q.   Okay.  And it was at that point that

3    Mr. Therrien comes in; right?

4          A.   Correct.

5          Q.   Well, your testimony still is after all that

6    went on, couldn't put the handcuffs on, getting back

7    up, you couldn't stop him, you were in control?

8          A.    It didn't go, you know, as ideally as I

9    hoped, but sometimes there's going to be a struggle.

10         Q.   Right.  Now, isn't it true that Target's

11   policies are that if somebody is trying to flee, that

12   the loss-prevention officer ought to let them go?

13   That's their policy; right?

14         A.   No, sir.

15              MR. DEMURO:  Please turn to Exhibit 62.

16   Don't put it on the screen yet, Ms. Wilson.

17         Q.   *(BY MR. DEMURO)*  Have you seen Exhibit 62,

18   before, which are called the asset protection common

19   directives?

20         A.   I have.

21         Q.   These are one set of policies that Target had

22   in place in March of 2005?

23         A.   Correct.

24         Q.   And if you turn to the third page of the

25   policies, does that appear to be an accurate copy of

1  the common directive on pursuit of shoplifters?

2      A.   Is that on 3?

3      Q.   It's actually 62, page 6.

4      A.   Page 6.  Yes, sir.

5      Q.   Now, does this appear to be a copy of the

6  policy that was in effect at the time?

7      A.   Yes, sir.

8              MR. DEMURO:  Your Honor, at this time

9  I'd move into evidence Plaintiff's Exhibit 62, page

10  6.

11             THE COURT:  Objection?

12             MR. RICHARDS:  Not for this page, Your

13  Honor.

14             MR. DEMURO:  Please put it up,

15  Ms. Wilson.

16             THE COURT:  Be admitted.  What's the

17  exhibit number?

18             MR. DEMURO:  Exhibit 62, page 6.

19             THE COURT:  So the Exhibit is 62?

20             MR. DEMURO:  That's right, Your Honor.

21             MR. RICHARDS:  It's my understanding,

22  Your Honor, he's not moved the admission of the

23  exhibit --

24             THE COURT:  Not the whole book, but the

25  exhibit for this case is 62, I mean, that one page?

1          MR. DEMURO:  That's right, Your Honor.

2          THE COURT:  Okay.

3          MR. DEMURO:  If you could highlight the

4    first paragraph on the bullet point, Ms. Wilson.

5       Q.  *(BY MR. DEMURO)*  The first paragraph says,

6    "xxxxxxxxxx xxxxxxxxxxxx xxx xx xx xxxxxxx xx x

7    xxxxxxxxxxxx xxxxxx xxx xxxxxxxxxx xx xxxxxxxx."

8          xxxx "xxxxxxxxxx xx xxxxxxxx" xxxx xx xxxx xx

9    xxxx xx xxxxxx xxxxx xxxxxx; xxxxxxx?

10      A.  Correct.

11      Q.  xxxx xxxxxxxx xxxxxxxx xxxx xxx xxxxx xx xx

12   xxxxxxxx xxxx xxxxxx xxxxxxxx xxxxxxxxxxx xxxxxxx xx

13   xx xxxxxxxx xxxxxx xxx xxxx xxxx, xx xxxxx xxxxxxx

14   xxxxxxxxx?

15      A.  Correct.

16      Q.  And customers could get hurt; correct?

17      A.  Correct.

18      Q.  xxx xxxx xx xxxx, "xx x xxxxxxxxxx xxxxxxxx

19   xx xxxx xxxxx xxxxx xxxxxxxxxx, xx xxxx xxxxxxx xxxx

20   xxx xxxx xxxxx xx xxx xxxxxx, xxxxxxx, xxxxxxx,"

21   xxxxxxxx; xxxxxxx?

22      A.  Correct.

23      Q.  Now, when you first encountered the

24   shoplifter, he attempted to flee; correct?

25      A.  Correct.

1    Q.   Now, when you first tried to take down that

2  shoplifter, it would have been a much safer

3  apprehension if you had a second Target

4  loss-prevention employee there; correct?

5              MR. RICHARDS:  Your Honor, I object to

6  the question.

7              THE COURT:  What's the question?

8              MR. RICHARDS:  This has been dealt with

9  by the court --

10              THE COURT:  Sustained.

11    Q.   *(BY MR. DEMURO)*  Mr. Pavey, in any written

12  statement that you've ever signed, has there ever been

13  a statement that you've signed in which it says that

14  Mr. Therrien backed away -- excuse me -- that you told

15  Mr. Therrien to back away as you've testified here

16  today?

17    A.   I don't know of any other statements.

18    Q.   We know that it wasn't in your statement to

19  the police; right?

20    A.   Correct.

21    Q.   And it wasn't in your handwritten statement;

22  right?

23    A.   Correct.

24    Q.   And that's something that really portrays you

25  in a better light in terms of doing your job as an

1  asset-protection person; right?

2      A.   Correct.

3      Q.   Now, you didn't hear anybody from Target tell

4  you that -- say anything during this altercation, did

5  you?

6      A.   No.

7      Q.   There was nobody else, no other Target

8  employee in the area -- correct? -- that you heard.

9      A.   Not that I heard.

10     Q.   You didn't hear, for example, Ms. Kreps tell

11 Mr. Therrien to back away?

12     A.   Not that I recall.

13     Q.   Okay.  At the time that Mr. -- at the moment

14 that you saw Mr. Therrien entering into the fight --

15             MR. DEMURO:  Please put up 15A,

16 Ms. Wilson.

17     Q.   *(BY MR. DEMURO)*  -- you looked up and you saw

18 him coming into the fight -- correct? -- at some

19 point.

20     A.   Are you referring to Mr. Therrien?

21     Q.   Yes.

22     A.   I wouldn't say that, no.

23     Q.   Okay.  At some point, you noticed he was

24 coming your way?

25     A.   Not even coming my way.  Like I said, my

```
 1   attention was on the shoplifter and I see Mr. Therrien
 2   come by me in a flash and latch onto the other guy's
 3   arm.
 4        Q.   Now --
 5        A.   So I didn't, like, look off and see him
 6   running towards me.
 7        Q.   And is that the point in time where you
 8   say -- you claim that you told him to back off?
 9        A.   Yes.
10        Q.   I thought you testified that you said "back
11   off" when he was running over?
12        A.   Right.  Whenever he came by, grabbed his arm,
13   I said, "Back off."
14        Q.   Now, when you first saw him coming toward
15   you, you had a hold of the shoplifter?
16        A.   Correct.
17        Q.   And when you first saw Mr. Therrien coming
18   towards you, you didn't let go of the shoplifter;
19   right?
20        A.   Right.
21             MR. DEMURO:   No further questions.
22             THE COURT:   Further cross-examination?
23             MR. RICHARDS:   Very brief, Your Honor.
24
25
```

**RECROSS-EXAMINATION**

**BY MR. RICHARDS:**

    Q.   xxx xxxxx, xxx xxxx xxxxx xxxxx xxxx xxxxxx

xx xxxxxx xxxxxxxxxx xxxxxxxxxxx xxxxxxxxxx xx xxxx

xxxxx xxxxx xxxxxxxxxx xxxx xxxx xxxx xxxxxx xxx xx

xxxx xxxxx.

    A.   Yes, sir.

    Q.   Did the shoplifter ever break away from your

hold?

    A.   No, sir.

    Q.   So you didn't have to give chase, did you?

    A.   No, sir.

    Q.   All right.  If at any point you had felt like

you didn't have reasonable control over this

situation, did you have an option?  In other words, if

at any point you thought that the shoplifter -- you

were not going to be able to restrain the shoplifter

safely, did you have options available to you?

    A.   Yes, sir.

    Q.   And what were those options?

    A.   xxxx, xx xx xxx xxxxx x xxxx xxxx x xxxxxx

xxxx xxxxxxx xx xxx xxxxxxxxx, x xxxxx xxxx xxxxxx xxx

xxx xxxxxxxxxxxx.

    Q.   xxx xxx xxx xx?

    A.   xxxxxxx.

1    Q.   So that he could run out the door just like

2 he ultimately did --

3    A.   Correct.

4    Q.   -- when he was let go; correct?

5    A.   Correct.

6         MR. RICHARDS:  Thank you.  Nothing

7 further.

8         **FURTHER REDIRECT EXAMINATION**

9 **BY** MR. DEMURO:

10   Q.   xx xxxxxx xxxxxxxx xxxxxx, xxxxx xx?  xx xxx

11 xxx xxxxxx xx xxxxxxx x xxxxxxxxx xxxxxxxxxx, xxx

12 xxxxx xx xxx xxx xx; xxxxxxx?

13   A.   Correct.

14        MR. DEMURO:  No further questions, Your

15 Honor.

16        THE COURT:  Just a moment.  Just a

17 second.  You may step down.  May this witness be

18 excused?

19        MR. DEMURO:  From the plaintiff, yes,

20 sir.

21        MR. RICHARDS:  Yes, Your Honor.

22        THE COURT:  Thank you, sir, for your

23 testimony.  You may step down.

24        THE WITNESS:  Thank you.

25        THE COURT:  You may be excused.

1          MR. DEMURO:  You may call your next

2     witness.

3          MR. DEMURO:  May I approach, Your Honor?

4          THE COURT:  You may.

5     *(Bench conference outside the hearing of the jury)*

6          MR. DEMURO:  At this time I would like

7     to offer into evidence, either by way of recalling

8     Mr. Therrien or by offering the tape-recording itself,

9     Mr. Therrien's statement in the hospital in which he

10    clearly stated that he, Mr. Pavey, asked him for his

11    help.  This was a statement made after -- immediately

12    after the incident prior to any motive for

13    fabrication.

14          Mr. Richards has now introduced evidence

15    designed to show that Mr. Therrien lied and fabricated

16    the story about Mr. Pavey asking for help.

17          THE COURT:  Now you've lost me.  Let's

18    start -- you want to do what now?

19          MR. DEMURO:  I want to enter into

20    evidence at this point a prior consistent statement of

21    Mr. Therrien.  Under the relevant hearsay rule, once

22    your adversary has questioned the veracity of a

23    witness, I'm entitled to put in evidence that shows a

24    prior consistent statement prior to the motive for

25    fabrication.

1          THE COURT:  Which is what?

2          MR. DEMURO:  Which is a statement that

3   Mr. Therrien made in the hospital to the news media --

4          THE COURT:  That's the issue?

5          MR. DEMURO:  Yeah.  So this is beyond

6   the duty question.  This goes to credibility because

7   his credibility has been impeached by Target, and now

8   I am entitled to rehabilitate under the evidence code.

9          MR. RICHARDS:  I think it's a side

10  issue, it's collateral, it's a collateral issue to

11  what we're trying.  If anything's going to be

12  played -- what he's trying to do is to play the news

13  media story from the hospital, which the court said is

14  not going to be admissible under the order in limine.

15          And I suspect -- I mean, if it wasn't the day

16  of the incident, it was several days later when that

17  was made -- and I suspect that the intention would be

18  not to play simply that statement in order to

19  establish that a prior consistent statement was made

20  in the hospital, but to play the whole thing.

21          If that one simple statement is played, you

22  know, I don't know -- again, it's collateral, but I

23  don't know that it's problematic.  But if more than

24  that is played, that is hearsay because it's not a

25  prior consistent statement, it's something completely

1   different.

2               MR. DEMURO:  I'm not going to play the

3   entire news media, never intended to.  It's just the

4   statement that he made --

5               THE COURT:  Okay.  When you say "just

6   the statement," what is the statement?

7               MR. DEMURO:  The statement is, when

8   asked by the reporter what happened, he is going to

9   testify that he ran over to the doors, the security

10  guard asked for his help, and he helped.

11              MR. RICHARDS:  I think it's a little bit

12  more involved than that in what he says.

13              THE COURT:  Well, what's the -- what's

14  the -- is this a recording?

15              MR. DEMURO:  Yes, sir.

16              MR. RICHARDS:  It's a news report.

17              THE COURT:  News story?

18              MR. DEMURO:  I'm not showing any of the

19  reporters or any of the coverage pieces or anything

20  like that, just his statement, Mr. Therrien's

21  statement, when he was asked what happened.

22              THE COURT:  Do you have another witness

23  so I can look at this at noon?

24              MR. DEMURO:  Yes, sir.

25              THE COURT:  Let's do another witness and

1   I can look at this at noon.

2              *(Bench conference concluded)*

3              MR. DEMURO:  Your Honor, may I lean

4   these exhibits against your well?

5              THE COURT:  You may.

6              MR. DEMURO:  May it please the court,

7   Your Honor, plaintiff calls Ms. Julie Plonczynski to

8   the stand.

9              **JULIE PLONCZYSNKI,**

10  ***after having been first duly sworn, says in reply to***

11  ***the questions propounded as follows, to-wit:***

12             **DIRECT EXAMINATION**

13  **BY MR. DEMURO:**

14       Q.   Ms. Plonczynski, before we begin, I really

15  want to make sure I'm pronouncing your name correctly.

16  Could you please pronounce your name for me and the

17  jury?

