```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF OKLAHOMA
 2

 3

     TIMOTHY S. THERRIEN,           )
 4                                  )
                  Plaintiff,        )
 5                                  )                    09:36
                                    )                    09:36
     vs.                            ) 06-CV-217-JHP-FHM
 6                                  )
     TARGET CORPORATION, a Minnesota )
 7   corporation,                   )
                                    )
 8                Defendant.        )

 9

10                                                      09:36

11   - - - - - - - - - - - - - - - - - - - - - - - - -

12

13          DEPOSITION OF J. PATRICK MURPHY, produced

14   as a witness on behalf of the Plaintiff in the above

15   styled and numbered cause, taken on the 7th day of    09:36

16   April, 2008, in the City of Tulsa, County of Tulsa,

17   State of Oklahoma, before me, Karla E. Barrow, a

18   Certified Shorthand Reporter, duly certified under

19   and by virtue of the laws of the State of Oklahoma.

20                                                      09:36

21

22

23

24

25
```



EXHIBIT
1

```
 1              A  P  P  E  A  R  A  N  C  E  S

 2

 3

 4

 5   FOR THE PLAINTIFF:        MR. PAUL DeMURO           09:36

 6                             Attorney at Law

 7                             124 East 4th Street

 8                             Tulsa, OK 74103

 9

10   FOR THE DEFENDANT:        MR. PHIL R. RICHARDS      09:36

11                             Attorney at Law

12                             525 South Main

13                             Suite 1200

14                             Tulsa, OK 74103

15                                                       09:36

16

17

18

19

20                                                       09:36

21

22

23

24

25                                                       09:36
```

1                          I  N  D  E  X

2

3     W I T N E S S                                P A G E

4

5     J. PATRICK MURPHY                                    09:36

6              Direct Examination by Mr. Richards      4

7     Reporter's Certificate                        215

8

9          .

10                                                        09:36

11

12

13

14

15

16

17

18

19          .

20

21

22

23

24

25

1    Q    So you were going to redo it, basically?

2    A    Yes.

3    Q    Do you remember what companies you've reviewed

4    loss prevention procedures and materials for?

5    A    For litigation?                                    10:15

6    Q    Any purpose.  Well, it's all litigation, but

7    that one case, right, that one retention?

8    A    Right.

9    Q    Do you remember what companies the various

10   ones were?                                              10:15

11   A    I have reviewed J.C. Penney's.  I have

12   reviewed Academy Stores.  I have reviewed Office

13   Max.  Big 5 Sporting Goods is a current case that

14   I've just received some documents for.  I believe

15   that's it.                                              10:16

16   Q    All right.  Now, which was the one on which

17   you were consulting rather than being involved in

18   litigation?

19   A    Giant stores; I believe it is called Giant &

20   Eagle Grocery store chain up in the Maryland area.      10:16

21   Q    So all of the others would then be litigation

22   related?

23   A    Yes, sir.

24   Q    And in any of these matters that were involved

25   in litigation, J.C. Penney, Academy, Office Max or      10:16

1    Q    Oh, okay, so you're just now looking at it?

2    A    Yes, sir.

3    Q    With these five other companies, and are any

4    of these companies, in terms of their business, of

5    the magnitude that Target is?                          10:20

6    A    J.C. Penney's certainly is.  The rest of them

7    are not.

8    Q    Do the procedures, the loss prevention

9    procedures that you reviewed for these five

10   companies, are they similar to what you saw of        10:20

11   Target's in 2005 or are there marked differences in

12   them?  Does it seem like these companies all sort of

13   have the same basic set of procedures or are they

14   just wildly different?

15   A    There are some accepted best practices that      10:20

16   are in place across retail in general.  It would be

17   difficult for me to characterize their full loss

18   prevention policies and procedures in total across

19   the board, but in the sense that they cover

20   generally the same types of scenario and material,    10:21

21   yes.

22   Q    In terms of, say, the detention of a suspected

23   shoplifter, what are some of the best practices

24   across retail?