18       A.   Plonczynski.

19       Q.   Okay.  I got it right.

20             Now, Ms. Plonczynski, as I understand it, you

21  are what's called an executive team leader for asset

22  protection at the Super Target that we have been

23  talking about?

24       A.   That's correct.

25       Q.   And in that role, you basically are the

1   supervisor of all the loss-prevention employees at the

2   store; right?

3       A.  Yes.

4       Q.  And you're here today to testify as Target's

5   representative in court?

6       A.  That's correct.

7       Q.  But you are not necessarily the person that

8   makes all the decisions about staffing that goes on at

9   your store; correct?

10      A.  Correct.

11      Q.  Okay.  For example, the decision of how many

12  uniformed security guards are on duty at any given

13  time is a function of somebody higher up than you's

14  decision?

15      A.  Yes.  But I also have input into it.

16      Q.  But ultimately, it's the budgetary

17  constraints that are put on you from a district or

18  regional level that determine your staffing levels --

19      A.  Yes.

20      Q.  -- correct?

21          I'm sorry.  Correct?

22      A.  Yes.

23      Q.  **XXX XXXXX.  XXX, XXX XXXXXXX XXXXXXX XX**

24  **XXXXXX XX XXXX**?

25      A.  **XXXXXXX.**

1      Q.   **XXX X XXXXX XXXXXX XXXXXX XXX XXXXX XX XXXXX,**

2      **XXXX XXXX XXXXXX, XXXX XX XXXX XX XX XXX XX XXXX XXX**

3      **XXXX XX XXXX XXXXXXXXXX**?

4      A.   **XXX.**

5      Q.   **XXX XXXX XXXX XX XXXXX XX XXXX**?

6      A.   **XXX.**

7      Q.   **XXX XXXXXX XXX X XXXXX XXXXX XXXX XXX XXXX XX**

8      **XXXXXX XXXX XXXX XXXXXXX XXX XX XX XXX XXXXXXXX**

9      **XXXXXXXX XXXX XXXXX, XXXXXX XXXXXX XX XXXXX XXXXXX**

10     **XXXXX XXXX**?

11     A.   **XXX.**

12     Q.   **XXXXXXXXXXXX, XXX XXXX XXXX XX XXX XXXXXX**

13     **XXXXXXXXXXX XX XXXX XXXXXX XX XXXXX XX XXXX**?

14     A.   **XXX.**

15     Q.   And that's two to three months -- about two

16     and a half months before the stabbing that took place

17     in this case?

18     A.   Two months, yes.

19     Q.   Now, at that time -- have I accurately

20     described for the jury what the roles are of a Target

21     asset-protection specialist and a Target specialist?

22     Strike that.  Terrible question.

23          You had basically two types of people that

24     worked on the floor for you; right?

25     A.   Yes.  Including myself.

 1     Q.   In asset protection?

 2     A.   Yes.

 3     Q.   You had the plain-clothes folks like

 4  Mr. Pavey; right?

 5     A.   Yes.  Asset-protection specialist.

 6     Q.   And you had the uniformed folks, and we

 7  haven't seen any of them involved in this case; right?

 8     A.   Yes.

 9     Q.   All right.  Now, around the time of this

10  incident, you believed that you were understaffed;

11  correct?

12          MR. RICHARDS:  Your Honor, I object to

13  this.  It's clearly covered by your order.

14          THE COURT:  Sustained.

15          MR. DEMURO:  May I make an offer of

16  proof?

17          THE COURT:  You may.

18    *(Bench conference outside the hearing of the jury)*

19          MR. DEMURO:  The plaintiff's offer of

20  proof is that this witness believed that she was

21  understaffed in terms of her security staff as of the

22  time of the incident.

23          MR. RICHARDS:  Your Honor, at this

24  point, I would again on behalf of Target move for a

25  mistrial based upon the questioning of counsel for the

1    plaintiff.  The jury's now been advised that -- or led

2    to believe that there was a prior incident involving

3    Mr. Pavey, that there was a length of time that he

4    tracked the shoplifter without contacting anyone for

5    assistance, that there's an implication that Target

6    pressures its employees to make apprehensions, that

7    there is training to use more than one person to make

8    apprehensions, that there was a requirement that more

9    than one person make apprehensions, that there were no

10   other employees available to assist in apprehensions,

11   and now this injection that there are budgetary

12   restrictions which prevented adequate staffing.

13        This is clearly injecting into the hearing of

14   the jury matters that the court has said are not to

15   come in to this case and it is prejudicial to Target,

16   and for that reason I must object and ask that the

17   jury be admonished and move for a mistrial.

18             THE COURT:  Counsel?

19             MR. DEMURO:  Well, many of the things

20   that he just talked about he never objected to.  I

21   don't know why he would want a mistrial.

22             THE COURT:  Well, he shouldn't have to

23   object to it because it's part of the court's motion

24   in limine.  You, you know, from my view are trying to

25   try the case you intended to try before I entered the

```
1   motion in limine.  I've given you the benefit of the
2   doubt, that you're doing that to preserve a record in
3   the event that I'm wrong.
4           But that question that you just asked totally
5   violates the court's order.  I'm going to instruct
6   them to disregard the question and overrule the
7   defendant's motion for a mistrial.
8                   (Bench conference concluded)
9               THE COURT:  Ladies and gentlemen of the
10  jury, the last question that was asked by counsel
11  should be disregarded in its entirety by the jury and
12  give it no effect or give it any further thought.
13      Q.   (BY MR. DEMURO)  Ms. Plonczynski, do you
14  recognize the gentleman sitting in the back of the
15  courtroom?
16      A.   No.
17      Q.   You don't recognize that as the expert that
18  Target has hired in this case to come in and give
19  testimony?
20      A.   No.
21      Q.   Never met him before?
22      A.   No.
23      Q.   Do you agree with Mr. Pavey that every
24  apprehension has a risk of danger to it?
25      A.   Yes.
```

1      Q.   xxx xxxx xxxxxxxx xxxx xxxxxx xxx xx xx xx

2   xxxx xxxxx xxxxxxxxxxxx xx xxx-xxx xx xxxxxxxx?

3      A.   Yes.

4      Q.   Because sometimes shoplifters resist;

5   right?

6      A.   Yes.

7      Q.   Because they want to get away?

8      A.   Yes.

9      Q.   And sometimes shoplifters carry knives;

10  correct?

11     A.   Sometimes.

12     Q.   Yeah.   Target knew that on June 3, 2005?

13     A.   No, we didn't.

14     Q.   You didn't know that sometimes shoplifters

15  carry knives on June 3, 2005?

16     A.   It's a possibility.   We did not know that

17  that shoplifter carried a knife.

18     Q.   Well, I accept that but that's not my

19  question, Ms. Plonczynski.

20          On June 3, 2005, isn't it true that Target

21  was aware that sometimes shoplifters carry knives?

22     A.   Yes.

23     Q.   And Target was aware that when a physical

24  alteration erupts between its employee and a

25  shoplifter, that there is a danger that customers

 1   could be attracted to that area?

 2        A.   Yes.

 3        Q.   In this case, you were aware that Target's

 4   produced a lot of documents; right?

 5        A.   Yes.

 6        Q.   Personnel files, your personnel file,

 7   Mr. Pavey's personnel file?

 8        A.   Yes.

 9        Q.   Have you ever seen the document that says

10   Mr. Pavey was certified as an asset-protection

11   specialist to make apprehensions produced in this

12   case?

13        A.   I've never personally seen it, no.

14        Q.   Neither have I.  Do you know where it is?

15        A.   It would be in his file.

16        Q.   His personnel file?

17        A.   Yes.

18        Q.   Do you know why we didn't get it when we had

19   his personnel file?

20        A.   No.

21        Q.   How long does it take for the police to get

22   to Target once they're called typically?

23             MR. RICHARDS:  Your Honor, object to

24   relevance.

25             THE COURT:  Sustained.

 1          MR. DEMURO:  Can I make an offer of

 2    proof, Your Honor?

 3          THE COURT:  You may.

 4    *(Bench conference outside the hearing of the jury)*

 5          MR. DEMURO:  Target had -- its security

 6    has a walkie-talkie system which allows them to access

 7    a 911 operator within moments, and the police are able

 8    to respond typically within two or three minutes to

 9    the Target location.  That's the offer of proof.

10          THE COURT:  Okay.  Accept the offer of

11    proof.  You may proceed.

12          *(Bench conference concluded)*

13      Q.  *(BY MR. DEMURO)*  Do you agree,

14    xxx xxxxxxxxxx, xxxx xxxxxxxx xxxxx xx xxxxxxxx x

15    xxxxxxxxxx xxxxxx xx xxxx xx x xxxx xxxxxx?

16      A.  xxx.

17      Q.  xxx xxxx xxx xxxxx xxxxxx xxxx xxxxxx, xxx

18    xxxxx xxxxx xx xxxxxxxxx xxxxxxxxxxxx xxxx xxxxxx?

19      A.  I'm sorry.  Can you repeat the question?

20      Q.  xxxx.  xx xxxxxxxx xxxxx xxxxxx xx xxxx xx x

21    xxxx xxxxxx xxx xxxxx xxx xxxxx xxxxx xx xxxxxxxxxx

22    xxxxxxxxxxxx xxxx xxxxxx?

23      A.  I still don't understand the question.

24      Q.  Do you agree with that?

25      A.  I don't understand.  Your mixing two terms of

1    Target that's not making sense to me.

2         Q.   The nonviolent intervention?

3         A.   Yes.

4         Q.   Let me see if I can break it down a little

5    bit easier.  I apologize for being confusing.

6              xxx xxxxx xxxx xxxxxxxx xxxxx xxxxxx xx xxxx

7    xx x xxxx xxxxxx?

8         A.   xxx.

9         Q.   xxx x xxxx xxxxxx xxxxx xx xxxxxx xx xxxx

10   xxxxx xxx xxxxx xxxxx xx xxxxxx xx xxxxxxx xxx

11   xxxxxxxxxx xxxx xxxx xxxxx?

12        A.   xxxxxxxx xxxxx xx xxx xxxx xxxx xxx xxxx xx

13   xxxxxxxxx xxxxx, xxx.

14        Q.   xxx xxxxx.  xx xxx xxxxx xxxx x

15   xxxx-xxxxxxxxxx xxxxxxx xxxxxx xxxxx xxxxx xx xxxx x

16   xxxxxxxxxxxx xxx xxxxxx xxx xxxx xxxx x xxxxxx xx xxxx

17   xxxx xxxxxxxxxx xxxx xxx xxxxx?

18              MR. RICHARDS:  Object to the relevance,

19   Your Honor.

20              THE COURT:  Sustained.

21              MR. DEMURO:  I've made my prior offer of

22   proof on that point, Your Honor.  May I reurge it

23   again?

24              THE COURT:  You may.

25        Q.   *(BY MR. DEMURO)*  Do you agree that making an

1  initial aggressive move can set the stage for a

2  violent confrontation?

3              MR. RICHARDS:  Same objection, Your

4  Honor.

5              THE COURT:  Sustained.

6              MR. DEMURO:  Same offer.

7      Q.  *(BY MR. DEMURO)*  Now, Target's

8  loss-prevention officers aren't given training -- like

9  Mr. Pavey is not given training on how to actually

10  physical fight, is he?

11     A.  No.

12     Q.  Their training consists mostly of applying

13  defensive moves to try to protect themselves if a

14  shoplifter fights them?

15     A.  If a shoplifter is fighting them, yes.

16     Q.  Right.  That's most of their training, how to

17  get away from holds and to block punches that a

18  shoplifter might be throwing at them; correct?

19     A.  That's correct.

20     Q.  They're not trained to one-on-one perform

21  offensive maneuvers, are they?

22     A.  No.

23     Q.  Now, you've reviewed the video and this tape,

24  haven't you?

25     A.  Yes.

1      Q.   And it's your opinion that Stacie Pavey did

2   everything by the book, everything right; correct?

3      A.   Yes.

4      Q.   Now, do you recall when Mr. Therrien's

5   daughter came to Target the day of the stabbing?

6      A.   Yes.

7      Q.   And she was coming back to get his car and to

8   gather his belongings?

9      A.   I was unaware about the car.  It was my

10  understanding that she was coming to get his

11  merchandise.

12     Q.   So you agree that you did have a conversation

13  with Jessica Therrien; correct?

14     A.   Yes.

15     Q.   Did you, as Jessica Therrien says, tell her

16  that her dad was a hero in your heart?

17     A.   No, I never said that.

18     Q.   So she just must be making that up?

19     A.   No.  I don't recall ever saying that word,

20  "hero."

21     Q.   Well, could she have said it and you just

22  didn't hear it?

23     A.   No.  It's not a word that I would use.

24     Q.   What word did you use?

25     A.   I didn't refer to him as anything other than

 1  the victim of a stabbing.

 2       Q.   So Jessica must be just making that up?

 3       A.   I never said it.

 4       Q.   Now, I want to talk about the incident

 5  itself.

 6            As I understand it, you were called to the

 7  music and CD section by Mr. Pavey who was observing

 8  several youth?