25   A    The first tier, I would call it, of practices    10:21

| | |
|---|---|
| 1 | accounting variances within the industry, but the |
| 2 | major components would be employee theft and |
| 3 | shoplifting. |
| 4 | Q    Do you have any information on whether the |
| 5 | amount of merchandise lost by Target to shoplifters,    10:58 |
| 6 | to external theft, is greater or lesser or about the |
| 7 | same as the industry average by percentage? |
| 8 | A    I have no idea. |
| 9 | Q    Okay.  Do you have any information or any |
| 10 | measure as to the effectiveness of their loss    10:58 |
| 11 | prevention program? |
| 12 | A    Would you repeat the question for me? |
| 13 | Q    Sure.  Do you have any information as to how |
| 14 | effective Target's loss prevention program is in |
| 15 | relation to other retailers in the industry?    10:59 |
| 16 | A    No, sir. |
| 17 | Q    Do you have any information as to how Target's |
| 18 | loss prevention program, in terms of processes and |
| 19 | procedures, compares to that, say, of Wal-Mart? |
| 20 | A    No, sir.    10:59 |
| 21 | Q    Or Kmart? |
| 22 | A    No, sir. |
| 23 | Q    Do you know what Sears' practices and |
| 24 | procedures are currently? |
| 25 | A    No, sir.    10:59 |

```
 1    Q      All right.  And how many attempted detentions
 2    were there among the CIRS reports that you reviewed?
 3    A      If you don't mind?
 4    Q      You bet.
 5    A      Also, just to make note, as I looked this        03:37
 6    over, we don't have all the CIRS reports, so
 7    anything I will tell you as far as compilation would
 8    be at this point inaccurate.
 9    Q      Now, when you say you don't have all the CIRS
10    reports, what do you mean?                             03:38
11    A      Well, we're looking for, based on Stacie
12    Pavey's 2005 appraisal, his evaluation, it says that
13    he had 32 apprehensions for 2005.  We don't -- I
14    don't have all of those reports.  I have some
15    reports from 2005, but we're missing some.            03:38
16    Q      All right.  Now, I think you told me all of
17    the reports you have are unredacted, correct, they
18    don't have any blacked out lines?
19    A      That's correct.
20    Q      Now, of the information you've looked at, have  03:38
21    you analyzed any detentions other than those
22    attempted by Mr. Pavey?
23    A      Yes.
24    Q      Okay.  And have you, as far as you know,
25    analyzed all of the detentions that occurred in the   03:38
```

1     time period that you looked at?

2     A     I guess the better way to say it is I have

3     reviewed the documents that I do have, and those are

4     inclusive of any loss prevention personnel, to the

5     best of my knowledge, that worked at that store.          03:39

6     Q     And what time period did that concern?

7     A     I have shoplifting reports dating back to

8     March 11, 2003.

9     Q     And how late do they go?

10    A     August 4th, 2006.                                     03:39

11    Q     And as far as you know, those are all of the

12    reports, incident reports or CIRS reports concerning

13    shoplifting during that period?

14    A     I just want to make sure I answer the question

15    properly.  It goes back, again, to the documents         03:39

16    that I have in my possession that that is what is

17    captured here on this compilation.

18    Q     Okay.  Let me clarify that.  You told me that

19    you believe there may be some other reports from

20    2005 that you've not been provided with regarding        03:40

21    Pavey's shoplifting detentions; correct?

22    A     Right.

23    Q     Excepting those, is it your understanding that

24    the list of documents that you've analyzed in the

25    Target CIRS reports with Tulsa PD calls for service      03:40

```
 1      spreadsheet constitutes all of the detentions at
 2      Target during that time period?
 3      A     When I did the report, I thought that was the
 4      case.  I'm not sure at this point in time that I
 5      have all the reports involving shoplifter            03:40
 6      apprehensions or attempts at apprehensions for the
 7      time period I have here, so I just don't know that I
 8      have all of those yet.
 9      Q     Of the reports that you have looked at, and
10      were those reports provided to you?                   03:41
11      A     Yes.
12      Q     You didn't select the reports to look at;
13      correct?
14      A     That's correct.
15      Q     All right.  Of the reports that you've looked   03:41
16      at, have you been able to determine the incidents of
17      violent response to an attempted apprehension of
18      shoplifters?
19      A     Yes, sir, I do not have that specific breakout
20      here; however, if you wanted me to, it would just be  03:41
21      a quick count to tell you which ones involve
22      resisting versus not.
23      Q     Well, is that of significance to you in your
24      opinions?
25      A     Yes, it is.                                      03:41
```

```
 1              MR. DeMURO:  Can we go off the record?
 2              MR. RICHARDS:   Sure.
 3              (Whereupon, a discussion was held off the
 4     record.)
 5     Q     (By Mr. Richards)  Have you figured the      03:45
 6     incidents of resistance in detentions versus the
 7     total number?
 8     A     Yes, sir.  What I have is based on the CIRS
 9     reports that I have in my possession, which is 69
10     shoplifting apprehension reports.                  03:45
11     Q     And that's for the entire period you
12     mentioned?
13     A     Yes, sir.
14     Q     Okay.
15     A     Out of that 69, 25 resisted the apprehension, 03:45
16     and within that number, I want to say about five
17     were simply handcuffed because these store personnel
18     felt it was appropriate.
19     Q     Five of the 25?
20     A     Five of the 25.                              03:46
21     Q     And what did you consider to be resistance?
22     A     That would be what they wrote in their
23     narrative.
24     Q     All right.  From looking at the narratives,
25     did that include, for instance, attempts to flee?  03:46
```