 9       A.   That's correct.

10       Q.   And you guys decided that you would split up,

11  and Mr. Pavey would follow the guy who was the

12  eventual stabber and you would follow the other three

13  kids who were looking like they might be shoplifters;

14  is that right?

15       A.   Correct.

16       Q.   Now, the other three kids turned out to be

17  innocent; right?

18       A.   Correct.

19       Q.   When did you realize that those kids were not

20  shoplifters?

21       A.   When they left the area with no merchandise.

22       Q.   And how long ago -- when you say "the area,"

23  do you mean the area of the music and CD area?

24       A.   Correct.

25       Q.   Okay.  And how long a period of time was that

1   by the time that you picked them up until the time you
2   realized that they had left the CD area without any
3   merchandise?

4       A.   Approximately five minutes.  Could have been
5   a little bit longer.

6       Q.   Okay.  Now, at some point in time, Mr. Pavey
7   radioed you and told you that he had concealment, he
8   had seen concealment on the stabber; correct?

9       A.   That's correct.

10      Q.   And that he was going to make an
11  apprehension?

12      A.   I believe he said that he saw concealment.

13      Q.   Well, you understood that that meant that he
14  was going to make an apprehension?

15      A.   Not necessarily, no.

16      Q.   Well, you didn't think he was going to make
17  an apprehension?

18      A.   The shoplifter could have dumped the
19  merchandise in that time.  I had no idea of
20  Mr. Pavey's location.

21      Q.   Okay.  Now --

22           THE COURT:  Counsel, let's stop for the
23  noon recess.

24           MR. DEMURO:  Perfect, Your Honor.  Thank
25  you.

1          THE COURT:  Members of the jury, if

2    you'll remember my admonition not to discuss this

3    among yourselves or allow anyone else to discuss it

4    with you during the noon break.  I'll ask you to be

5    back at 1:15.

6          Now, if everyone in the courtroom would

7    please remain seated as the jury leaves the courtroom.

8              *(The jury exits the courtroom)*

9          THE COURT:  Let the record reflect the

10   jury's departed the courtroom.

11         Anything from plaintiff's counsel before we

12   recess?

13         MR. DEMURO:  No, Your Honor.

14         THE COURT:  Defense?

15         MR. RICHARDS:  No, Your Honor.

16              *(Lunch recess was taken)*

17         THE COURT:  Let the record reflect the

18   jury is in the box, parties are present with counsel.

19         You may continue with your witness.  Ma'am,

20   if you'll take the witness stand.

21         MR. DEMURO:  Thank you, Your Honor.  May

22   it please the court.

23         THE COURT:  You may proceed.

24         MR. DEMURO:  Thank you, Your Honor.

25     Q.   *(BY MR. DEMURO)*  Ms. Plonczynski, before the

1    break, I'd asked you whether or not when Mr. Pavey

2    called you and said that he had seen the suspect

3    conceal the merchandise, at that point whether or not

4    you knew he was going to make an apprehension and you

5    said you weren't sure; correct?

6        A.    Correct.

7              MR. DEMURO:  Now, Ms. Wilson, please

8    turn to Exhibit 57.

9        Q.    *(BY MR. DEMURO)*  And do you recall after the

10   incident being required by your employer, Target

11   Corporation, to give a statement that Target would use

12   for its reporting system?

13       A.    Yes.

14       Q.    That it would use to put in the database and

15   it would use to keep track of criminal events like

16   this?

17       A.    Yes.

18             MR. DEMURO:  Ms. Wilson, could you

19   please blow up that particular paragraph?

20       Q.    *(BY MR. DEMURO)*  And is Exhibit 57, which is

21   already admitted into evidence, that statement?

22       A.    Yes.

23       Q.    All right.  Now, in that statement, you say,

24   "The subject re-entered the music and movie department

25   with a shopping cart.  Mr. Pavey continued observation

1  and I continued observation on the three juveniles.

2  The three juveniles went to the electronics

3  department, approximately five minutes went by when

4  Mr. Pavey radioed that he had observed concealment on

5  the subject and he was going to make an apprehension."

6      So does that refresh your recollection that

7  you did, in fact, know when Mr. Pavey called you and

8  said he had concealment that he was going to make an

9  apprehension?

10     A.   Yes.

11     Q.   You did know that?

12     A.   Well, I understand what I wrote and that's

13  true what I wrote.  But when he radioed me and he said

14  he saw concealment and he said he was going to make an

15  apprehension, I didn't know for sure at that point he

16  was going to make an apprehension 100 percent.

17     Q.   Okay.  Now, let's go to another statement

18  that you made, Exhibit 58.

19     Do you remember making a statement to

20  Target's claims adjustor, a tape-recorded statement?

21     A.   Yes.

22     Q.   And is Exhibit 58 that statement?

23     A.   Yes.

24     Q.   And this statement was made shortly after the

25  incident?  It indicates that it was made on June 6,

1    2005.

2         A.   Yes.

3         Q.   Okay.  And on page 3 of that statement, which

4    is Exhibit 58, page 3 --

5              MR. DEMURO:  Ms. Wilson, if you could

6    blow up this paragraph.

7         Q.   *(BY MR. DEMURO)* -- "you again say, About

8    five minutes went by and he radioed" -- Mr. Pavey --

9    "via two-way radio that he had concealment on the

10   subject and that he was going to make an

11   apprehension."

12             Do you see that?

13        A.   Yes.

14        Q.   So you knew at least that he thought that he

15   was making an apprehension; correct?

16        A.   Yes.

17        Q.   And you decided not to go over and help?

18        A.   No.

19        Q.   Correct?

20        A.   No.

21        Q.   At that point when he told you you were

22   making an apprehension, you didn't go over and help,

23   did you?

24        A.   I had no idea where he was in the store.  I

25   contacted him to find out if he was going to make the

1    apprehension and I didn't hear anything back from

2    him.

3        Q.   Now, you know that -- what steps did you take

4    to move to where Mr. Pavey may have been making the

5    apprehension?

6               MR. RICHARDS:  Judge, I object to

7    relevance.

8               THE COURT:  Sustained.

9        Q.  *(BY MR. DEMURO)*  What did you -- strike that.

10              xxx xxxx xxxx xxxx xxxx-xxxxxxxxx xxxxxxxxx

11   xxxx xxx xxxxxxxxxxxx xxxxx xx xxx xxxx xxxxx;

12   xxxxxxx?

13       A.   xxxxxxx.

14       Q.   xx xxx xxxx xxxx xxxx xxx xxxxx xxxx xxxx xx

15   xxx xxxxx xx xxxx xx xxxxxxxxxxxx, xxxx xx xxx xxxxx

16   xx xxxx xxxx xxxxxxxxxxxx xx xxx xx xxx xxx xxxxx;

17   xxxxxxx?

18       A.   Correct.

19       Q.   Now, did you move towards any of those two

20   doors when he told you that he was --

21       A.   I was already near --

22              THE COURT:  Ma'am, just a minute.

23   Now.

24       Q.  *(BY MR. DEMURO)*  Did you move towards one of

25   those doors when he told you that he was going to make

1  an apprehension?

2                    THE COURT:  Don't answer that

3  question.

4                    MR. RICHARDS:  Same objection.

5                    THE COURT:  Sustained.

6                    MR. DEMURO:  I'd like to make an offer

7  of proof on that.

8                    THE COURT:  You may.

9    *(Bench conference outside the hearing of the jury)*

10                    MR. DEMURO:  My offer is she would

11  testify that she made -- she voluntary chose not to go

12  over to where the place of the apprehension was taking

13  place even though she knew that he was going to make

14  the apprehension by himself.

15                    MR. RICHARDS:  It's irrelevant, Your

16  Honor.  She was not involved.

17                    THE COURT:  Offer of proof is accepted.

18                    *(Bench conference concluded)*

19      Q.  *(BY MR. DEMURO)*  You knew when he had radioed

20  you that he was going to make the apprehension that

21  there were no other Target security guards in the

22  store; correct?

23      A.  Correct.

24      Q.  Now, in your statement that's Exhibit 53 --

25  if Ms. Wilson could please put that up -- I'm sorry.

1    That's fine.

2            Exhibit 53, take a look at it.  Does it look

3    like the CIRS report to Target?

4        A.   Yes.

5            MR. DEMURO:  And if we can blow up that

6    middle paragraph, Ms. Wilson.  Not that one.  I'm

7    sorry.  The one above, this one.

8        Q.   *(BY MR. DEMURO)*  This is the same statement

9    that we just previously looked at that you

10   incorporated into the CIRS statement; right?

11       A.   Correct.

12       Q.   And you knew this was an important statement

13   to get accurate because it was the statement that you

14   were providing to your employer; correct?

15       A.   Correct.

16       Q.   For the purpose of documenting this criminal

17   incident?

18       A.   Yes.

19           MR. DEMURO:  Now, Ms. Wilson -- strike

20   that.

21       Q.   *(BY MR. DEMURO)*  Turn to Exhibit 53, page 5.

22       A.   *(Witness complies)*.

23       Q.   At the bottom of this guest incident report

24   is the name of Teresa Johnson and the signature of

25   Teresa Johnson.  Who was Ms. Johnson?

1    A.   She was the executive team leader over human

2    resources.

3    Q.   For Target?

4    A.   Yes.

5    Q.   For the Supercenter?

6    A.   Yes.

7    Q.   Okay.  And this is her guest incident report

8    that she also had to fill out?

9    A.   Yes.

10                MR. DEMURO:  Now, if you'll blow up

11   the middle section, please, Ms. Wilson.  Right there,

12   yes, ma'am.  Right there.  That's okay.

13   Q.   *(BY MR. DEMURO)*  Do you see where the

14   executive human resource manager says, "Guest saw our

15   APS in a confrontation, ran to assist, and was stabbed

16   in lower left-side area"?  Do you see that?

17   A.   Yes.

18   Q.   So this is another document in which Target,

19   when the incident took place, described it as a

20   customer assisting a Target employee; correct?

21   A.   Yes.

22   Q.   Now, getting back to your statement, Exhibit

23   57 --

24                MR. DEMURO:  If we could again blow up

25   that paragraph.

1    Q.   *(BY MR. DEMURO)*   -- after Mr. Pavey radioed

2    you that he was going to make the apprehension, you

3    claim that you radioed him back and that he did not

4    respond; correct?

5    A.   Correct.

6    Q.   And approximately two minutes later

7    you -- excuse me -- two minutes -- probably two

8    minutes went by and that's when you tried to contact

9    him; right?

10   A.   Correct.

11   Q.   In other words, you got the call, two minutes

12   went by, you tried to call him, and there was no

13   answer by Mr. Pavey; correct?

14   A.   Correct.

15   Q.   Okay.  Now, the next sentence you say that,

16   "I continued" -- I'm right here -- "I continued my

17   observation of the three juveniles while Mr. Pavey

18   contacted me over the two-way radio.  He was

19   requesting my presence at the green doors

20   immediately."

21        Now, this second time that Mr. Pavey called

22   you on his radio, by that time he had already been

23   stabbed; correct?

24   A.   Correct.

25   Q.   That was the second call where he called you

1    to say, come to the green doors immediately?

2        A.   Correct.

3        Q.   He'd already been stabbed at that point?

4        A.   Yes.

5        Q.   Now, you say in your statement to Target that

6    at that time that that second call was made, that you

7    were continuing your observation of the three

8    juveniles; correct?

9        A.   Correct.

10       Q.   But that's not the case, is it?  You were

11   actually walking with the camera repairman, Scott

12   Manley, when that call came in; isn't it true?

13       A.   No, that's not correct.

14       Q.   Okay.  So your testimony is you weren't

15   walking with Mr. Manley when that second call came

16   in?

17       A.   Absolutely.

18       Q.   Okay.  Now, after you got that first call

19   from Mr. Pavey that he was going to make an

20   apprehension, you knew that he was going to make that

21   apprehension by himself; correct?

22       A.   No.

23       Q.   Who else do you think was going to help?

24       A.   Myself.

25       Q.   Oh.  But you've made no effort to move to

1  where he was?

2       A.   I made an effort.  I was at the other door.

3       Q.   Which other door?

4       A.   The green side.

5       Q.   And when you saw that he wasn't over there,

6  what did you do?

7       A.   I had no idea where Mr. Pavey was.

8       Q.   If he wasn't at the door, you knew he was

9  going to make the apprehension at the other door?

10      A.   Not necessarily.  I had no idea of the

11  location of Mr. Pavey in the store.

12      Q.   Why didn't you -- when Mr. Pavey called you

13  the first time and said, I'm getting ready to make an

14  apprehension, why didn't you ask him, what door are

15  you going to be making your apprehension?

16           MR. RICHARDS:  Your Honor, let me object

17  to this.  This is becoming argumentative and it's

18  irrelevant to what the court has ruled is the issue of

19  the case.

20           THE COURT:  Argument, Counsel?

21           MR. DEMURO:  Well, I think it's very

22  relevant.  It calls into question why there wasn't a

23  second security guard at the incident.

24           THE COURT:  Sustained.

25      Q.   *(BY MR. DEMURO)*  Now, you didn't see the

1   stabbing take place, did you, ma'am?