J. PATRICK MURPHY, 4-7-08

1    A    Yes.

2    Q    So not necessarily an altercation, but someone

3    who is simply trying to get out the door?

4    A    I'm not sure I could differentiate between the

5    two.   The sole purpose for them to fight with the        03:46

6    loss prevention person is to flee.

7    Q    Well, were there -- I guess eliminating the

8    five that were handcuffed just as a prophylactic

9    measure, would the remaining 20 who resisted, did

10   all of those actually result in an altercation         03:47

11   instead as opposed to simply the application of some

12   force to restrain them?

13        MR. DeMURO:   Object to the form of the

14   question.

15   A    You know, I didn't get that deep into the         03:47

16   narratives to try to understand any kind of

17   differentiation between the two.

18   Q    (By Mr. Richards)   Now, in looking at that, I

19   take it you're not able to say whether that degree

20   of physical resistance would have been any different   03:47

21   in any other store in that area; is that true?

22   A    That is true.

23   Q    Do you have any opinions as to whether that is

24   -- and of the 69 apprehensions, and that's over

25   about a four year period; is that right?               03:47

J. PATRICK MURPHY, 4-7-08

1   A     Probably 2003, and this actually goes through

2   August 5th of 2007.

3   Q     Okay.

4         MR. DeMURO:  What's the starting date?

5   A     March '03.                                      03:48

6   Q     (By Mr. Richards)  So about three-and-a-half

7   years?

8   A     Yes.

9   Q     So in that, let's call it 40 months just to

10  make it easy, in that 40 month period, did that seem   03:48

11  like a high number of apprehensions?

12  A     That's why I'm not comfortable with the

13  numbers I have here because I -- that would be a

14  fairly low apprehension rate for a large Target

15  store and --                                           03:48

16  Q     What would be your expectation of the norm, if

17  you have one?

18  A     Not knowing their sales volume and that sort

19  of thing, I couldn't even make a guess.

20  Q     Do you have any understanding of the number of   03:49

21  customers that come through that store in the course

22  of a year, say?

23  A     No, sir.

24  Q     Do you have any perception as to whether the

25  percentage of individuals who resist, as we've         03:49

J. PATRICK MURPHY, 4-7-08

155

```
 1    have to look at the circumstance of the detention to

 2    say whether or not resistance was something that

 3    would appear surprising or inappropriate?

 4    A    I would look at the percent, and just based on

 5    experience and knowledge of what I would consider a      03:52

 6    typical large A store retailer, whether that would

 7    be high or not.

 8    Q    And in your opinion, for a large, did you say

 9    A store?

10    A    A store.                                            03:52

11    Q    What is that?

12    A    That's a CIRS term for a high volume mall type

13    of department store.

14    Q    And would this store fall within that

15    category?  It's not in the mall, but --                  03:53

16    A    I don't know what their sales volume is so I

17    don't know.

18    Q    For a store of this type, if you can say, and

19    if you can't, that's fine, what percentage would you

20    expect to see?                                           03:53

21    A    I have no way of gauging that.

22    Q    All right.  So would it also be true that were

23    you to look at or be able to look at data that you

24    felt was accurate, you wouldn't be able to say

25    whether it appeared out of line or not?                  03:53
```

**J. PATRICK MURPHY, 4-7-08**

156

```
 1   A      Well, what I would go back to is my own
 2   personal experience as to the number of people who
 3   resisted apprehension and do some sort of
 4   comparative analysis as to what I recall that that
 5   number was back when I was making those              03:54
 6   apprehensions myself versus this store.  You know,
 7   there's no finite comparison here.  I'd have to look
 8   at the data, the specifics of the shoplifting
 9   apprehensions, see what was involved in it, but the
10   ultimate number would be a simple percentage.        03:54
11   Q      But the basis of comparison for your opinion
12   would be your experience over 10 years in Sears
13   stores in the Houston area; correct?
14   A      Yes.
15   Q      And there's no other data you have at hand     03:54
16   that you could compare information from this store
17   to, is there?
18   A      There is not.
19   Q      All right.  Now, do you know that those would
20   be comparable comparisons?                           03:55
21   A      No.
22   Q      All right.  Have you formed any opinion as to
23   whether the demographics of this store or the
24   neighborhood in which it's located are indicative of
25   a high crime area, a low crime area, medium crime    03:55
```

1    area, in terms of the volume of people that come

2    through the store and its parking lot?