2       A.   No.

3       Q.   You didn't see anything that happened in the

4   vestibule that day; right?

5       A.   No.

6               MR. DEMURO:  May I approach the well,

7   Your Honor, with these exhibits?

8               THE COURT:  You may.

9       Q.   *(BY MR. DEMURO)*  Now, before I get there,

10  getting back to your statement, nowhere in your

11  statement does it say, that we just looked at, Exhibit

12  57, that you were somehow moving to the other door

13  trying to find Mr. Pavey?  Doesn't say that, does

14  it --

15      A.   I wasn't.

16      Q.   -- in your statement?

17           Right, it doesn't say that?

18      A.   Correct.

19      Q.   Is says you were following these other three

20  juveniles?

21      A.   I wasn't following them.

22      Q.   Okay.

23               MR. DEMURO:  Would you blow that up?

24      Q.   *(BY MR. DEMURO)*  It says you were continuing

25  your observation of the three juveniles?

**United States District Court**

1          A.   I was observing them.  I wasn't following

2     them.

3          Q.   There's a difference?

4          A.   There is a difference.

5          Q.   Okay.  So you were continuing your

6     observation is what your statement was --

7          A.   Yes.

8          Q.   -- of the three individuals?

9               It doesn't say on here that you were trying

10    to locate Mr. Pavey, does it?

11         A.   No.

12         Q.   Okay.  Doesn't this mean to imply that what

13    you were really doing is trying to observe the three

14    juveniles and not help Mr. Pavey?

15         A.   No.

16         Q.   Isn't that what you were meaning to convey to

17    Target?

18               MR. RICHARDS:  Your Honor, I object.

19    It's argumentative and it's irrelevant.

20               MR. DEMURO:  I'll withdraw.

21               THE COURT:  Question withdrawn.  Next

22    question.

23               MR. DEMURO:  Go to Exhibit 15A, please,

24    Ms. Wilson.

25         Q.   *(BY MR. DEMURO)*  Now, we know that the first

1  confrontation with the shoplifter occurred at 2:05:50;

2  correct?

3      A.   Yes, yes.

4      Q.   And the first time that we see you arrive on

5  the scene is almost a minute later at 2:06:49 --

6      A.   Yes.

7      Q.   -- correct?

8          Is this your picture, Miss?

9      A.   Yes.

10     Q.   And at that time there were women and

11 children still coming through the exit ay; correct?

12     A.   Correct.

13     Q.   And the one person that we see up here at

14 2:06:41, some 50 seconds after the altercation, is

15 Lisa Kreps?

16     A.   Correct.

17     Q.   Okay.  At the time that you arrived at

18 2:06:49, almost exactly a minute after the shoplifter

19 was there, you were the first other security personnel

20 that arrived at the scene other than Mr. Pavey;

21 correct?

22     A.   Yes.

23     Q.   Target has what, 88 cameras in the Super

24 Target store at the time of this incident?

25     A.   Approximately.

1    Q.   And 78 of the cameras are digital?

2    A.   Approximately, yeah.

3    Q.   And the rest are analog, meaning they use VHS

4    tapes?

5    A.   Yes.

6    Q.   But this is the only view that we have of the

7    actual scuffle itself?

8    A.   Yes.

9    Q.   Now, on that day there was somebody from a

10   company called "Sensormatic" out there trying to fix

11   some cameras?

12   A.   Correct.

13   Q.   Some of your digital cameras -- excuse

14   me -- analog cameras were down?

15   A.   All of the analog cameras were down.

16   Q.   And that's what Mr. Manley was doing?

17   A.   Yes.

18   Q.   Now, Mrs. Plonczynski, you don't deny that

19   Mr. Therrien was trying to help Mr. Pavey when he came

20   into that vestibule, do you?

21   A.   I think he thought he was going to help, yes.

22   Q.   You don't deny that, do you, that he thought

23   he was helping?

24   A.   Yes.  No, I don't deny that.  Sorry.

25           MR. DEMURO:  No further questions, Your

1    Honor.

2               MR. RICHARDS:  May I proceed, Your

3    Honor?

4               THE COURT:  You may proceed.

5               MR. RICHARDS:  Thank you.

6                    **CROSS-EXAMINATION**

7    **BY MR. RICHARDS:**

8         Q.   Ms. Plonczynski, I believe if we can pull up

9    the photo of you entering the area, that's the one

10   that you and Mr. DeMuro just discussed as your first

11   arriving on the scene; is that correct?

12        A.   Yes.

13        Q.   And that is you in the white shirt?

14        A.   Yes.

15        Q.   And the time of that is 2:06:49; correct?

16        A.   Correct.

17        Q.   And if we could go then to 2:07:12, tell me,

18   who is that gentleman that we're seeing now?

19        A.   Scott Manley with Sensormatic.

20        Q.   All right.  That's about 20 seconds after you

21   arrived on the scene?

22        A.   Yes.

23        Q.   And I think we can probably scroll back a

24   couple and see when he first shows up.

25             You said a moment ago that you were not in

                    **United States District Court**

1  your recollection with Mr. Manley when you got this

2  radio call.  How is it that you remember that?

3       A.   Because I questioned why he was responding.

4  I had no idea why he would even be on the scene being

5  that he was in my office and we have two-way radios.

6  Well, the radios are on in my office.  So when he was

7  repairing the camera unit, the system, he said that he

8  overheard Stacie's cry for help over the two-way radio

9  and then he had responded.

10      Q.   Now, is the equipment that was being repaired

11 by Mr. Manley, is that located in your office?

12      A.   Yes.

13      Q.   And you say you have radios that are in the

14 office and turned on?

15      A.   Yes.

16      Q.   I see.  Now, of course as we've discussed,

17 you didn't see this incident occur, did you?

18      A.   The stabbing incident, no, I did not.

19      Q.   All right.  But you have seen the video of

20 the incident; correct?

21      A.   Yes.

22      Q.   And many times, I gather?

23      A.   Many times.

24      Q.   If we could go to 2:05:51, you were asked

25 some questions earlier about whether Mr. Pavey acted

```
 1   according to the policy and acted correctly.

 2              xxxx xxxxxxxx xxxxxx xxxxxx xxx xx

 3   xxxxxx-xxxxxxxxxx xxxxxxxx xx xxxxxxx xx xxxxxxxx x

 4   xxxxxxxxxx xxx xx xxxxxx xx xxx xxx xxx xxxx?

 5        A.   xxx.

 6        Q.   xxx, xxx xxxxxx xxxxx xxx xxxx xxxxxxxxx

 7   xxxxx -- xx xxxxxxxx xxx xxxxx; xxx xxx xxxx xxx --

 8   xxxxx x xxxxxx xxxx xxxx xxx xxxxxx xxxxxxxx xx

 9   xxxxxxx xxxxx x xxxxxxxxxx; xx xxxx xxxxxxx?

10        A.   xxx.

11        Q.   xxxxxx xxx xxxxxxxxxx xxxxxxx xxxxxxxx

12   xxxxxxxxx xxx xxxxxxxxxxx xxxxxxx?

13        A.   xxxx xxxxx xxxxxx xx xxxxxxxxxxxx, xxxxxx xxx

14   xx xxxx xxxx xxxx xx xx xxxx xxxxxx, xxxx xxx xxxxx,

15   xx xxxxx xxxx xx xx xxxxx xxx xxxxxxxxx xxxx.  xxx

16   xxxxxxxxxx xxxxxxx xxxx xxxxxxxx xxxxxxx xx xxxxxxx

17   xxxxxxx, xxxxxxx xxxx xxxx xx, xxxxxxx xxxxxxx, xxx xx

18   xxxx x xx-xxxxx xxxxxx xx xxxxxx xx, xxx xxxxxxxxxxx,

19   xxx xxx xxxxxx, xxxxx xx xxxxx xxxxx xxxx xxx xxx xxx

20   xxxxxxxx xxxx xxx xxxxxx xxx xx xxxxx xx xxxxx

21   xxxxxxxx xxxxxxxxx xxxxxx, xxxxxxxxx xxxxxxxxx.

22        Q.   xx xx x xxxxxxxxxx xxxxxxxxx, xxxx xxx xxx xx

23   xxxx xxxxxxxx xxxxx xxxxxxxx xxxxxxxxxxx xxxx xxxxxx,

24   xxxx xx xxxx xxxxxxxx xxx xx xxx xxxxxxx xxx xxxx?

25        A.   xxx.
```

1      Q.   All right.

2      A.   Some of them do.

3      Q.   They don't all stand passively and allow you

4   to put them in handcuffs; correct?

5      A.   Not all of them, no.

6      Q.   xxx xxx xxx xxxxxxxxx xx xxxx xxxx xxxx

7   xxxxxxx xxx xxx xxxx xx xxx xxx xxxx xx xx xxxx?

8      A.   xxx, xxxxxx xxxxxxx.

9      Q.   xxx xxxxx.  xxx xxxx xxxx -- xxx x xxxx xx

10  xxxx xx xxxxxxxxxx xxxx -- xxxx xx xx xxxxx-xxxxxxxxxx

11  xxxxxxxx xx xxxxxx xxxxxx xxx xxxxxxx xx xxxxxxxxx

12  xxxxxxxxx.

13            xxxx xx xxx xxxx xx "xxxxxxxxx xxxxxxxxx"?

14     A.   xxxxxxxxx xxxxxxxxx xxxxx xx xxxxxxxxx xxxxx

15  xx xxxx xxxxxxxxxx xxxxxx xxxxxxxxxx xxxx xx xxx xxxx

16  xxxx xxxxxxx, xxxxxxx xxxx, xxxxx xxxxxxxxxxxx xxxxx,

17  xxxxxxxx xxxx, xxxxxxx xxxx, xxxxxxxx xxxx, xxxxxxx

18  xxxx.  xxxx xxxxx xxx -- xxxx xxx xxx xxxxxxx xxx

19  xxxxx.

20     Q.   xxx xxxxx.  xx xxxx xxx xxxx xxxxxx xxx

21  xxxxxxxxx xx xxx xx xxxx xxxx xx xxxx xxxx xx xxx xxxx

22  xxx?

23     A.   xxxxxxx.

24     Q.   xxx xxxxxx xxx xxxxxxxxx xx xxxxx xxxx?  --

25     A.   xxxxx.

1    Q.   -- xx xxx xx xxxxxxxx xxxx?

2         xxxxxx xxx xxxxxxxxx xx xxxxx xxxx?

3    A.   xx.

4    Q.   xxx xxx xxxxxxxxx xx xxxx xxxx?

5    A.   xx.

6    Q.   xxxx xxxx?

7    A.   xx.

8    Q.   xxx xxxxx.  xxxx xxx xxx xxxxxxxxx xx xx?

9    A.   xxxxx xxxxxxxxx xx xxxx xx xx xxxx xxx

10   xxxxxxx xx xxx xxxx xxxx xxxxxx xxxx xxxxxxxxx,

11   xxxxxxxxx xx xxxx xx xx xxxx xxx xxx xxxx xxxx x

12   xxxxxxxx, xxxx xx xxx xxxxx xxxxx xx xx, xxx xxxx

13   xxxxxxx xxx xxxx xxxx xxxx xxxxxxxxx xxxx xxx xxx xxxx

14   xxxx xxxxxxxxx.

15   Q.   And from what you've seen of this video, does

16   that appear to be what Mr. Pavey was attempting to

17   do?

18   A.   Yes.

19   Q.   xx xx xxxx xx xxx xxxxx xxxx xxx xxxx xxxx

20   xxx xxx xxx xxxx xx xxxxxxx xxx xxxxxxxxx, xxxx xxx

21   xxx xxxxxxxxxx xx xx?

22   A.   xx xxxxx xxx xxxx xx xxxxxxx xxx xxxxxxxxx,

23   xxx xxxxxx xx xxx xxxxxxxxxx xxxxx, xxxx xx xxx xx xxx

24   xx xxx xxxx xxxxx.

25   Q.   xxx xxxx xx xxx xxx xxxx?

1  A.   xxx.

2  Q.   Which is what they're trying to do anyway?

3  A.   Yes.

4  Q.   And now, ma'am, in terms of the training that

5  xxxxxx xxxxxxxx xxx, xxx xxxxx xxxxxx xxxxx xx xxxxxx

6  xxxxxxx.  xx xxxx -- xxx xxxx xxxxxxx xxxx xxxx

7  xxxx-xxxxxxx xx xx-xxx-xxx-xxxx xxxxxxxx?

8  A.   xxx xxxxx xx xxxxxxx xx xxxxxx xxxxx xxxxxxxx

9  xxxxxxxx xxx xxxx xxxx xx xxxxxxx xx xxxxxxxxxxxx

10  xxxxxxxxxxxxx xxxxx -- xxx xxxx xxxxx xx xxxxx x xxx

11  xx xxx xxxx-xxxxx xxxxxx -- xxx xxxx xxxxxxx

12  xxxxxxxxx.  xx xxx xxxxxxxxxx xxxxxxxxx xxxx, xxxx

13  xxxxxxx xxxxxxxxx.