3    A    I did not do any studies of demographics.

4    Q    I guess that gets back to the foreseeability

5    issue that you said really wasn't a part of your          03:55

6    opinions in this case?

7         MR. DeMURO:  Object to the form of the

8    question, it misstates.

9    A    Let me make sure I answer the question

10   properly.  The foreseeability aspect of this is          03:56

11   based on the incidents of the store specifically,

12   not in another form of foreseeability based on

13   demographics or crime rate.

14   Q    (By Mr. Richards)  All right.  As you use the

15   term foreseeability, what is it that in your opinion      03:56

16   was foreseeable as regards this incident?

17   A    That there is a greater chance that

18   shoplifters are going to resist and/or attempt to

19   flee, so we use those terms interchangeably, than

20   there is that they are compliant.                         03:56

21   Q    In your opinion, was it foreseeable that in

22   this incident, the suspect would pull a knife and

23   stab people?

24   A    Through the incident reports and through the

25   productive merchandise recoveries which occur when        03:57

**J. PATRICK MURPHY, 4-7-08**

```
 1    the asset protection staff feels like there is

 2    danger because they observe a cutting instrument,

 3    usually it's a knife of some sort, this store had a

 4    history of knives being involved in shoplifting

 5    incidents.  Those incidents were not -- for the most    03:57

 6    part were handled by the Tulsa Police Department

 7    based on a phone call from the store.  I did read on

 8    two occasions on the reports that I had that the

 9    asset protection staff handled them on their own

10    without police assistance.                             03:57

11    Q     And without incident to the personnel;

12    correct?

13    A     I'm sorry?

14    Q     And without incident to the personnel?

15    A     Correct.                                         03:58

16    Q     Now, when you say knives being used in

17    shoplifting, you're talking about knives being used

18    to cut open packages and things of that nature?

19    A     Yes.

20    Q     There was never a prior incident of someone     03:58

21    threatening anyone with a knife in this Target

22    store, was there?

23    A     There was, but I would have to check the date

24    to see when that occurred.

25    Q     And that was not a shoplifting incident, was    03:58
```

```
 1    it?  Wasn't that an occasion of a domestic dispute?
 2    A     Well, I believe it was a store detective named
 3    Jess who had a knife pulled on him.
 4    Q     You may be correct.  I may be misremembering
 5    the situation.  All right.  So prior to this          03:58
 6    incident, there was one occasion where a knife may
 7    have been brandished?
 8    A     I believe that's correct.
 9    Q     And no injuries from that incident?
10    A     Correct.                                         03:59
11    Q     What happened in that incident?  Did the asset
12    protection person back off?
13    A     Yes.
14    Q     And let the suspect go?
15    A     Correct.                                         03:59
16    Q     Based upon that, is it your testimony that it
17    was foreseeable in this incident that either Mr.
18    Pavey or Mr. Therrien or both would be stabbed?
19    A     It's my opinion that based on the history of
20    the knives and the resisting arrest, that the         03:59
21    incident itself, A, that there was resisting that
22    took place within the context of the apprehension,
23    and B, that there was a knife involved, that those
24    two facets were foreseeable, and based on that
25    foreseeability, they didn't have enough staff on      04:00
```

 1   duty to mitigate that possibility.

 2   Q      But the knife was not displayed until the

 3   detention was in progress; correct?

 4   A      Right.

 5   Q      So that wouldn't indicate foreseeability that     04:00

 6   there would be a stabbing; correct?  In other words,

 7   it wasn't like they saw somebody walking through the

 8   store holding up a knife threatening people and then

 9   perceived there would be a stabbing?

10   A      I don't think foreseeability is as strict as      04:00

11   you're trying to characterize it, if I'm

12   understanding what you're saying.  The

13   foreseeability aspects are both the

14   resisting/fleeing aspects, and the fact that there

15   were numerous incidents involving knives or other      04:01

16   cutting instruments being used to open packages.  I

17   can't possibly say that anybody foresaw that if a

18   customer got involved in this type of altercation on

19   this type of day with these circumstances, this

20   would happen, that's just not in the realm of         04:01

21   possibility.