14  Q.   As his supervisor, did you observe Mr. Pavey

15  in doing his job?  In other words, Mr. DeMuro had

16  asked if you actually saw a written certification that

17  he was authorized as an APS to make apprehensions and

18  I think you said you did not.

19        Did you observe him to tell that he had been

20  trained to do that job?

21  A.   Yes.  I was on apprehensions with Stacie in

22  the past.

23  Q.   All right.  And did he act according to

24  Target policy?

25  A.   Absolutely.

1    MR. RICHARDS: I don't think I have

2  anything further, Your Honor.

3                **REDIRECT EXAMINATION**

4  **BY** MR. DEMURO:

5    Q.   Really you've been with Mr. Pavey on his

6  apprehensions in the past and you testified that he

7  followed Target's policies --

8    A.   Yes.

9    Q.   -- in this case?

10   A.   Yes.

11   Q.   All of Target's policies with respect to

12  apprehensions?

13   A.   Yes.

14   Q.   Now, you mentioned that most shoplifters

15  flee -- want to flee when they get caught; correct?

16   A.   Yes.

17   Q.   xxxxx xxxx xxx xxxxxx xxx x xxxxxx xxxx xxxx

18  xxx xxxxxxxx x xxxxxxxxxx, xxx xxxx xx xxxxxxxx xxxx

19  xxxx xxx xxxxx?

20   A.   xxxx xxx xxxx xxxxx, xxx.

21   Q.   All right.

22           MR. DEMURO: Turn to Exhibit 63,

23  Ms. Wilson, Plaintiff's Exhibit 53 -- 63. Okay.

24  Don't put it up.

25           MR. RICHARDS: That's not been admitted.

1          MR. DEMURO:  You can go ahead and take

2     that down.

3          Q.  *(BY MR. DEMURO)*  Turn to Exhibit 63,

4     Ms. Plonczynski, and look at page 4 of Exhibit 63.

5               Isn't that the Target policy that

6     dictates -- or strike that.

7               Isn't that the Target policy that talks about

8     how an approach to a shoplifter should be made?

9          A.  Yes.

10         Q.  And isn't that the policy that was in effect

11    at the time of this stabbing?

12         A.  Yes.

13         Q.  Okay.

14              MR. DEMURO:  Your Honor, at this time

15    I'd move into evidence Plaintiff's Exhibit 63-4.

16              MR. RICHARDS:  We offer the same

17    objections.  It precedes the point of Mr. Therrien's

18    involvement.

19              THE COURT:  Sustained.

20              MR. DEMURO:  May I make an offer of

21    proof or be heard on that?

22              THE COURT:  You can make an offer of

23    proof.  I think the document speaks for itself, but

24    you can say whatever you'd like to on it.

25       *(Bench conference outside the hearing of the jury)*

**United States District Court**

1          MR. DEMURO:  Mr. Richards has just

2     opened the door.  He just asked this witness on two or

3     three times whether she followed -- Target followed

4     their policies with respect to the whole apprehension

5     process.  He didn't limit it to when it happened, when

6     the fight started.  And now it's inherently unfair,

7     Your Honor, to limit me to rebut that.

8          They didn't follow their policies with

9     respect to apprehensions, and now the jury has

10    evidence that they did because Mr. Richards opened the

11    door.  In fundamental fairness, I've got to be able to

12    get this evidence in now.

13          THE COURT:  Counsel?

14          MR. RICHARDS:  Your Honor, first of all,

15    I didn't open the door.  The question was asked in

16    response to Mr. DeMuro's suggestion that Stacie Pavey

17    was not, in fact, certified to conduct apprehensions.

18          The question that I asked was whether she had

19    observed him to see if he appeared to have been

20    trained in that.  She volunteered, in response to

21    that, that yes, she had been on apprehensions with him

22    before.  Mr. DeMuro then questioned her about whether

23    he had followed the policies.  That doesn't open the

24    door.

25          THE COURT:  Objection sustained.  You

1    can make your offer of proof.

2                    MR. DEMURO:  My offer of proof would be

3    this particular exhibit that I'm on right now.

4                    *(Bench conference concluded)*

5        Q.   *(BY MR. DEMURO)*  The fact that shoplifters

6    always flee is one of the reasons why your policies

7    say it's always safer to do it with two people too;

8    correct?

9                    MR. RICHARDS:  Your Honor, I object;

10   same basis.

11                   THE COURT:  Sustained.

12       Q.   *(BY MR. DEMURO)*  xxx, xxx xxxxxxxxx xxxx

13   xxxxxxxx xxxxxx xx xxxx xx xxx xxxxxx xx xxxxxx

14   xxxxxxx xx -- xxx xxxx xxxxxxxxxx xxx xx xxxxxx

15   xxxxxxx xx xxx xxx xxx, xxxx xxxxxx xxx xxx xxx xxx

16   xx; xxxxx?

17       A.   It's that person's judgment who's making the

18   apprehension, yes.

19       Q.   xxx xx xxxx xxxxxx xxxxxxxx xxxxxxx xxxxxx

20   xxxxxxx, xxxx xxxx xx xxx xxxx xx?

21       A.   xxx.

22       Q.   Because a few CDs isn't worth all of this, is

23   it?

24       A.   No.

25                   MR. DEMURO:  May I approach the well,

**United States District Court**

1    Your Honor?

2              THE COURT:  You may.

3         Q.  *(BY MR. DEMURO)*  I'm holding up part of

4    Exhibit 15.  There's another individual who we haven't

5    spoke much about in this case but does appear on the

6    video at 2:07:27 p.m.  That's Michael Hendricks;

7    correct?

8         A.  Correct.

9         Q.  He is a Target loss-prevention employee?

10        A.  Correct.

11        Q.  He was on the store premises that day but it

12   was an off-duty day for him; correct?

13        A.  Correct.

14        Q.  He just happened to be at the store?

15        A.  Correct.

16              THE COURT:  What was his name?

17              MR. DEMURO:  Michael Hendricks.

18        Q.  *(BY MR. DEMURO)*  Now, Mr. Hendricks didn't do

19   anything to help that day, did he?

20        A.  No.

21              MR. DEMURO:  Thank you, Ms. Plonczynski.

22   No further questions.

23              MR. RICHARDS:  No, Your Honor.

24              THE COURT:  Ma'am, you may step down.

25         Call your next witness.

1    MR. DEMURO:  The plaintiff would call

2    Scott Manley.  With Your Honor's permission, I'll go

3    out in the hallway and get him.

4        THE COURT:  You may.

5            **SCOTT MANLEY,**

6    ***after having been first duly sworn, says in reply to***

7    ***the questions propounded as follows, to-wit:***

8            **DIRECT EXAMINATION**

9    **BY MR. DEMURO:**

10       Q.   Mr. Manley, could you please introduce

11   yourself to the jury?

12       A.   My name is Scott Manley.  My full name's

13   Douglas Scott Manley.  I go by "Scott Manley."

14       Q.   And where do you live, sir?

15       A.   Chouteau, Oklahoma.

16       Q.   **XXX XXX XX XXX XXXX XXX**?

17       A.   **X XXXXXXX XXXXXX XXXXXXXXXXX XXXXXXXXXXX XX**

18   **XXX XXXXXXXXXXX.**

19       Q.   And what does Sensormatic do?

20       A.   We do shoplifting prevention such as security

21   cameras, EAS.

22       Q.   **XXX XXX XXXX XXXX XXX XXXX XXXXX XXXX XXXX XX**

23   **XXXX, XXX**?

24       A.   **XXXXX XXX XXXXX.**

25       Q.   And what's your position with Sensormatic?

1    A.   I'm a service tech.

2    Q.   And over those ten years as being a service

3  tech, has the Target store, the Supercenter store on

4  71st Street in south Tulsa, been one of your clients?

5    A.   Yes, sir.

6    Q.   And in general, what does a service tech do?

7    A.   We install, maintain, repair our equipment

8  that we sell.

9    Q.   And is Target still one of your clients?

10   A.   As far as I know, yes, sir.

11   Q.   Okay.  Now, were you in the store on June 5,

12  2005 -- excuse me -- June 3, 2005?

13   A.   I believe so.  Are you referring to the date

14  of the incident?

15   Q.   Yeah.  Were you there when the people got

16  stabbed?

17   A.   Yes, sir.

18   Q.   Okay.  And what were you doing there?

19   A.   I believe I was there to look at some

20  equipment that was broken.

21   Q.   And you were there right around 2:00 p.m.?

22   A.   As far as the time frame, sir, I do not

23  remember.

24   Q.   It was in the afternoon?

25   A.   To be honest, I really don't know what time I

1   showed up there.

2        Q.   Okay.   Now, when you got there, who did you

3   meet and who were you working with?

4        A.   I always check in with the AP that's on-site,

5   and I would have been working with one of the AP's.

6        Q.   Okay.   Did you work with Ms. Plonczynski at

7   all?

8        A.   Who's Ms.   --

9        Q.   Ms. Plonczynski, Julie.

10       A.   Julie, yes.   I forgot her name.   I

11   apologize.

12       Q.   Didn't you see her that day?

13       A.   Yes.   I was walking the store with her.

14       Q.   Okay.   And what happened as you were walking

15   the store with Ms. Plonczynski?

16       A.   Are you -- in what aspect are you referring

17   to as far as --

18       Q.   What happened?

19       A.   Oh.   We were walking as far as -- what part

20   of the store, I don't know.   But we were walking

21   towards some equipment to be looked at, and the only

22   thing I remember is she had to go and she took off.

23       Q.   Well, you remember that there was a call on

24   her radio; right?

25       A.   To be honest, I really wasn't paying

**United States District Court**

1  attention.  All I know is she was gone.

2      Q.  Okay.  Are you saying, sir, that you don't

3  remember that she got a call on her radio when you

4  were walking with her?

5      A.  I believe so.  I mean, I'm -- I believe she

6  got a call and she was gone.  I'll be honest with you;

7  it's vague.

8      Q.  When you say "it's vague," you are sure that

9  you were walking with her on the sales floor and a

10 call came through on her radio; correct?  You are sure

11 about that; right?

12     A.  I'm pretty positive she got -- as far as from

13 what I remember -- and I apologize, it's been a long

14 time ago.  I've had two kids during that time period

15 so I apologize.

16         We were walking the store and I believe she

17 got a call on the radio and she was gone, but I was

18 more interested on what was going on with the

19 equipment, I believe.

20     Q.  All right.  We'll get to that in a minute.

21         Do you remember giving your deposition in

22 this case?

23     A.  Yes, sir.

24     Q.  And that wasn't that long ago.  It was March

25 26, 2008; correct?

1       A.   If that's what you say, yes.

2       Q.   And you remember Mr. Vanderhoof took your

3   deposition?

4       A.   Yes, sir.

5       Q.   And you remember him asking you, how did you

6   become aware of the stabbing?

7       A.   I believe, yes, sir.  I don't recall

8   everything to that -- to the degree of my deposition

9   to be honest.

10      Q.   But you recall him asking you that question?

11      A.   Vaguely.

12      Q.   Let's see if I can help you refresh your

13  recollection.

14      A.   Okay.  Thank you very much.

15              THE COURT:  Counsel, do you have a line

16  and page?

17              MR. DEMURO:  I do, sir, if you'll give

18  me a moment.

19      A.   Okay.

20      Q.   (BY MR. DEMURO)  Now, if you'll look at page

21  43 -- excuse me -- page 44, line 1.

22              "QUESTION:  And how did you become aware

23  of -- through Julie, I'm assuming -- well, how did you

24  become aware of the stabbing through Julie?

25              "ANSWER:  Correct.

1          "How did you become aware?

2          "ANSWER:  Via the radio."

3          Do you see that?

4     A.   Yes, sir, I do.

5     Q.   Okay.  So isn't it true -- and we can go

6  through some more of this -- that you were walking

7  with Julie on the sales floor when she got a call on

8  the radio that told her she needed to go to the front

9  of the store?

10    A.   Yes, sir.

11         MR. DEMURO:  No further questions.

12                    **CROSS-EXAMINATION**

13  **BY MR. RICHARDS:**

14    Q.   Mr. Manley, there's evidence in this case,

15  one of the exhibits, that indicates that on that day

16  there was something called a VM-96 matrix switcher

17  that was down, that wasn't working.

18         Is that the type of thing that you would have

19  fixed?

20    A.   Yes, sir, it is.

21    Q.   Now, do you have any recollection why you

22  were out there to make repairs that day?

23    A.   No, sir, I really don't.

24    Q.   Okay.  Or what it was you were going to

25  fix?

1      A.   No, sir.  I apologize.

2      Q.   That's okay.  But if the VM-96 was broken,

3  then that's the type of thing that you would have been

4  called out to take care of; right?

5      A.   Yes, sir.

6      Q.   And that's the thing that controlled all of

7  the VHS cameras; right?

8      A.   Yes, sir.

9      Q.   VHS being what -- they've been called analog

10 or VHS.  Not the digital stuff; is that right?

11     A.   The VM-96 is what provides the video to -- I

12 guess all the video comes into the VM-96, then goes

13 out to the other monitors which goes to VHS tapes --

14     Q.   Okay.

15     A.   -- to be more correct, I guess.

16     Q.   So if the VM-96 is broken, it's like the

17 switch is off between the cameras and the monitors?