22   Q      And it's also true, isn't it, that in this

23   incident, the suspect was never observed opening the

24   packages of the items he ultimately stole using a

25   knife; in other words, the knife was never seen in     04:01

1   his possession before he pulled it out and stabbed

2   Stacie Pavey and Mr. Therrien?

3   A       Correct.

4   Q       So there was no indicator to the asset

5   protection personnel that this particular individual    04:01

6   had a knife; is that correct?

7           MR. DeMURO:  Object to the form.

8   A       That is correct.

9   Q       (By Mr. Richards)  All right.  And is it

10  equally fair to say that there would be no more          04:02

11  reason to believe that this suspect would pull out a

12  knife and stab someone than there would be that any

13  other suspect being stopped for shoplifting would

14  pull out a knife and stab someone?

15          :   MR. DeMURO:  Object to the form.            04:02

16  A       The approach that should be taken is that

17  there's a high possibility that everybody who is

18  shoplifting has access to some sort of weapon, be it

19  keys or knives or whatever.  So I'm not sure I can

20  answer that question properly for you.                   04:02

21  Q       (By Mr. Richards)  All right.  Let me see if I

22  can get us to agree on this.  Would you agree that

23  as Mr. Pavey was approaching to make this detention,

24  that it was not predictable that this individual

25  would stab anyone?                                       04:03

```
 1              MR. DeMURO:   Object to the form of the
 2    question.
 3    A      Based on the numbers that we have, I think it
 4    was more likely to be predictable than it was not.
 5    Q      (By Mr. Richards)  So it was more probable      04:03
 6    that Mr. Pavey would be stabbed in making this
 7    apprehension than that he would not be stabbed?
 8    A      Yes.
 9    Q      And that's because of the history of knives
10    being used to open packages in shoplifting incidents   04:03
11    at this store?
12    A      And the prior instance where there was a knife
13    brandished on a shoplifting incident.
14    Q      With Jess?
15    A      Yes.                                             04:03
16    Q      And are there any other factors that lead you
17    to that opinion that it was more probable than not
18    that he would be stabbed than most?
19    A      Not at this time.
20    Q      Is that really what this first opinion goes to   04:04
21    is that the significant experience in apprehension
22    of shoplifters and specific knowledge of prior
23    occasions or injuries that occurred should have led
24    Target to recognize that this was a foreseeable
25    circumstance?                                           04:04
```

```
 1    Q     Are there any opinions that you intend to
 2    offer at the time of trial that we haven't talked
 3    about?
 4    A     Not at this time.
 5    Q     Are there any bases for the opinions that      05:22
 6    we've talked about or that you intend to offer at
 7    trial that we haven't discussed?
 8    A     Not at this time.
 9    Q     Can you think of anything that I haven't asked
10    you that if you were in my seat you'd ask?          05:22
11              MR. DeMURO:  Object to the form of the
12    question, inappropriate, compound.
13    A     I think we've discussed everything at this
14    point in time.
15              MR. RICHARDS:  All right.  That being the  05:22
16    case, I'll pass the witness.
17              MR. DeMURO:  No questions.
18              (Whereupon, a discussion was held off the
19    record.)
20              MR. DeMURO:  We'll waive.                  05:23
21              (Whereupon, the witness waived signature
22    and the deposition was concluded at 5:23 p.m.)
23
24
25                                                         05:23
```

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF OKLAHOMA     )

                            )  ss.

 4     COUNTY OF TULSA       )

 5            I, Karla E. Barrow, Certified Shorthand      05:23

 6     Reporter within and for Tulsa County, State of

 7     Oklahoma, do hereby certify that the above named

 8     witness was by me first duly sworn to testify to the

 9     truth, the whole truth and nothing but the truth in

10     the case aforesaid, and that I reported in          05:23

11     stenograph his deposition; that my stenograph notes

12     were thereafter transcribed and reduced to

13     typewritten form under my supervision, as the same

14     appears herein.

15            I further certify that the foregoing 214     05:23

16     pages contain a full, true and correct transcript of

17     the deposition taken at such time and place.

18            I further certify that I am not attorney

19     for or relative to either of said parties, or

20     otherwise interested in the event of said action.    05:23

21            WITNESS MY HAND this        day of April,

22     2008.

23

24                    KARLA E. BARROW, CSR
                      CSR No. 00113

25
```