18     A.   The recording devices, yes.

19     Q.   Okay.  It's why you do what you do and I

20 don't.

21     A.   I apologize.

22     Q.   It's all right.  Now, sir, that VM-96 that

23 was broken would have been in the asset-protection

24 office, wouldn't it?

25     A.   Yes, sir.

1      Q.   All right.  Now, let me ask you, sir:  Do you

2   recall when you --

3                MR. RICHARDS:  And if we could bring up

4   how about 2:07:14, please.

5      Q.   *(BY MR. RICHARDS)*  Is that fella in the white

6   shirt with the sunglasses you?

7      A.   Yes, sir, I believe that would be me.

8                MR. RICHARDS:  You might back it up one.

9   That's a little better.  And another one.

10     Q.   *(BY MR. RICHARDS)*  Now, is that better?

11     A.   Yes, sir, I do believe that would be me.

12     Q.   Is that about the time that you got there?

13     A.   I apologize.  I --

14     Q.   That's all right.  In any event, that's about

15  the time we first have a picture of you?

16     A.   Okay.

17     Q.   Now, when you arrived, or at least at some

18  point while you were there, you saw Mr. Therrien;

19  correct?

20     A.   Who?

21     Q.   Mr. -- the fella here, one of the fellas that

22  had been stabbed.

23     A.   Yes, sir.

24     Q.   Do you remember seeing him?

25                And what do you remember him doing when you

1  saw him?

2      A.   I seen him basically when I was following --

3  not really following Julie -- but I was heading up

4  towards the front.  I seen the gentleman and he was

5  just -- I don't know how to -- acting kind of radical

6  -- not -- just kind of erratic and he was holding his

7  side, and he was screaming that somebody was in the

8  vestibule, or yelling that somebody was in the

9  vestibule stabbed, I think.

10     Q.   Okay.  When we took your deposition, you used

11  a particular expression, that he looked like a chicken

12  with his head cut off.

13     A.   Yeah.  He looked like a chicken with his head

14  cut off.  I apologize.

15     Q.   And is that your recollection of how he was

16  acting when you saw him that day?

17     A.   Yes, sir.

18          MR. RICHARDS:  I don't have any further

19  questions, Your Honor.

20                    **REDIRECT EXAMINATION**

21  **BY MR. DEMURO:**

22     Q.   You mean that he was acting like a chicken

23  with his spleen cut?

24     A.   No, sir.  Like a chicken with his head cut

25  off.

1      Q.   Now, when you heard this radio call come in,

2   you were walking on the sales floor, as you said in

3   your deposition, not in the office; correct?

4      A.   Correct.

5              MR. DEMURO:  No other questions, Your

6   Honor.

7              THE COURT:  Further questions?

8              MR. RICHARDS:  No, Your Honor.

9              THE COURT:  May this witness be excused,

10  plaintiff?

11             MR. DEMURO:  Yes, Your Honor.

12             THE COURT:  Defense?

13             MR. RICHARDS:  Yes, Your Honor.

14             THE COURT:  Sir, thank you for your

15  testimony.  You may step down.  You may be excused.

16             THE WITNESS:  Thank you.

17             THE COURT:  You may call your next

18  witness.

19             MR. DEMURO:  Your Honor, at this time

20  the plaintiff, with the court's indulgence, would like

21  to play the already admitted videotape -- thank you,

22  sir -- of Dr. Traub, the treating physician for

23  Mr. Therrien.

24             THE COURT:  Let me see counsel just a

25  minute.

1      MR. DEMURO:  Yes, sir.

2     *(Bench conference outside the hearing of the jury)*

3           THE COURT:  Just out of an abundance of

4   caution from the court, there's no objections and

5   everything's been ruled on and it's ready for jury to

6   see?

7           MR. RICHARDS:  We've worked out all

8   objections and parts that should be redacted so it

9   is -- it's --

10          THE COURT:  You may proceed.

11          MR. DEMURO:  At least there's one piece

12  of evidence we worked out and agreed on, Your Honor.

13          THE COURT:  Okay.

14            *(Bench conference concluded)*

15          MR. DEMURO:  Your Honor, at this time I

16  would like to present to the jury the videotaped

17  deposition of Dr. Traub, who was the pain-management

18  physician who treated Mr. Therrien after his surgery.

19      I warn the jury, it's a little bit more

20  lengthy than it should be, probably about a half an

21  hour, give or take.

22          THE COURT:  Does counsel have any

23  objection to the court reporter not taking --

24          MR. DEMURO:  I'll relieve the court

25  reporter of his duty to take down the transcript.

1        MR. RICHARDS:  We have no objection.

2        THE COURT:  You may proceed.

3    *(The videotaped deposition of Dr. Traub is shown)*

4        MR. DEMURO:  Your Honor, if I can

5    interrupt, it looks like we have a little technical

6    glitch with an edit that was made.  We've viewed this

7    video before.  I'm sure it's just something that can

8    be worked out very quickly.  Never mind.

9        I was saying I think with Your Honor's

10   indulgence, I can take a short break to clean this

11   technical problem up.

12       THE COURT:  We will be in recess

13   probably 15 minutes.  Remember my admonition not to

14   discuss it with yourselves, allow anyone else to

15   discuss it with you.

16       Ask everyone to please remain seated as the

17   jury leaves the courtroom.

18           *(The jury exits the courtroom)*

19       THE COURT:  Let the record reflect the

20   jury's departed the courtroom.  How much more time is

21   there?

22       MR. DEMURO:  Well, not much, Your Honor.

23   After we present this video, if I may approach.

24       THE COURT:  You may.  No.  I mean, how

25   much more video?

1      MR. DEMURO:  Oh, I think there's

2  probably fifteen minutes or ten.  Ten minutes.

3      THE COURT:  Okay.

4      MR. DEMURO:  Thereabouts.  I'm following

5  through on the transcript.

6      THE COURT:  Okay.  We'll be in recess

7  for about fifteen minutes.

8                  *(Short break)*

9      THE COURT:  You may proceed.

10      MR. DEMURO:  Your Honor, we --

11      THE COURT:  Let the record reflect the

12  jury's in the box, parties are present with counsel.

13      You may now proceed.

14      MR. DEMURO:  Your Honor, Ms. Wilson, my

15  assistant, has worked out the problems and we're ready

16  to go.

17      THE COURT:  Okay.

18      MR. DEMURO:  I thought as a housekeeping

19  matter, Your Honor, this might be an appropriate time

20  to enter into the record the transcript of the video

21  that we've been watching of Dr. Traub so the record

22  has that transcript.

23      THE COURT:  You may.

24      MR. DEMURO:  And that has been marked as

25  Plaintiff's Exhibit 83.

1    May I approach and hand it to your bailiff?

2              THE COURT:  You may.  I assume there's

3    no objection; is that correct?

4              MR. RICHARDS:  None, Your Honor.

5              THE COURT:  Eighty-three admitted

6    without objection.

7              MR. DEMURO:  And just so everybody

8    knows, there's probably about 13, 14 minutes left.

9              THE COURT:  Okay.

10             *(Video continued for the jury)*

11             MR. DEMURO:  Your Honor, that's

12   obviously the end of the video.

13        At this time I have that issue to present to

14   the jury that we talked about before with respect to

15   the prior consistent statement that I'd like to

16   present.

17    *(Bench conference outside the hearing of the jury)*

18             MR. DEMURO:  This is the prior

19   consistent statement of Mr. Therrien at the

20   hospital.

21             THE COURT:  The television reporter?

22             MR. DEMURO:  Yes, sir.  And I've got a

23   transcript of the brief clip -- literally, it's two

24   lines long -- that we can excise and play.  I've

25   showed it to Mr. Richards.

1          THE COURT:  Do you have any objection?

2          MR. RICHARDS:  Well, I do, your Honor.

3     It's basically the same objection I made earlier.

4     This was five days after the incident.  If there's

5     anything played, though, certainly I think this is the

6     sentence that he's speaking of.  I think it should

7     begin "so I" because this first portion doesn't have

8     anything to do with whether there was a call for help

9     or not.

10          THE COURT:  Okay.  Not okay good, but I

11    understand.

12          MR. DEMURO:  I don't think it's possible

13    to really excise out that sentence and make it one

14    phrase excised from the other.

15          THE COURT:  Let me back up a step.

16          Your support, legal support, for doing it is

17    what?

18          MR. DEMURO:  Yes, Your Honor.  It's rule

19    81(d)(1)(B), consistent statement intended to rebut an

20    expressed or implied charge of recent fabrication.

21          The defendant continues to persist that

22    Mr. Therrien lied when he said that he was asked for

23    help.  So now that Mr. Pavey asked for help, he

24    intends to, I think, get on another witness to say

25    that.  So now it's a credibility issue, Your Honor.

1  It doesn't go to the duty question.

2          If they attack his credibility, which they

3  have, I am entitled to rehabilitate.  The rule that

4  I've just cited is the rule that permits me to do

5  that.  I've met all the foundational requirements

6  under that rule.

7          MR. RICHARDS:  Your Honor, to the extent

8  that what's played deals with whether -- with him

9  stating he was surprised there was any backup, that

10  clearly is something that should not come in.

11          If it's admissible at all as a prior

12  consistent statement, it should simply be the second

13  half of the phrase.  If it can't be edited so to play

14  the portion as the prior consistent statement, it

15  shouldn't be played.

16          THE COURT:  Well, is it significant?

17  I'm still confused about how you plan to present it to

18  the jury.

19          MR. DEMURO:  I can do that one of two

20  ways.  I can recall Mr. Therrien and authenticate it

21  that way, but I don't think there's an issue about the

22  authenticity, so I think that Mr. Richards will permit

23  me just to play it, if it was admissible, rather than

24  going through it.

25          So technically, I'm asking to reopen -- not

1    to reopen -- but to recall Mr. Therrien for that

2    limited purpose, but I don't think we have to do that

3    procedurally.

4                    MR. RICHARDS:  I would agree that if

5    it's allowed, it can just be played.  He doesn't need

6    to put Therrien back on the stand.

7                    THE COURT:  So is it set up in a TV news

8    format?

9                    MR. DEMURO:  I don't think you -- you

10   may see a news insignia, but you don't see a reporter

11   in the clip, you don't hear the reporter, all you hear

12   is the statement.

13                   THE COURT:  He made the statement --

14                   MR. DEMURO:  Yes, sir.

15                   THE COURT:  -- live?  Well, what would

16   have been live TV then?

17                   MR. DEMURO:  Yes, sir.  I'm sorry.  Go

18   ahead.

19                   MR. RICHARDS:  He was being videoed.

20                   MR. DEMURO:  Yes.  While he was still in

21   the hospital.

22                   THE COURT:  Okay.  Now, do you have --

23   any on the defense side, is there any objection, and

24   what's the basis of your objection?

25                   MR. RICHARDS:  Well, the objection is

**United States District Court**

1  twofold.  First of all, that it's -- I think it's a

2  collateral issue, although it is correct that I do

3  intend to present additional witnesses as to the

4  affect that he did not make a statement to the police

5  officer in the emergency room the day of this incident

6  when he was asked to help.  And then, of course, Lisa

7  Kreps will testify that she told him not to go over

8  there and heard Stacie Pavey yell back.

9          The second objection is to the first portion

10 of the statement which deals not with whether he heard

11 a call for help, but his surprise that there

12 wasn't -- that Stacie Pavey didn't have backup, which

13 is an issue that the court said is not admissible

14 here.

15               MR. DEMURO:  May I briefly --

16               THE COURT:  Why if this is -- why

17 wouldn't it be appropriate in rebuttal, if it's

18 appropriate at all?  What's the -- let me see the

19 rule.

20               MR. DEMURO:  Your Honor, I think it

21 would be appropriate in rebuttal.  I think it

22 requires -- as I understand it, Your Honor, the

23 foundational requirements are once the credibility has

24 been attacked, and so I couldn't do it initially with

25 Mr. Therrien because he had not yet been attacked.

1  Mr. Richards attacked Mr. Therrien's credibility on

2  this point through Mr. Pavey's testimony.

3              THE COURT:  And you're saying

4  801(d)(1)(B)?

5              MR. DEMURO:  Yes, sir.

6              THE COURT:  Doesn't (B) say, "consistent

7  with the declarant's testimony and is offered to

8  rebut"?

9              MR. DEMURO:  That's right.  Consistent

10  with his testimony at trial.  This is a prior

11  consistent statement.

12          So the declarant makes the statement at trial

13  that the light is green.

14          Then the opponent says, no, no, didn't you

15  say the light was red at such and such a time?

16          And then I can come back and say, no, wait a

17  minute.  Before that, I made a consistent statement

18  that the light was green to prove that I didn't

19  fabricate --

20              THE COURT:  The statement was made

21  before the statement he testified about on direct?

22              MR. DEMURO:  Right.

23              MR. RICHARDS:  Your Honor, the problem

24  is, we're not saying that Mr. Therrien ever made a

25  statement -- an extrajudicial statement or a statement

1    under oath that he did not here recall.  I mean, he's

2    testified here he recalled.  It's disputed whether

3    that happened, but, I mean, essentially our evidence

4    is that are two different versions of what happened

5    and the jury is going to have to decide who they

6    believe.  I don't know that's suggesting that someone

7    has recently fabricated something.

8                    MR. DEMURO:  He's put on three

9    witnesses -- three different witnesses --

10                   THE COURT:  Now, this is your case.  You

11   put them on and he cross-examined them.  Let's be sure

12   the record is real clear.  This is your case, they

13   were your witnesses, and they were cross-examined.

14                   MR. DEMURO:  Correct.  He's getting

15   ready to put on two other witnesses that are going

16   to --

17                   THE COURT:  Now, I understand that.  I

18   mean, I think this is -- I'm still listening to you

19   but I think it's more entertainable as rebuttal but

20   I'm --

21                   MR. RICHARDS:  Let me -- just to save

22   time, Judge, I would tell you that if the court is

23   inclined to allow it, I don't have a problem with the

24   timing now as opposed to after --

25                   THE COURT:  Let's put it on.

1          MR. RICHARDS:  But I do have a problem

2     with the first part of it.

3          THE COURT:  Well, I do too.  I thought

4     we had a concession that you weren't going to put the

5     first part of -- tell me exactly what you're going to

6     put in.

7          MR. DEMURO:  I don't think I can edit

8     that sentence effectively without it being garbled,

9     but I wouldn't object, in consideration of your prior

10    ruling, to instruct them that they're to disregard the

11    first part of the sentence.

12         MR. RICHARDS:  Well, can she turn the

13    sound off on the first part and do it herself?

14         THE COURT:  Can she do that?

15         MR. DEMURO:  Sure.

16         THE COURT:  Check and see.  I want to

17    see.  Let me see that just a minute.  I want your

18    copy.

19         *(Discussion held off the record)*

20         THE COURT:  I know -- I have confidence

21    that you know how you're setting this up, but, I mean,

22    how are you going to introduce it to the jury?

23         MR. DEMURO:  Again, with Mr. Richards'

24    consent, I would just say this -- Your Honor, I'm

25    going to present a video of the statement Mr. Therrien

1 made while he was in the hospital.

2                MR. RICHARDS:  I think you need to give

3 them the date.

4                THE COURT:  You need to give them the

5 date.

6                MR. DEMURO:  Thank you.

7                THE COURT:  Okay.  Let's go with that.

8                MR. DEMURO:  Okay.  Your clerk is

9 checking on the technical part.

10                THE COURT:  Okay.

11                MR. RICHARDS:  I understand that he's

12 going to rest after this.  Will we have an opportunity

13 to make a record?

14                THE COURT:  Yes, yes.  I plan

15 to -- yeah.  What is it, four o'clock?

16                MR. RICHARDS:  Yes, sir.

17                THE COURT:  When he rests, we'll make a

18 record and --

19                MR. RICHARDS:  I've got a brief witness

20 and a long one, both standing by, so I think I'd like

21 to get the brief guy on and off because I'm paying him

22 to be here.

23                THE COURT:  I'm planning to quit earlier

24 today than usual.  So when you get through, I'll let

25 you make a record and we'll let the jury go and come

1    back in the morning.

2                    MR. RICHARDS:  Okay.  So I need to have

3    my witness come back tomorrow?

4                    THE COURT:  Yeah.

5                    MR. RICHARDS:  May I have Jason tell

6    him?

7                    THE COURT:  You may.

8                    MR. RICHARDS:  Judge, in light of as

9    much problems as this is becoming, if we could just

10   play it and maybe you could say to disregard the first

11   part of it.

12                   THE COURT:  Okay.  Let's go.  Give me

13   one of those.

14                   *(Bench conference concluded)*

15                   THE COURT:  Counsel, you may proceed.

16                   MR. DEMURO:  Thank you, Your Honor.  And

17   I appreciate the jurors' patience and the court's

18   patient on this.

19        Your Honor, at this time plaintiff will

20   present a statement made by the plaintiff in the

21   hospital on June 8, 2005.

22                   THE COURT:  You may proceed.

23                   MR. DEMURO:  That's marked as

24   Plaintiff's Exhibit 17.  Try it again.  There was no

25   audio.

1          MR. RICHARDS:  Could I make a

2     suggestion?  Maybe Mr. DeMuro could read it to the

3     jury and we could agree that that's what he's

4     saying.

5          MR. DEMURO:  That's fine, your Honor.

6          THE COURT:  Well, let me get both of you

7     up here and make sure we have an agreement before we

8     start reading.

9     *(Bench conference outside the hearing of the jury)*

10          THE COURT:  Okay.  So we get it right, I

11    think you ought to be able to tell the jury what this

12    is and he's in the hospital.

13          MR. RICHARDS:  That's fine.

14          THE COURT:  And the date.  And then

15    you're going to read what?

16          MR. DEMURO:  I'll just read it now so we

17    can avoid any problems.  I'll just read, "So I went

18    out there and he said, 'Help me.'  So I did."

19          THE COURT:  Okay.  That's it.

20          MR. DEMURO:  May I play the video

21    without the sound so they see that he was in the

22    bed.

23          THE COURT:  That's fine.  That's fine.

24          *(Bench conference concluded)*

25          THE COURT:  Members of the jury, we

1  haven't talked to the technicians but here's the

2  solution.

3         We're going to attempt to play the video so

4  it gives some demonstration of who the witness is.

5  You may have caught a glimpse of it earlier but we're

6  going to try it show that again.  Counsel is going to

7  read a very short statement which depicts what the

8  witness said.

9         I'LL give Mr. DeMuro a chance to speak on

10  behalf of his client.

11         MR. DEMURO:  Thank you, Your Honor.

12  Plaintiff will present a short statement that was made

13  by Mr. Therrien while he was in the hospital on June

14  8, 2005, to a news interviewer about the circumstances

15  of the stabbing.

16         Go ahead and play the video, Ms. Wilson.  No

17  sound.

18         The statement was, "So I went out there and

19  he said, 'Help me.'  So I did."

20         With that, Your Honor, the plaintiff rests.

21         THE COURT:  Okay.  Thank you.

22         Members of the jury, we're going to recess

23  for this evening.  I'll ask you to be back in the

24  morning at nine o'clock.

25         There are issues that the court needs to take

up outside the hearing of the jury that has to do with

this case.  So rather than have you wait in the jury

deliberation room, I thought it would be best if I

allowed you to go home early.  I've robbed you of 15

or 20 minutes so I'll give you back 45 now.  So we'll

see you in the morning at nine o'clock.  Remember my

admonition not to discuss this matter among yourselves

or allow anyone else to discuss it with you.

Everyone please remain seated as the jury

leaves the courtroom.

*(The jury exits the courtroom)*

THE COURT:  Let the record reflect the

jury has departed the courtroom.  The parties are

present with their clients.

Anything on behalf -- further -- as I

understand it, the plaintiff has rested.  Do you want

to check with the clerk to be sure you have all your

exhibits in that you think you have in before you

announce rest?  I know you've indicated that but you

may check with the clerk if you have any concerns.

I'm not suggesting you should but want to give you the

opportunity to be sure you have everything in that you

think you have.

MR. DEMURO:  I would like to do that,

Your Honor.  I would also like to make an additional

1    offer of proof before we formally rest.  I didn't want

2    to interrupt as much as I already had been

3    interrupting.

4                    THE COURT:  No.  You may.

5                    MR. DEMURO:  It's a written offer of

6    proof entitled, "Facts pertaining to the

7    apprehension."

8                    THE COURT:  You want to speak from that

9    podium.

10                    MR. DEMURO:  Yes, sir.

11                    THE COURT:  I'll hear you on your offer

12    of proof.

13                    MR. DEMURO:  This offer of proof is

14    called, "Facts pertaining to the apprehension."  It's

15    self-explanatory.  It includes a time line of some of

16    the facts that Your Honor excluded.  And I'd like to

17    offer it in its form -- in its written form right

18    now.

19                    THE COURT:  Counsel familiar with the

20    offer?

21                    MR. DEMURO:  Yes.

22                    MR. RICHARDS:  Can you get me a copy of

23    it at some point?

24                    MR. DEMURO:  Sure.  There's nothing in

25    there that hasn't been provided to Mr. Richards.

1    THE COURT:  Well, I accept your offer of

2    proof.

3    MR. DEMURO:  May I approach and hand it

4    to the bailiff?

5    THE COURT:  You may.

6    MR. DEMURO:  Your Honor, I have an

7    assistant from my law office in the gallery.  May she

8    approach the bench and hand me something?

9    THE COURT:  She may.

10    *(Discussion held off the record)*

11    THE COURT:  Mr. DeMuro, I think it's

12    plaintiff's exhibit, offer of proof, and there's a

13    time line, June -- is that part of it or is that a

14    separate offer?

15    MR. DEMURO:  Well, it was supposed to be

16    attached to it, but I can certainly mark it as a

17    separate offer of proof.

18    THE COURT:  No, that's fine.  It was not

19    attached and I wasn't sure if you wanted to make any

20    special mention.  We'll just attach it to the back of

21    your offer of proof.  Is that satisfactory?

22    MR. DEMURO:  That would be fine, Your

23    Honor.

24    THE COURT:  Anything further from the

25    plaintiff?

1       MR. DEMURO:  Nothing further, Your

2  Honor.  The plaintiff rests.

3       THE COURT:  Defense have anything?

4       MR. RICHARDS:  Yes, Your Honor.

5       Your Honor, comes now the party corporation

6  defendant at the conclusion of plaintiff's case and

7  pursuant to Rule 50 of the Federal Rules of Civil

8  Procedure moves for judgment as a matter of law.

9       The court's order in limine, document No. 91,

10  indicated that the issue in this case was -- or that

11  the danger to the plaintiff arose at the point that

12  the plaintiff joined the altercation between Stacie

13  Pavey and the suspected shoplifter and that it was at

14  that point that a duty arose on the part of Target to

15  act reasonably to prevent injury to plaintiff.

16       The evidence in this case has been that

17  Mr. Pavey contacted the shoplifter in an attempt to

18  apprehend him and that subsequent to that,

19  approximately four seconds later, Mr. Therrien first

20  entered this exit vestibule where the altercation was

21  occurring.

22       According to the testimony of Mr. Pavey,

23  Mr. Therrien ran into the vestibule, at which point he

24  was told to back off.  He nonetheless grabbed the

25  shoplifter's arm.  The shoplifter then immediately

1   pulled a knife and stabbed Mr. Pavey.  He then stabbed

2   Mr. Therrien, at which point Mr. Therrien and

3   Mr. Pavey both fell back upon being stabbed.  Upon

4   being released after the stabbings, the shoplifter

5   immediately ran through the exit and out of the

6   building and the matter was over in seconds.

7         According to Mr. Therrien, he walked into the

8   vestibule after he noticed or heard or was -- it was

9   brought to his attention that there was some type of a

10  scuffle going on where he heard a call for help.  He

11  positioned himself between Mr. Pavey and the

12  shoplifter and the exit from the store.  He observed

13  what was going on, at which point he claims that

14  Mr. Pavey asked him for help.

15        In response, Mr. Therrien testified that he

16  engaged the shoplifter by punching him in the eye,

17  kicking him in an attempt to kick his legs out from

18  under him, at which point Mr. Pavey was stabbed and

19  went down, that he then got him in a choke-hold with

20  his left arm and choked him until he believed he had

21  gone limp and thought he had blacked out, at which

22  point he released the shoplifter.

23        Although he was being stabbed as he held the

24  gentleman in a choke-hold -- the shoplifter in a

25  choke-hold, upon releasing him the shoplifter turned

**United States District Court**

1    and stabbed him one last time and said, "That will

2    teach you to get involved."

3         At which point, according to Mr. Therrien,

4    Mr. Pavey moved between the shoplifter and

5    Mr. Therrien in an effort to protect him and the

6    shoplifter ran out the exit door.

7         Your Honor, under either scenario, there is

8    no evidence presented in this case that, first of all,

9    Target had time or the opportunity to act in a manner

10   to protect the plaintiff.  This was an incident that

11   was over in a matter of seconds and the opportunity to

12   do something, to take some action, to protect

13   Mr. Therrien from the altercation that he decided to

14   enter into, simply did not exist.

15        But perhaps more importantly there's been a

16   complete absence of evidence from the plaintiff as to

17   what it was that Target failed to do, that it was

18   reasonably possible to do, in order to protect the

19   plaintiff after he entered into the altercation.

20        The plaintiff entered the fight, he became a

21   combatant, and Pavey was immediately stabbed and went

22   down.  The question is, how could Target reasonably

23   act to protect Mr. Therrien in the seconds that the

24   incident lasted?  There's simply been no evidence

25   whatsoever to suggest what Target failed to do.  There

1  must be more than mere speculation for the plaintiff

2  to establish a legally cognizable claim against Target

3  under the law of the state of Oklahoma.  And yet,

4  there is no evidence whatsoever upon which a

5  reasonable jury could find against Target on a legally

6  sufficient evidentiary basis.

7          Only as a product of the improper questioning

8  by counsel suggesting other bases upon which Target

9  should be liable, and testimony elicited on issues

10 which the court has excluded, could the jury possibly

11 find against Target.

12         But absent that, based upon the evidence of

13 what happened when Mr. Therrien entered that vestibule

14 and became a combatant in that altercation, based upon

15 that, there is simply no legally sufficient

16 evidentiary basis for an adverse verdict finding that

17 Target acted negligently in failing to protect

18 Mr. Therrien in the seconds that remained before the

19 altercation was over and the shoplifter ran out the

20 door.

21         So on that basis, Your Honor, under Rule 50

22 of the Federal Rules of Civil Procedure, Target moves

23 that the court enter a judgment as a matter of law in

24 this case and find for it.  Thank you.

25              THE COURT:  For the plaintiff.

1          MR. DEMURO:  Your Honor, as a procedural

2    point, I'd like to make a motion to reopen my case for

3    the purpose of asking the court to reconsider its

4    rulings on the motions in limine in light of the

5    evidence induced at trial and in light of Target's

6    counsel's repeated questioning of his own witnesses to

7    the effect that Target complied with its own policies

8    and procedures with respect to the entire apprehension

9    process, a statement that he also made in his opening,

10    and on that basis I'm asking the court to reconsider

11    its motions in limine.

12          THE COURT:  Overruled.

13          MR. DEMURO:  Now, with respect to the

14    motion for a judgment as a matter of law under Rule

15    50, as I'm sure this court is aware, it is a very,

16    very difficult burden to reach. *Marquez v. City of*

17    *Albuquerque* is an example of a Tenth Circuit case on

18    this point, 399 F.3d 1216.

19         In weighing a motion of this type, the court

20    may not weigh the evidence, it may not assess the

21    credibility of any witness, it must indulge all

22    reasonable inferences in favor of the nonmoving party,

23    and it can only grant a motion if there's a complete

24    absence of evidence that would permit a reasonable

25    jury to find for the plaintiff, a very, very high

1  burden indeed.

2         I am mindful of the court's order.

3  Repeatedly the court has advised me that the scope of

4  the duty in this case has been narrowed to a very fine

5  level, but within that parameter, Your Honor, here is

6  where we are.

7         We know from the evidence that Mr. Therrien

8  turned around when a small child said, "Mommy, there's

9  a fight."  We know that when he turned around and he

10 observed Mr. Pavey in a violent struggle, Mr. Pavey

11 was out of control of the situation.  All reasonable

12 inferences in Mr. Therrien's favor has to be

13 established is true for purposes of this motion.

14        We know that Mr. Therrien took some number of

15 seconds to come to the altercation itself and that

16 when he arrived at the altercation, Mr. Pavey was

17 still trying to wrestle the shoplifter and still had a

18 hold of the shoplifter.  And here is the critical

19 point with regard to Your Honor's order.

20        Mr. Pavey failed to let the shoplifter go at

21 the point in time that Mr. Therrien became involved.

22 Now, why is that significant?

23        Even under your very narrow order, Your

24 Honor, it's significant because every Target witness

25 xxxx xxxxxxxxx xxx xxxxxxxx xxxx xxxxx xxxxxx xx xxxx

xx xxx xxx xxx xx xxxxxxx xx x xxxxxxxxx, xxxx xxx

xxxx xxxxxxxx xx xx xxx xxx xxxxxxxxxx xx xxxxxxx x

xxxxxxx xxxxxxxxxx xx xxxx xxxxx xxx xx xxxxxxx xx

xxxxxxxxxx xxxx xx xxx xxxxxxxx.

The evidence has been overwhelming --

overwhelming and undisputed that shoplifter resists --

Target knows this -- that shoplifters carry knives --

Target knows this -- and that this particular

shoplifter was a sophisticated criminal.

The breach, even in the few seconds that Your

Honor has given me to work with, those few seconds,

what Mr. Pavey did wrong was, number one, he didn't

let him go when he knew that Mr. Therrien was coming

to the altercation and when Mr. Therrien was at the

altercation.  That's why I asked Mr. Pavey that

question twice, twice I asked him.  So when

Mr. Therrien was at the altercation, did you have a

hold of the shoplifter?  Yes.  You didn't let him go,

did you?  No.

That's a failure.  It breaches Target's

policies enough to go to the jury.  A reasonable juror

could easily conclude that if their policies

say -- could easily conclude that Mr. Pavey was not in

control of the situation.  The video proves that.

Even he admitted that it wasn't an ideal situation as

1  far as he was able to give me.

2          So a reasonable juror could conclude easily

3  that he was out of control of the situation, and

4  Target's policies demand when they're out of control

5  of the situation to let the shoplifter go and he

6  didn't do that.  Even if it wasn't two seconds or

7  three seconds, that's what he should have done.  He

8  didn't do it.  If he had let the shoplifter go,

9  neither one of them would have been stabbed.

10          That's the inference that I'm asking this

11  court to make in viewing all of the evidence in favor

12  of the plaintiff as it must in this standard --

13  underneath this standard.

14          Also, two other points.  Number one, we have

15  evidence that Mr. Therrien -- or Mr. Pavey wasn't even

16  certified to make apprehensions.  There's no record of

17  his certification.  His own supervisor has never seen

18  a record of the certification.  It's Target's policy

19  that they need to be certified in order to make

20  apprehensions.  That is a defect that persisted.  It

21  persisted before, during, and after Mr. Therrien got

22  involved, and a reasonable juror could consider that

23  as well when we get to breach and causation.

24          I know we've had a tussle on this third

25  point, which is they had inadequate people there.

1    They should have had somebody there -- somebody else

2    there.  They know --

3                    THE COURT:  What Tenth Circuit law do

4    you rely on to support that theory?

5                    MR. DEMURO:  Which theory, Your Honor?

6                    THE COURT:  The one you just spoke

7    about, that they had to have people there.

8                    MR. DEMURO:  Well, I don't know that

9    there's a Tenth Circuit case that talks about the

10   level of security.  But all the Tenth Circuit law that

11   I've looked at talks about the duty arising when the

12   imminent risk of criminal conduct is there and the

13   harm.  The undisputed testimony is the risk of harm in

14   this case, as they admit, occurs at the time that you

15   know that you're going to apprehend a shoplifter.

16   That's when the risk of harm occurs.

17            And what are those risks?  Those risks are he

18   could be carrying a knife, he could resist, it could

19   attract a customer, and a customer could get hurt.

20   And that's exactly what happened, exactly what

21   happened.

22            But I'm confident that the Oklahoma Supreme

23   Court under the *Taylor v. Henson* ruling, the Tenth

24   Circuit in this case --

25                    THE COURT:  Isn't it fair under these

1  facts that the imminent danger was not known until the

2  knife became an issue?

3        MR. DEMURO:  Well, that's -- I disagree

4  that.  The imminent danger was known the minute they

5  knew they were going to apprehend the shoplifter.  And

6  then the imminent danger was known when they

7  decided --

8        THE COURT:  Until a knife was evident,

9  which was in the midst of a struggle that would take

10  milliseconds, we're just talking about a scuffle.

11        MR. DEMURO:  Well, Your Honor, we're

12  talking about --

13        THE COURT:  When it became an imminent

14  danger is when there was a knife produced.  Isn't that

15  correct?

16        MR. DEMURO:  No.  That's not correct at

17  all, no.  There was an imminent danger by their own

18  testimony when they decided to stop, ambush from

19  behind, grab somebody leaving the store from behind

20  who was trying to fly and then he tried to get away.

21  That's when the imminent danger to the people around

22  them occurred.

23        The knife -- the pulling of the knife was a

24  manifestation of the risk that they created.  That

25  would be like saying that you could do that with

1  somebody, then he pulls out -- you could tackle

2  somebody in the entranceway -- let me back up.

3          What Your Honor's order is saying, and

4  ruling, I think, means, is that Target has no duty at

5  all to use reasonable care in the manner in which it

6  apprehends a shoplifter.  That's the affect of your

7  ruling, unless and until the shoplifter pulls a gun or

8  a knife and at that particular moment.

9          THE COURT:  The case law says imminent

10  danger.

11          MR. DEMURO:  And the imminent -- the

12  imminent danger is the danger of being involved in the

13  altercation if it goes bad.

14          THE COURT:  Okay.  You can go to the

15  next point.

16          MR. DEMURO:  And so there are -- there

17  are those -- and I don't mean to reargue.  I think

18  we're a little bit rearguing your motion in limine.

19          THE COURT:  No, that's not what I'm

20  doing.

21          MR. DEMURO:  But I think --

22          THE COURT:  I think, Counsel, you have

23  been trying to do that, but I've ruled and I think

24  it's real clear.

25          MR. DEMURO:  Well, what's real clear,

1    Your Honor?

2              THE COURT:  The motion in limine.  The

3    order that was issued as a result of the motion in

4    limine.

5              MR. DEMURO:  So those are the breaches

6    that they -- that we have established in the evidence.

7              There's the other point that the shoplifter

8    did not stab Mr. Therrien until Mr. Pavey told him to

9    let the shoplifter go.  And Mr. Therrien followed

10   Mr. Pavey's direction, let him go, and that's when he

11   turned around and was stabbed.  If Mr. Therrien were

12   permitted to continue the hold, he may have subdued

13   him and the injury may never have occurred.

14             Now, that's something you have to consider a

15   hundred percent in our favor.  So even in this

16   microsecond -- well, I think it's actually longer; I

17   think there's several seconds -- there's that fact as

18   well, that there's a breach of causation.  I mean,

19   that establishes the causation between their duty to

20   reasonable care and the injuries that Mr. Therrien

21   suffered.

22             Under your narrow view, Your Honor, they

23   should have let him go, and when he pulled the knife,

24   they should have let -- they should have not

25   instructed Mr. Therrien to let him go at that time in

```
 1   addition to all that I've said.
 2                THE COURT:  Counsel.
 3                MR. RICHARDS:  Your Honor, the essence
 4   of plaintiff's argument is that plaintiff breached --
 5   or Target breached a duty in not letting the
 6   shoplifter go and yet Target breached a duty in
 7   telling Mr. Therrien to let the shoplifter go.
 8                The evidence was that Mr. Therrien was being
 9   stabbed when he was holding the shoplifter.  There's
10   no dispute that this was something that happened in a
11   matter of seconds.  There's simply not a dispute.
12                What the problem is here is the question of,
13   you know, what was it that Target should have done but
14   did not do?  That's what's unanswered by the evidence.
15   The answer now seems to be, well, Target should have
16   simply let the shoplifter go.
17                And yet, Target had a legal privilege under
18   the Oklahoma shopkeeper statutes to detain this
19   individual.  There's no dispute that he was stealing
20   merchandise from Target.  There's no dispute that
21   Oklahoma law under Title 22 gives Target a privilege
22   to detain this man.
23                Mr. Therrien interjected himself into this
24   situation.  Releasing the shoplifter doesn't act to
25   protect Mr. Therrien, it simply releases the
```

1  shoplifter.  And once again, it was after the

2  shoplifter was released, according to the plaintiff,

3  that he was stabbed.  So that doesn't discharge a duty

4  to protect Mr. Therrien.

5  　　　　Your Honor, simply put, Rule 50 requires that

6  there be some evidence, some legally sufficient

7  evidence, upon which a reasonable jury can reach a

8  decision adverse to Target, and it simply is not here.

9  　　　　There's not been any evidence as to what

10  Target should have done but didn't do after

11  Mr. Therrien entered into this altercation in the few

12  seconds before it was over and, in fact, in the few

13  seconds -- in the less than few seconds from the point

14  that the knife was first brandished by the shoplifter

15  and Stacie Pavey was stabbed before this incident was

16  over.

17  　　　　In fact, once the knife was pulled, Mr. Pavey

18  was immediately stabbed.  Because the only evidence is

19  that the first time it was ever seen was as he was

20  being stabbed, causing him to fall back and remain on

21  the floor.  What could Mr. Pavey have done reasonably

22  under those circumstances?  There's simply no evidence

23  to suggest that he could have done anything.

24  　　　　For that reason, I think, again, to allow

25  this case to go forward when the essence of

1    plaintiff's case is not what Target failed to do in

2    those few seconds that this altercation involved

3    Mr. Therrien, but truly is all of the other things

4    that they're contending should have been done before

5    that, is to allow this jury to return a verdict

6    against Target potentially not on the basis of its

7    liability for this incident, but on the basis of a

8    claim that the court has said is not legally

9    cognizable and they're not entitled to try and yet

10   they have tried anyway.

11          So for that reason, we would ask the court to

12   enter judgment for Target at this time.  Thank you.

13              THE COURT:  I'll take your motion under

14   advisement until nine o'clock in the morning.

15          So you'll know everything, I have an eight

16   o'clock, supposedly 15-minute appointment with the

17   dentist.  As soon as I'm released, I'll be here.

18   Thank you.

19              *(The proceedings were recessed)*

20

21

22

23

24

25

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Eastern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 13th day of June 2008.

s/ Brian P. Neil
_____
Brian P. Neil, CSR-RPR, CRR, RMR
United States Court Reporter